UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------------

ANGEL L. MARTINEZ,

                          Plaintiff,

vs.                                            04-cv-440

SCOTT THOMPSON, LARRY SISCO,
SCOTT MEYERS, THOMAS NOVAK,
R. LABRAGUE, MICHAEL DUVALL,
DONNA TEMPLE, DONALD LANE,
DONALD SELSKY, R. SIPLEY, and
Corrections Officer PILMORE,

                          Defendants.
----------------------------------------------------------

MINUTES OF JURY TRIAL
held on September 8, 2008,
at the United States District Courthouse,
100 South Clinton Street, Syracuse, New York,
the HONORABLE DAVID E. PEEBLES, Presiding.

A P P E A R A N C E S

FOR THE PLAINTIFF
SIVIN, MILLER LAW FIRM
Attorneys at Law
170 Broadway
Suite 600
New York, New York 10038
BY:GLENN D. MILLER, ESQ.
EDWARD SIVIN, ESQ.

FOR THE DEFENDANTS
OFFICE OF THE ATTORNEY GENERAL
615 Erie Boulevard West
Suite 102
Syracuse, New York 13204
BY:  TIMOTHY P. MULVEY, AAG

*Eileen McDonough, RPR, CRR*
*Official U.S. Court Reporter*
*100 S. Clinton Street*
*Syracuse, NY 13261*
*(315)234-8546*

1                    (Court convenes at 10:10.)

2                    THE CLERK:  Angel L. Martinez versus Scott

3    Thompson, et al.; 04-CV-440.  Note your appearances for the

4    record.

5                    MR. MILLER:  For the plaintiff, Glenn Miller

6    from the law firm of Sivin and Miller, LLP, 170 Broadway,

7    New York, New York, 10038.

8                    MR. SIVIN:  For the plaintiff, Edward Sivin

9    from Sivin and Miller.

10                    MR. MULVEY:  For the defendants, Timothy

11    Mulvey, Assistant Attorney General, Syracuse Regional Office.

12                    THE COURT:  Good morning, Mr. Mulvey.  You

13    look lonely at that table.

14                    MR. MULVEY:  Good morning, Your Honor.  Maybe

15    we could just start with a point of clarification.  I meant

16    to raise it in chambers but now is the obvious time.  I'm

17    assuming the Court is going to limit representation to one of

18    counsel, that there is not co-counsel authorized for this

19    proceeding.

20                    MR. MILLER:  That's not a problem.  We do have

21    a division of labor but you'll see rather quickly that it's

22    very defined, so we will not be tag-teaming at any time.

23                    THE COURT:  Any problem with that, Mr. Mulvey?

24    In other words, if a particular attorney is questioning a

25    witness, then that attorney should be making the objections

3

1   with respect to your questioning of that witness.

2                  MR. MULVEY:  Yes.  As long as the Court

3   doesn't have the tag team where I'm two on one, that would be

4   fine.  Thank you, Your Honor.  I won't feel as lonely then.

5   Thank you.

6                  THE COURT:  I think you're up to the task of

7   taking on two attorneys.  All right.

8                  Counsel, we've discussed a number of matters

9   in chambers.  Let me first confirm that the parties have

10  consented to my jurisdiction as the United States

11  Magistrate-Judge to handle this trial.

12                 MR. MILLER:  Yes.

13                 MR. MULVEY:  Yes, Your Honor, so stipulated.

14                 THE COURT:  We also discussed in chambers

15  certain evidentiary issues.  I have a pending motion in

16  limine brought by the plaintiff and I will hear you briefly.

17  I understand -- I'm sorry, brought by the defendant.  I

18  understand your position, Mr. Mulvey.  Perhaps you could

19  elaborate for the record as to what the basis of your motion

20  is.

21                 MR. MULVEY:  Simply put, Your Honor, we are

22  requesting that the Court limit any testimony specifically by

23  the plaintiff to his accusations in the remaining causes of

24  action that are before the Court against the named

25  defendants, and that the Court do not allow him to present to

1   the jury information concerning alleged violations of his

2   rights or bad acts made by others at Oneida Correctional

3   Facility who have not been identified and named in this

4   action.  And on behalf of the defense it's our position that

5   that would be extremely prejudicial and in the nature of

6   seeking to find these defendants guilty by association for

7   acts of others who are not included.  And therefore, we would

8   ask the Court grant the motion and give an instruction to the

9   plaintiff and limit his testimony accordingly.

10              THE COURT:  Who would like to respond?

11              MR. SIVIN:  I would, Your Honor.  Initially I

12   would rely on our written submission to Your Honor dated

13   August 25th, 2008 regarding that issue, that evidence of

14   actions that were taken against the plaintiff by certain

15   corrections officers who may not have been named as

16   defendants are still relevant with respect to plaintiff's

17   overall retaliation claim.

18              But additionally to that, one of plaintiff's

19   claims is that defendants Duvall and LaBrague filed a

20   misbehavior report against plaintiff falsely accusing him of

21   assaulting them in the SHU on March 5th, 2003.  Plaintiff

22   intends to testify that by March 5th, 2003, which is the date

23   that he is accused of making this unprovoked attack on

24   corrections officers, he knew that assaulting a corrections

25   officer in the SHU would be nearly tantamount to suicide

1   because he had already been brutally beaten by other

2   corrections officers in the SHU without any provocation.

3              So, evidence of what plaintiff had been

4   through by other corrections officers, regardless of whether

5   they had been named as a defendant, certainly is relevant to

6   the defendant's claim that on March 5th, 2003, plaintiff

7   while in the SHU attacked these corrections officers without

8   provocation.

9              Additionally, to the extent that the

10  defendants are claiming that plaintiff to establish a

11  violation of his constitutional rights needs to demonstrate

12  that the time that he spent in the SHU was atypical or worse

13  than normal time spent in the SHU.  Evidence of unprovoked

14  beatings that plaintiff endured in the SHU clearly is

15  relevant, regardless of whether those beatings were at the

16  hands of named defendants or corrections officers who are not

17  named defendants.

18             Finally, as I indicated in my letter of

19  August 25th, it's relevant to plaintiff's claim for damages,

20  anything he endured while in the SHU.

21             THE COURT:  Well, I have a concern and I've

22  considered carefully the assertions that you've raised in

23  your letter.  This issue certainly did not come as a surprise

24  to the Court because we dealt with it at least tangentially

25  when we were dealing with the discovery issue relative to the

1   photographs, but essentially this implicates Rule 403 of the

2   Federal Rules of Evidence.  I have to make a determination of

3   whether the evidence, though as you allege is potentially

4   relevant to certain of plaintiff's claims including damages,

5   it nonetheless is unduly prejudicial and essentially opens up

6   the trial beyond the bounds that we had contemplated.

7            If I permit -- and I note that there are no

8   claims of conspiracy in plaintiff's complaint which might

9   alter my thinking, but if I permit that type of testimony

10  regarding the actions of other corrections workers besides

11  those named in plaintiff's complaint who are not here and who

12  are not anticipated to testify, I am essentially opening up

13  new issues and giving rise to a trial within a trial, and I

14  just don't think that's a prudent exercise in my discretion.

15  So I'm going to grant defendants' motion in limine under Rule

16  403 of the Federal Rules of Evidence.

17           There was also one additional matter discussed

18  in chambers.  It is my understanding, Mr. Sivin, that the

19  plaintiff intends to dismiss his claims as against defendant

20  Pilmore, is that correct?

21           MR. SIVIN:  That's correct, Your Honor.

22           THE COURT:  Is there any objection on the part

23  of the defendant?

24           MR. MULVEY:  There is none, Your Honor.  Thank

25  you.

7

1          THE COURT:  All right.  Then based upon the

2     agreement of parties, I will order that all claims against

3     defendant Pilmore in this case be dismissed with prejudice.

4          Is there anything further?  I know,

5     Mr. Mulvey, you raised a couple of concerns in chambers.

6     Would you like to place anything on the record at this time?

7          MR. MULVEY:  I just would like to make one

8     observation or submission to the Court, and that is that the

9     plaintiff is proceeding at his election without a translator,

10    that in prior proceedings leading up to this trial there has

11    been from time to time an issue concerning the plaintiff's

12    fluency, and on behalf of the defense I submit to the Court

13    that we will strenuously object to any suggestion in front of

14    the jury that the plaintiff's having a problem understanding,

15    not the substance of a question, but that there is a language

16    barrier that prevents him from understanding or appreciating

17    the proceedings.  Counsel assures me that that's not going to

18    be an issue.  I accept their word on that.  I just thought it

19    was appropriate for me to make the Court aware of it, so that

20    if that issues arises, that everyone is on notice.

21         MR. MILLER:  The only thing I say in response

22    to that is I agree with Mr. Mulvey that in my professional

23    opinion Mr. Martinez is capable of proceeding with this trial

24    without the use of an interpreter.  In fact, not even close.

25    However, English is his second language, and I would say that

8

1   there is always the chance with anybody, whether it be

2   Mr. Martinez or anyone else who has a -- whose second

3   language is English might not understand a word, and I think

4   it would be incumbent upon either myself or other counsel to

5   clarify it if he expresses some confusion with a particular

6   word.  That in no way rises to the level that concerns

7   Mr. Mulvey.  There will never be an issue in this case that

8   will in any way prejudice the defendants with regard to

9   Mr. Martinez's language; however, I do reserve my right to

10  clarify if he doesn't understand a particular word that's

11  used.

12              THE COURT:  All right.  I think that's fair.

13  I think that if Mr. Martinez does not genuinely understand

14  something that's being asked, I think it's fair to indicate

15  that, but if I get the sense that he has overstated his

16  inability or fabricated in an effort to convince the jury of

17  his limitations regarding the English language, then I might

18  side with the defendant and consider appropriate action,

19  including perhaps a mistrial.  So, as long as we all have

20  that issue on our radar screen, I think we've done everything

21  we can do at this point.

22              MR. MULVEY:  And, finally, Your Honor, I would

23  request that any non-party witnesses be excused from the

24  courtroom after the jury is chosen until they're called to

25  testify.

1          THE COURT:  And that request is granted.  We

2     will sequester any non-party witnesses until after their

3     testimony has been received.

4          MR. MILLER:  I believe the agreement was after

5     opening statements.

6          THE COURT:  Yes.

7          MR. MULVEY:  That's fine, Your Honor.

8          THE COURT:  Yes.

9          MR. SIVIN:  One additional thing.  I think I

10    can accommodate the Court's concern about Rule 403 with

11    respect to the testimony about what plaintiff went through in

12    the SHU.  I'm sure the Court did not intend to exclude all

13    evidence of damages resulting from plaintiff's being confined

14    to the SHU, so perhaps plaintiff can just describe what

15    happened in the SHU but not name any of these officers, not

16    identify them.  I mean, that would seem to be a fair

17    accommodation of both concerns.

18          THE COURT:  Mr. Mulvey?

19          MR. MULVEY:  Your Honor, I maintain

20    defendants' position that to the extent that the defendant

21    wants to testify about violations of his constitutional

22    rights --

23          MR. SIVIN:  Plaintiff.

24          MR. MULVEY:  Excuse me, the plaintiff.  That

25    he needs to identify which defendant, the individual

1    defendant and the acts that he is complaining of.  To allow

2    him to testify that unknown or unnamed parties committed acts

3    that violated his rights at this juncture would be highly

4    prejudicial, and I don't believe even for the purpose of

5    damages, because that's just a backdoor way of doing the same

6    thing, of raising a claim, that he shouldn't be allowed to do

7    so.

8                 MR. SIVIN:  Your Honor, if plaintiff were

9    beaten every day in the SHU by other inmates, for instance,

10   or underwent other indignities, he certainly would be

11   entitled to testify to that.  The fact that some of the

12   beatings took place by corrections officers should not

13   prevent him from bringing on his damages.

14                Also I would remind the Court that the only

15   reason plaintiff did not name these other corrections

16   officers as defendants is because he didn't have an

17   opportunity to do so.  He was litigating this case pro se for

18   years and made several attempts, several motions to identify

19   these corrections officers.  It was only until June 11, 2008

20   after Your Honor finally ordered that the defendant turn over

21   copies of these photographs that he said, yep, those are the

22   guys.  So, any inability for plaintiff to identify them is

23   not his own fault.

24                THE COURT:  Well, this is certainly a complex

25   issue because it does implicate damages.  It also implicates

1     whether or not he was deprived of a liberty interest that is

2     cognizable under the Fourteenth Amendment.  The jury is going

3     to be asked to determine whether he suffered a significant

4     and atypical departure from the conditions of ordinary prison

5     life in the SHU.  But that contemplates in my mind what is

6     prison life like for an SHU inmate as opposed to someone in

7     general population.

8              I doubt very much that inmates in SHU on a

9     regular basis are subjected to beatings by other inmates or

10    corrections workers.  The fact that the plaintiff in this

11    case may have been subjected to a beating in SHU is not a

12    function of what it's like to be in SHU under ordinary

13    conditions, it's a function of some corrections officer

14    allegedly committed a constitutional violation.  That

15    corrections officer is not before this Court.  I think it

16    would be unduly prejudicial to permit that type of testimony.

17             So, I will permit him to testify as to what

18    it's like in SHU confinement 23 hours a day confined to your

19    cell, two showers per week, that sort of thing, one hour of

20    recreation a day, but I will not permit him to testify

21    concerning acts that are independent of SHU ordinary

22    conditions committed by defendants -- I'm sorry, corrections

23    workers who are not defendants in this case.  I think that

24    that is unduly prejudicial.

25             Anything further?

1          MR. MULVEY:  Nothing from the defendants.

2          MR. SIVIN:  If I may, one additional point on

3    that.  I believe the test is not whether SHU confinement is

4    different from ordinary prison confinement, but the test is

5    whether plaintiff's SHU confinement was different from

6    ordinary SHU confinement.

7              So, to that extent, merely testifying that he

8    was confined to a cell for 23 hours a day and went through

9    everything else that every other SHU inmate goes through may

10   not rise to a constitutional violation.  It is for that

11   reason that evidence of things that he went through that

12   ordinary SHU inmates do not go through, some of whom are

13   there voluntarily for protective custody, that that is not

14   only relevant but it may even be necessary to prove

15   plaintiff's cause of action.  That's my final point on that.

16             THE COURT:  Suppose that Officer Smith, who is

17   not a defendant in this case, beat the plaintiff while he was

18   in SHU confinement.  What makes you think that Officer Smith

19   couldn't have beaten the plaintiff when he was in general

20   population?  I don't understand that the SHU confinement made

21   it possible for this beating to occur.  I think it's an

22   independent act.  It has nothing to do with the determination

23   to confine him to SHU; it has something to do with the

24   independent act of Officer Smith who is not before the Court.

25             MR. SIVIN:  I guess any act that takes place

13

1    in SHU could also take police in general population, so that

2    argument could be made there as well.  I don't know how you

3    separate the issues.

4              If he is trying to prove that his time in SHU

5    for whatever reason, maybe because they were trying to

6    retaliate against him, was different than other inmate's time

7    in SHU, other inmates had their 23 hours, they were left

8    alone, they were let out for one hour to exercise, he may

9    have not have been allowed out for one hour during times and,

10   incidentally, he was beaten on a regular basis or whatever

11   the testimony might be, despite that the fact that that could

12   also happen in general population, I don't think that

13   detracts from the relevance of whether his SHU confinement

14   was atypical.

15             THE COURT:  I'm going to adhere to my initial

16   determination under Rule 403.  If there isn't anything

17   further, we'll have the jury brought up.  It will be a little

18   awkward for a few moments because we'll have 23 people back

19   there but what we'll do, we'll call them into the jury box so

20   that we all have seats.

21             (Jury selection was conducted, 10:30 to 12:20,

22   and is located in a separate binder.)

23             THE COURT:  Please be seated.  Is everyone

24   doing all right?  What I plan to do is give you about twenty

25   minutes of preliminary instructions, we'll break for lunch

14

1   and then we'll have opening statements and the beginning of

2   proof.  Does that work for you folks?  Are you doing all

3   right?  All right.

4              If at any time you need a break, please raise

5   your hands, because we want to accommodate you, you're the

6   most important people in this courtroom.

7              I'm going to allow you, the jurors, to take

8   notes during the course of these proceedings.  After opening

9   statements once the proof has begun, I will place note pads

10  on each of your chairs.  Please leave them in place when you

11  leave the courtroom and we'll collect them at the end of each

12  day and then you'll have them for your use later during your

13  deliberations.

14             Please also try to remember your seating.  And

15  the court security officer will help you when you come in and

16  go out, he will tell you how to do it in such a way that

17  you're not climbing over each other.

18             Members of the jury, now that you've been

19  sworn, before the formal presentations of the parties begin,

20  I will give you some preliminary instructions to guide you in

21  fulfilling your role as jurors during the course of this

22  trial.  It will be your duty to find from the evidence what

23  the facts are.  You and you alone will be the judges of the

24  facts.  You will then have to apply those facts to the law as

25  I will give it to you at the close of the trial.  You must

1   follow that law, whether or not you agree with it.

2                    Nothing that I say or do during the course of

3   this trial is intended in any way to indicate or should be

4   taken by you as indicating what your verdict should be.

5                    The evidence from which you will find the

6   facts will consist of testimony of witnesses, documents and

7   other things received into the record as exhibits, and any

8   facts that the lawyers agree upon or stipulate to or that I

9   may instruct you to find as a matter of law.

10                    Certain things are not evidence and therefore

11  must not be considered by you.  Let me take a moment to

12  address what types of things do not constitute evidence in

13  the case.  First, statements, arguments and questions by

14  lawyers are not evidence.  Secondly, objections to questions

15  are not evidence.  Lawyers have an obligation to their

16  clients to make objections when they believe evidence being

17  offered is improper under the rules of evidence.  You should

18  not be influenced by the objection or by my ruling on it.  If

19  the objection is sustained, then ignore the question.  If it

20  is overruled, treat the answer like any other.  If you are

21  instructed that some item of evidence is received for a

22  limited purpose only, then you must follow that instruction.

23                    Testimony that I have excluded or told you to

24  disregard is not evidence and must not be considered.

25  Anything you may have heard or seen outside the courtroom is

1    not evidence and must also be disregarded.  You are to decide

2    the case solely on the evidence presented here in the

3    courtroom.

4                There are two kinds of evidence; direct and

5    circumstantial evidence.  Direct evidence is direct proof of

6    a fact such as testimony of an eyewitness.  Circumstantial

7    evidence is proof of facts from which you may infer or

8    conclude that other facts also exist.  If you go to sleep at

9    night in the dead of winter and you see brown grass in the

10   front of your house and you wake up in the morning and you

11   see a foot of snow, then you haven't seen the snow but you

12   can infer from that direct evidence, the snow existing on

13   your front law, inferentially that it snowed overnight.  So

14   that's the difference between direct and circumstantial

15   evidence.  I will give you further instructions on these as

16   well as other matters at the end of the case, but keep in

17   mind that you may consider both types of evidence.

18               It will be up to you to decide which witnesses

19   to believe, which witnesses not to believe, and how much of

20   any witness's testimony to accept or reject.  I will give you

21   some guidelines for determining the credibility of witnesses

22   at the end of the case.

23               This is a civil case.  We've already talked

24   about this but let me reiterate.  The plaintiff in this case

25   has the burden of proving his case by what is called a

17

1    preponderance of the evidence.  This means the plaintiff has

2    to produce evidence which, considered in light of all facts,

3    leads you to believe that what the plaintiff claims is more

4    likely true than not.  To put it differently, if you were to

5    put the plaintiff's and the defendants' evidence on opposite

6    sides of a scale, the plaintiff would have to make the scale

7    tip somewhat on his side.  If the plaintiff fails to meet

8    this burden, then your verdict must be for the defendants.

9    Those of you who have sat on, watched or read about criminal

10   cases will have heard reference to proof beyond a reasonable

11   doubt.  That requirement does not apply to a civil case and,

12   therefore, you should put it out of your minds for purposes

13   of this action.

14            Let me talk about the applicable law in this

15   case.  In this case plaintiff Angel Martinez has asserted

16   several constitutional and common law claims against the

17   defendants arising out of incidents which occurred in the

18   early part of 2003 at the prison facility in which he was

19   incarcerated at the relevant times.  Not all of the

20   defendants are named in each of plaintiff's claims, and it

21   will therefore be particularly important throughout these

22   proceedings that you pay attention to the evidence regarding

23   the alleged involvement of each defendant and the conduct

24   which forms the basis for plaintiff's claims.

25            Among plaintiff's claims is his allegation

1   that he was subjected to excessive force on more than one

2   occasion by certain corrections officers at the prison in

3   which he was housed.  Plaintiff also alleges that he was

4   retaliated against, both through the use of excessive force

5   and by the issuance of false misbehavior reports charging him

6   with violation of prison policies and rules, as a result of

7   having exercised his right to complain of prison conditions

8   or for threatening to do so.

9            Additionally, plaintiff alleges that through

10  their initiation of criminal charges against him, which were

11  later dismissed, certain of the defendants engaged in

12  malicious prosecution.

13           Finally, the plaintiff asserts that during the

14  course of disciplinary proceedings which resulted in the loss

15  of certain privileges and a period of disciplinary

16  confinement in a special housing unit, he was denied

17  procedural due process.

18           I will give you detailed instructions on the

19  law at the end of the case and those instructions will

20  control your deliberations and decision.  In order to help

21  you follow the evidence, however, I will now give you a brief

22  summary of the elements which the plaintiff must prove to

23  prevail on his claim.

24           The legal principles which govern plaintiff's

25  excessive force claim arise under the Eighth Amendment to the

19

1    United States Constitution which protects inmates from cruel

2    and unusual punishment.  That constitutional right is

3    violated when a prison inmate is subjected to unnecessary and

4    wanton infliction of pain.  In order to determine plaintiff's

5    excessive force claims, you will be asked to decide whether

6    based upon the evidence the plaintiff has proven by a

7    preponderance of the evidence that one or more of the

8    defendants applied force against him maliciously and

9    sadistically for the purpose of causing him harm and

10   additionally whether the plaintiff suffered any damages as a

11   proximate result of those acts.

12                   In addition to the claims addressed to the use

13   of force, the plaintiff also asserts that certain of the

14   defendants, although perhaps not active participants in the

15   use of force against him, unlawfully failed to protect him

16   from constitutional violation.

17                   In determining this aspect of plaintiff's

18   claim, you will be asked to determine whether plaintiff has

19   proven by a preponderance of the evidence that one or more

20   corrections officers, other than the defendant you are

21   considering, used excessive force against him, whether the

22   defendant you are considering had actual knowledge of the use

23   by another corrections officer of excessive force, whether

24   the defendant had a realistic opportunity to intervene and

25   prevent the harm from occurring, and, lastly, whether the

1  defendant you are considering disregarded the risk to the

2  plaintiff by intentionally refusing or failing to take

3  reasonable measures to prevent or stop the use of excessive

4  force.

5          Plaintiff's retaliation claim arises under the

6  First Amendment to the United States Constitution, which

7  guarantees that when a prison inmate files a grievance or

8  otherwise complains regarding prison conditions, he or she

9  will not suffer adverse action as a result of those

10  complaints.  When addressing plaintiff's retaliation claim,

11  you will be asked to determine whether Mr. Martinez has

12  proven by a preponderance of the evidence that he engaged in

13  constitutionally protected conduct, that adverse action was

14  taken against him by one or more of the defendants, and that

15  his protected conduct was a substantial or motivating reason

16  for the action taken against him.

17          If you find that the defendant has met this

18  burden, then you will additionally be asked whether

19  defendants have established by a preponderance of the

20  evidence their affirmative defense in which they claim that

21  the adverse action at issue would have been taken against the

22  plaintiff even in the absence of his protected conduct.

23          Plaintiff's procedural due process claim,

24  which is addressed to the disciplinary hearing conducted by

25  defendant Lane and the role of defendant Selsky in deciding

plaintiff's appeal of that determination implicates a
provision found within the Fourteenth Amendment to the United
States Constitution, which guarantees that person will not be
deprived of a liberty interest without being afforded
procedural due process.

In order to decide this claim you will be
asked based upon a more detailed set of instructions to
determine whether the consequences actually suffered by the
plaintiff as a result of the determination at the close of
that hearing represented a deprivation of a liberty interest,
and, if so, whether the defendants failed to afford him due
process before depriving him of that interest.

The last of plaintiff's claim for malicious
prosecution stems from both the Fourth Amendment, which
guarantees against unreasonable seizures, and the common law
of the State of New York.  When addressing this claim you
will be asked to determine whether plaintiff has established
again by a preponderance of the evidence that a criminal
prosecution was initiated against him, that the prosecution
was terminated in his favor, that at the time the prosecution
was initiated the defendants did not have probable cause to
commence the proceeding, and whether the initiation of that
prosecution was motivated by actual malice.

In addition to these issues, you will be
called upon to determine whether for any claim upon which you

1    find liability plaintiff has proven by a fair preponderance

2    of the evidence that he suffered damages which are

3    proximately caused by those actions, and, if so, in what

4    amount.  Once again, I will provide you with more detailed

5    instructions concerning this and the other issues which you

6    will be asked to decide during your deliberations after all

7    of the proof is in.

8              In addition to denying plaintiff's claims,

9    defendants have asserted their entitlement to qualified

10   immunity.  At the close of the trial you will also be asked

11   to address whether, if you find that any of the defendants

12   are liable on any of plaintiff's claims, they are nonetheless

13   entitled to good faith qualified immunity.  Consideration of

14   that defense will require you to determine whether the

15   defendants' conduct was objectively reasonable in light of

16   the legal rules clearly established at the time of the

17   incident at issue and that, therefore, they should not be

18   held liable for violation of plaintiff's constitutional

19   rights.  Because qualified immunity is an affirmative

20   defense, the defendants must prove each of the elements of

21   that defense as I instruct you concerning that at the close

22   of the case by a fair preponderance of the evidence.

23             Let me add a few words about your conduct as

24   jurors.  First, during the trial you should not discuss the

25   case with anyone or permit anyone to discuss it with you.

23

1    Until you retire to the jury room at the end of the case to

2    deliberate on your verdict, you simply are not to talk about

3    the case.

4              Second, do not read or listen to anything

5    touching on this case in any way.  If anyone should try to

6    talk to you about it, bring it to the Court's attention

7    promptly.

8              Third, do not try to do any research or make

9    any investigation about the case on your own.

10             And, finally, do not form any opinion until

11   all of the evidence is in.  Keep an open mind until you start

12   your deliberations at the close of the case and after I've

13   given you the legal instructions that you will need to apply.

14             If you wish, as I indicated, you may take

15   notes.  If you do, however, please bear in mind that they are

16   not to be used for any other purpose other than to assist you

17   and should not be substituted for your recollection of the

18   evidence.  You should also ensure that your note taking does

19   not interfere with your ability to listen to and consider all

20   of the evidence.  Any notes taken should be left on your

21   chairs and will be collected when you leave at night.  Please

22   remember that any such notes are for your own personal use

23   only.

24             The trial will now begin.  After lunch each

25   side may make an opening statement.  An opening statement is

24

1    neither evidence nor argument.  It is an outline of what that

2    party intends to prove offered to help you follow the

3    evidence.  The plaintiff will then present his witnesses and

4    the defendants may cross-examine them.  The defendants then

5    will present their witnesses and plaintiff may cross-examine

6    them as well.  Following this the plaintiff may be permitted

7    to present brief rebuttal evidence.

8              It is important for you to remember to keep an

9    open mind and not to form any impressions until all of the

10   evidence is heard and you are able to piece it together with

11   the aid of the parties' submissions and the Court's jury

12   instructions.

13             After all of the evidence is presented, the

14   attorneys will make their closing arguments to summarize and

15   interpret the evidence for you and I will give you the

16   instructions on the law.  You will then retire to deliberate

17   on your verdict.

18             Thank you in advance for your service.  At

19   this time we will break until 1:45 for lunch.  Please

20   remember the instructions I just gave you.  Do not discuss

21   this case with anyone, including your fellow jurors, remember

22   to keep an open mind, and I hope you have a good lunch.

23   We'll see you back here at 1:45.

24             (Recess at 12:40.)

25             (Reconvene at 1:50.)

1                THE COURT:  I understand you're making a

2    better-late-than-never application to the Court for admission

3    pro hac vice?

4                MR. MILLER:  Yes, I am.

5                THE COURT:  Any objection?

6                MR. MULVEY:  None, Your Honor.

7                THE COURT:  That is granted subject to your

8    making the requisite payment and filling out the paperwork.

9                MR. MILLER:  The paperwork is done and I will

10   pay the $30 before the end of the day.

11               MR. MULVEY:  Before we proceed, do you want to

12   continue on the record the discussion of one of the

13   plaintiff's witnesses and the subpoena that was issued?  We

14   would like to address the Court.  Would you like to proceed

15   on the record?

16               THE COURT:  Well, it's my understanding that

17   you have reached the accommodation to take the deposition in

18   non-business hours of the physician.  Is there any objection

19   to proceeding in that fashion?

20               MR. MULVEY:  Only, I did not agree, I was just

21   informed about five minutes ago, Your Honor, of the time and

22   that does present a problem for me.  I just had a few hours

23   notice.  It's going to create severe scheduling and

24   inconvenience for me to do it today.  I told counsel I would

25   be willing to do it at some other mutually agreeable time,

1  but I wasn't consulted about the time or the location.  I

2  even agreed to travel and use our Rochester office to do it

3  since the doctor is located in the Rochester Metropolitan

4  area.

5           THE COURT:  Well, let me express my hope that

6  this can be worked out between counsel in an amicable fashion

7  so that we can minimize any potential inconvenience for the

8  physician.  It doesn't present a problem, I wouldn't think,

9  to having the testimony read and shown to the jury out of

10 sequence and I wouldn't think that you would have any

11 objection to that.

12          MR. MULVEY:  No.

13          THE COURT:  Even after plaintiff has rested

14 and you've commenced your case, if we could work out the

15 scheduling differences, that would be wonderful; if not,

16 we'll have to go back to Plan B.

17          MR. MILLER:  After speaking with Mr. Mulvey I

18 called back Dr. Coniglio's go office.  They have no problem,

19 although it's inconvenient, the doctor has no problem

20 traveling here for tonight.  He would be leaving his office

21 between 5:30 and 6, and I have set up a conference room in my

22 hotel, which is right down the block, for 8:00.  After

23 speaking to Mr. Mulvey, I called back to ask about tomorrow.

24 Tomorrow he is in surgery all day and so there is no

25 guarantee as to when he gets out because of the unreliability

27

1    of a hospital schedule.  I feel that I might get stuck if I

2    don't go forward today, which is the day he was subpoenaed

3    for and it's the day that the doctor says he will come.

4                Now, just I'm not sure how important this is

5    to the Court, but we actually drove up to this area on Friday

6    to accommodate Mr. Mulvey's request to depose one of his

7    doctors.  I'm assuming that he could work around whatever

8    schedule he has tonight to do a half-hour deposition of a

9    doctor right down the block.

10               THE COURT:  Is there perhaps someone else in

11   your office that could defend the deposition?

12               MR. MULVEY:  I could look into it.  Just in

13   fairness to me, two things.  I was just informed in the last

14   ten minutes of this schedule, so that's why my immediate

15   resistance, because I have no plan and I do have ten

16   defendants that I have to work with in this case.  And

17   secondly, that I did try with as much lead time as possible

18   to set up a schedule for the defendants' doctor, his

19   testimony to be taken, there was more than a few moments lead

20   time, that was arranged and countenanced.  And so I

21   appreciate that there should be some courtesy extended and I

22   would do that if it could be worked out in a slightly more

23   convenient fashion than being told we have to do it this

24   evening given very, very, very short notice.

25               THE COURT:  We're trying to do our best given

28

1    the circumstances that were presented.  If you would like to

2    take a five or ten minute recess if you would like to call

3    your office to see if someone else can cover for you.

4                    MR. MULVEY:  I would prefer not to do that

5    because that would require they have some familiarity with

6    the case which would probably put just as much burden on my

7    time.  And I appreciate that, and I'm sure there is somebody

8    that could do it, but that would effectively be the amount of

9    time that I would spend giving them the information necessary

10   to do it competently, it would probably be as equivalent as

11   doing it myself.

12                   THE COURT:  Are you telling me that you have

13   some scheduling issues beyond your responsibilities for

14   defending these?

15                   MR. MULVEY:  I have both personal and

16   professional reasons why this evening having to set aside

17   things in order to accommodate the doctor and the plaintiff's

18   counsel would present an inconvenience to me on such short

19   notice.  I'm open to doing it sometime that would allow

20   plaintiff to introduce the testimony.  I'm also still open to

21   working out a stipulation, as the Court indicated.  Certainly

22   our office has a nurse on staff that can assist me in trying

23   to work out an uncontested stipulation as to what's in the

24   record as we discussed earlier.

25                   THE COURT:  Well, I'm not going to force

1    Mr. Mulvey to participate in a deposition tonight, given what

2    he has just said, but I am open to other alternatives,

3    including those just mentioned by Mr. Mulvey, or the

4    possibility of taking the doctor's deposition tomorrow,

5    Wednesday, Wednesday before office hours, Wednesday after

6    office hours, do the best we can.

7                    MR. MILLER:  All right.

8                    MR. MULVEY:  Thank you, Your Honor.

9                    MR. SIVIN:  Your Honor, one additional brief

10   matter, application in limine.  I just ask that pursuant to

11   Federal Rule of Evidence 403 and 404(b), defense counsel be

12   directed not to attempt to cross-examine plaintiff or to

13   mention to the jury during opening statements any arrests to

14   the plaintiff that did not result in a conviction or any

15   circumstances leading up to those arrests.

16                   THE COURT:  It doesn't seem like you would

17   have to make that motion, but we'll deal with the conviction.

18   I take the position that I will permit the plaintiff and any

19   other witness to be cross-examined based upon felony

20   convictions pursuant to Rule 609, I believe it is, of the

21   Federal Rules of Evidence.  I don't believe that the reason

22   for Mr. Martinez being in prison in the first place is

23   relevant, and so, although I understand that you may intend

24   to bring that up yourselves, but certainly he should not be

25   asked about any arrests where no resulting convictions

30

1  occurred.

2                MR. SIVIN:  Thank you.

3                THE COURT:  Do you have anything?

4                MR. MULVEY:  I understand your ruling, Your

5  Honor, and we'll abide by it.  Thank you.

6                MR. MILLER:  The only thing I would ask now is

7  I need two minutes to call the doctor's office to head him

8  off.

9                THE COURT:  Can that be done by one of you

10  while the other begins opening statements?  Please bring in

11  the jury.

12                (2:00, jury present.)

13                THE COURT:  I apologize for the delay.  We had

14  some matters that we had to handle outside of your presence

15  and I had some other proceedings, but we'll try to keep on

16  schedule and get this to you as quickly as we can.

17                Any of have you any problems beginning at 9:00

18  in the morning?  You all look like early risers.  We'll start

19  at 9 and try to finish each day by 5:00.  Are you prepared to

20  proceed with opening statements?

21                MR. MILLER:  Yes.

22                THE COURT:  All right.  Mr. Miller, proceed.

23                MR. MILLER:  Good afternoon.  The one thing I

24  like about jury selection, although it might appear tedious

25  to you, is there is a little levity in the room and it's

1   somewhat informal and our goal and the Court's goal is to

2   make you feel comfortable to talk to us about whether or not

3   you feel you can be a fair juror.

4              Once the trial begins and once you hear

5   testimony from witnesses, you're going to notice a change in

6   temperature in the room and it's going to get very serious

7   because there is some very serious allegations being made,

8   and the defendants here deny them.  And so you as the jury,

9   the finders of fact, are going to end up having to decide on

10  an accusation that you as human beings would hope should

11  never happen, and you might actually find it hard to believe

12  that in a civilized society some of the things that Angel is

13  going to tell you actually happened to him.  And all I can

14  ask you now as Angel's lawyer is to give him that fair trial

15  that you promised that you would give during jury selection.

16             You're going to be hearing from Angel after

17  the opening statements.  He will be the first witness.  At

18  some later point during the trial you'll be hearing from

19  other witnesses; his wife, his sister, possibly a doctor, a

20  therapist, social worker who he has been treating with since

21  he has been out of jail.

22             But what this case is going to come down to in

23  my opinion will be who you believe.  It will be Angel's

24  credibility against the credibility of a lot of people.  And

25  I think I'm stating the obvious that numbers alone should not

1    tilt the playing field, it should be the quality of the

2    testimony, the believability, the consistency.  And obviously

3    Judge Peebles will give you further instructions on judging

4    witnesses and their credibility, but what it comes down to in

5    two words is common sense.  It's leaving your biases and

6    prejudices outside the courtroom and using your common sense

7    inside.

8            I think I said this during jury selection as

9    well, that there are certain prices that an inmate must pay

10   for his crime, which is why Angel was incarcerated at Oneida

11   Correctional Facility back in February of '03.  He is not

12   contesting his incarceration, and he'll tell you all about

13   his life.  But there are certain prices that no one, not even

14   an inmate, should have to pay for his incarceration.

15           Angel will tell you that he never up until

16   February 25th of '03 ever had an infraction while in jail, or

17   as the terminology is never had a ticket written against him,

18   never had a fight, never had a problem with a corrections

19   officer.  He will tell you that he was serving his time

20   because he committed a crime and he was in jail serving a

21   sentence for the crime that he committed.  Something he is

22   not proud about, but that's not why we're here.

23           Angel will tell you all about his addiction to

24   heroin since he was a teen-ager.  He is in his forties now.

25   He will tell you about his criminal history.  He will tell

33

1    you about his history of depression.  Angel is going to be an

2    open book during this trial and he is going to make an

3    attempt to let you know everything; the good, the bad.

4                He is also going to tell you about a string of

5    events at Oneida Correctional Facility starting on February

6    25th, 2003, and he will detail for you this string of events

7    that should never happen to another human being.  He will

8    tell you that on February 25th, and I believe Judge Peebles

9    mentioned this to you earlier, he was on an outside medical

10   trip for a finger injury that he had suffered, and when he

11   was returning to his dorm, he was in a large dorm with dozens

12   of cubicles, he went up to the third floor of this building,

13   which is the top floor, and he rang the bell, which is the

14   way you get back into a dorm after being outside.  Angel will

15   tell you that after ringing this bell there was no answer.

16               There is a guard station right on the other

17   side of this door, so it was reasonable for Angel to think

18   that the guard was not at his station because the door did

19   not open immediately.  He waited a few minutes and he rang

20   the bell again.  Still no answer.  Angel will tell you he

21   thought maybe the guard was in the rec room where bells

22   cannot be heard.  He waited a little bit longer.  And after a

23   few minutes he rang the bell again.  After ringing the bell

24   again, Angel will tell you that defendant Thompson, who is

25   not here today, presumably he will be here at some point

1   during the trial, but Angel will tell you that officer,

2   Corrections Officer Scott Thompson opened the door, and I

3   want you to pardon my language, and said to Angel, can't a

4   guy take a fucking shit.  With two hands he pushed Angel like

5   this.

6          Angel is someone, you see him, he is a slight

7   person, clearly not the type who's looking to get involved in

8   a physical confrontation, no less with a guard who is about

9   six-one, 210, just trying to walk away and go back to his

10  cubicle.  But Thompson wanted more and he pushed him again

11  and he said you're going to the box.  Angel's response to

12  Thompson's statement that you're going to the box is

13  important because that's where our claims for retaliation

14  come in.  Angel said to him, if I'm going to the box, I want

15  to speak to the sergeant because you pushed me.  It sounds

16  like an innocuous conversation, doesn't it?

17         At this point Angel just went on his way to

18  the back of the dorm where his cubicle was, he put his coat

19  down, this was February, he was outside, and then he headed

20  back toward the front of the dorm where the door is, that's

21  where the bathroom is, the showers and the toilets, he had to

22  use the bathroom.  And when he went back to the bathroom,

23  Officer Thompson was there and he said to Angel, take your

24  name off the board.  He took his name off the board.  And

25  then he said I want to see your ID.  Angel went back to his

1    cube, came back with his ID.  And then Thompson said to

2    Angel, come here, let's step outside, let's talk.  Angel

3    assumed that Thompson didn't want him going to the sergeant.

4    Angel assumed Thompson was taking him outside so he would

5    just say let's forget this thing, which is probably what

6    Thompson should have done.

7              What does Thompson do?  Takes Angel outside

8    the door where the bell is and he takes a swing at him.

9    Angel will tell you he was able to avoid that swing and he

10   tried to get back into the dorm.  Why did he try to get back

11   into the dorm?  Because that's where there is witnesses,

12   that's where people will see the activities.

13             Angel is going to go into the details of what

14   happened next.  In a nutshell, Officer Thompson pulled out

15   his radio and pulled a pin.  A pin is an emergency pin like

16   officer needs assistance.  Dropped the pin, dropped the radio

17   and attacked Angel, punching him, knocking him to the floor.

18   Next thing Angel knows Officer Sisco is next on the scene and

19   punches him right in the face.

20             Angel will tell you that at some point he lost

21   consciousness and when he woke up, he was lying on the floor

22   outside the dorm where the bell is, Thompson, Sisco, Novak,

23   Meyers kicking him, punching him, just beating him up.  Angel

24   will tell you he was helpless.  He had absolutely no way of

25   getting assistance.  He will tell you that there were no

1    witnesses because this was outside the dorm.  He will tell

2    you that at one point he was flat on his belly with a foot on

3    his back, he couldn't breathe.

4                    Angel will tell you that Sergeant Temple was

5    there, Sergeant Temple, a supervisor, let this happen.  There

6    is no claim that Sergeant Temple was involved in this

7    assault, but she let it happen.  And when you listen to Judge

8    Peebles' instructions on the law, that is a battery.

9                    Members of the jury, Angel will tell you that

10   he was thrown up against the wall, handcuffed, pushed down

11   three flights of stairs, taken to an infirmary.  Angel will

12   tell you that when he exited this infirmary, he was covered

13   in blood.  He will also tell you that from the moment he

14   entered this infirmary, he was being videotaped while he was

15   covered in blood showing his injuries.

16                   Members of the jury, they claim there is no

17   videotape.  He will tell you that after he got to the

18   infirmary, they cleaned off the blood and they took pictures

19   of him, photographs.  Those you'll see.  And you'll see the

20   injuries to his body, his face, his back, his side, his legs.

21   You'll see the cuts in his wrist after they handcuffed him.

22                   You'll also see pictures of Officer Thompson

23   who claims to have been injured in this incident, and I

24   challenge each of you to find one injury in those pictures.

25   I challenge each and every one of you to try to get around

1    those pictures.  Counsel during his voir dire said, will

2    pictures alone make you go one way or the other, and the

3    answer is obviously no, but the pictures are evidence and

4    they will assist you in determining what happened up in M

5    dorm.

6            THE COURT:  Mr. Miller, I've given you a

7    little latitude, but your opening statement is slightly on

8    the argumentative side.  I prefer that you limit it to what

9    you believe the proof will show at trial.

10           MR. MILLER:  Okay.

11           The proof will show that Angel from the

12   infirmary that same day was taken right to the SHU, special

13   housing unit.  During the course of the trial I suspect

14   you're going to be hearing the term SHU used a lot; you'll

15   all know what that means.

16           You'll hear that Sergeant Temple was one of

17   the people who took him to the SHU.  There were other

18   officers there whose names probably will not come up during

19   this trial.  Angel will tell you how he was beaten again

20   right in the presence of Sergeant Temple.  Angel will tell

21   you not only about the physical abuse, but the verbal

22   humiliation that he went through when he was taken to the

23   SHU.  And he'll tell you more about that, but let me just

24   tell you that the evidence will clearly show that as a result

25   of this beating, he actually defecated in his underwear and

1    when he was taken to the SHU, he was humiliated about that.

2              Members of the jury, Angel altogether spent 11

3    months in the SHU.  Even though Captain Lane who is sitting

4    here sentenced him to two years, you will see why he only

5    spent 11 months.

6              But let me go to something else.  Angel will

7    talk about his days in the SHU from February 25th on, how he

8    was deprived of virtually everything.  Didn't get three full

9    meals, didn't get any writing material.  He didn't know why

10   he was there.  He didn't know the regulations.  He didn't

11   have access to anything.  He will tell you he couldn't leave

12   this little cell.  He will tell you that at times they would

13   open the window just to make him even more uncomfortable.

14             And he will tell you that on March 5th he was

15   assaulted again while he was in the SHU, this time by

16   officers Duvall and LaBrague.  That's Duvall sitting over

17   there catty-corner.  Officer Duvall is going to try to

18   convince you that Angel attacked him.  This is after having

19   spent over a week in the SHU, even weaker than he was before.

20   Angel will tell you that he was beaten and battered by these

21   two people as a Sergeant Sipley watched.

22             When Angel describes to you all what it was

23   like living in the SHU, I'm going to ask you to just imagine.

24   Now, we talked about the February 25th incident.  One more

25   thing about the March 5th incident.  Duvall and LaBrague

1    actually said something to Angel during this attack that's

2    very telling.  They said, I saw Tom this morning, he says hi.

3    Tom, that's what they call Officer Thompson.

4           Members of the jury, the assault on March 5th,

5    the evidence will show, was a retaliation for what happened

6    on February 25th, a retaliation for his, my client's, threat

7    to call a sergeant.

8           Now, there is something called a Tier III

9    hearing, and the reason why there was a Tier III hearing is

10   because Angel received what's known as a misbehavior report

11   signed by Officer Thompson for the February 25th incident.

12   And this hearing is supposed to be fair.  The guidelines for

13   these hearings are every inmate is entitled to a fair

14   hearing.  The hearing was conducted by Captain Lane.  You

15   will hear a transcript -- or, hear an audio and read a

16   transcript of that hearing.  You'll decide whether or not

17   there was any fairness at all during this hearing.  What I

18   will tell you now is the reason why he only spent 11 months

19   in the SHU is because on the advice of the Attorney General's

20   Office, Captain Lane's decision to sentence him for two years

21   and finding him guilty was reversed.

22          Members of the jury, there was another Tier

23   III hearing for the March 5th incident where Angel received

24   another misbehavior report.  And you'll also decide whether

25   or not that hearing affected Angel as he remained in the SHU

1    all those days and weeks and months.  It got worse.

2              At some point when Angel was in the SHU he was

3    served with a felony complaint.  Now, what's the difference

4    between a felony complaint and a misbehavior report?  A

5    misbehavior report you'll learn is an internal report where

6    you're disciplined internally, such as going to the SHU.  A

7    felony complaint is a complaint brought by the DA of Oneida

8    County.  And this felony complaint was sworn to by Thompson

9    and Sisco and Meyers and Novak.

10             There was a Grand Jury proceeding where they

11   tried to indict Angel Martinez for assault in the second

12   degree, a Class D felony, assault on a corrections officer.

13   Angel said I want to tell what happened to the Grand Jury

14   myself, and he went before that Grand Jury and he told that

15   Grand Jury of Oneida County what happened to him on February

16   25th, 2003.  The Grand Jury returned what's known as a No

17   True Bill, case dismissed.

18             That also, members of the jury, should be an

19   indication to you of what happened on February 25th, 2003.

20             I just want to mention one further name that

21   you heard this morning but is also not here, and that's

22   Commissioner Selsky, who is also a defendant in this case.

23   Commissioner Selsky did not in any way participate in the

24   beating of Angel, nor did he participate in the hearings.

25   That was Captain Lane's job.  But Selsky is the person who

41

1    reviewed the transcript and the audiotape of that hearing.

2    And Selsky is the one who, despite reading that transcript

3    and hearing that tape, decided that nothing unfair was done

4    in that hearing, and it was only after the Attorney General's

5    Office 11 months later told Selsky to reverse Captain Lane

6    and that's when it was reversed, but for 11 months he was in

7    that SHU.  Commissioner Selsky had the power and the

8    authority to review that transcript and say this was not

9    fair, but he didn't do it.

10              Members of the jury, you will hear from Angel

11   about what happened to his body and his mind as a result of

12   all of these incidents.  The injuries he describes to you

13   will be documented in both prison medical records as well as

14   outside hospitals once he was released from prison in

15   December of 2006.  You will see that Angel suffered what's

16   known as a herniated disc to his lower back and you will hear

17   that a doctor working for the prison recommended that he have

18   what's known as a discectomy, which is spinal surgery.

19              Angel will tell that you for most of the time

20   he was incarcerated he had to walk around with a cane issued

21   to him by the prison on the say-so of the prison doctors.

22   You will also hear that as a result of this beating on

23   2/25/03 Angel broke at least one rib on his right side.  You

24   will hear that he had old fractured ribs, but you'll also

25   hear that as a result of this beating he had a new fractured

1    rib, at least one, straight from the foot or the fist of

2    these officers involved in this beating.

3                    And you will also hear from his current

4    therapist and you will read documentation from various other

5    psychiatrists, psychologists, both within the prison system

6    and outside.  And you will hear clearly that Angel had bouts

7    of depression before he went to jail, and once you hear about

8    some of the things about his life, you will see why.  But

9    Angel is now suffering from what's known as post-traumatic

10   stress disorder and that is as a result of what they did to

11   him.  And you will have the opportunity to hear the testimony

12   of Christine Janick, who is his current therapist, and she

13   will tell you the difference between depression and

14   post-traumatic stress disorder and she will make it very

15   clear to you that the post-traumatic stress disorder came as

16   a result of the events that took place at Oneida.

17                   Members of the jury, you will hear that up

18   until less than a year ago, Angel was his own lawyer.  My

19   partner and I took over this case less than a year ago.  You

20   will hear that he did as well as he could, all with the goal

21   of ending up in this courtroom before a fair-minded jury and

22   a judge and a level playing field.  This is something that my

23   client has been waiting for for a long time.  And the only

24   thing that we can expect out of you as the jury is to walk

25   out of here when it's over and be convinced that justice was

1    served.   Thank you.

2                THE COURT:  Thank you, Mr. Miller.

3    Mr. Mulvey.

4                MR. MULVEY:  Good afternoon, ladies and

5    gentlemen.  I'm Tim Mulvey from the State Attorney General's

6    Office, as you heard already, and I represent the ten

7    defendants in this case.  And let me add my thanks to you for

8    taking the time to both participate in this process and give

9    your fair undivided attention to what I have to say on behalf

10   of the defendants.

11               As the days go by here you may find the

12   statement I'm about to make surprising, but I agree in

13   principle with many of the points that Mr. Miller made at the

14   opening of his statement.  And those principles would be that

15   you apply your judgment fairly to an individual regardless

16   of, in this case, my clients, who are charged with a

17   responsibility of maintaining order and discipline in a

18   corrections setting.

19               I believe that you will come to see as the

20   proof is given to you what I consider this case to be about,

21   and that is administering fairly prison discipline.  There is

22   no question when an inmate comes to the custody of the New

23   York State Department of Corrections that he is entitled to

24   the constitutional protections that are afforded to each of

25   us.  But I'm going to ask you also not to discard or set

44

1    aside the fact that it is a corrections setting, and that the

2    men and woman who are responsible for maintaining order in a

3    corrections setting, to protect themselves and the inmates,

4    have a heavy duty and responsibility both to protect those

5    civil rights and to maintain order in the facility.

6            The other important concept that I urge you,

7    ask you, hope you will keep in mind as you hear the proof is

8    look for the factual proof that among the 360 corrections

9    officers, twenty sergeants, ten lieutenants, two captains and

10   a deputy superintendent of security throughout that facility

11   supervising 1,200 inmates on three shifts every day, 365 days

12   a year, that there is not homogeneity, there is not

13   uniformity, that we can't just infer that every officer and

14   every sergeant and every lieutenant knows everything about

15   what every inmate is doing in every part of that prison every

16   day.

17           MR. MILLER:  Objection.

18           THE COURT:  I think I would echo what I said

19   earlier to Mr. Miller, I'm going to ask you to be as

20   non-argumentative as possible and just present what you

21   believe the evidence at trial will show.

22           MR. MULVEY:  And I submit to the jurors that

23   there will not be evidence that that is the case.  There will

24   be a suggestion.  I ask you to focus on the facts and be

25   guided by the strength of the evidence, not by those

1  suggestions or inferences that you're asked to draw without

2  some reasonable proof, such as the snow example that the

3  Judge gave you.

4          The plaintiff Mr. Martinez will have you

5  believe that eight of these ten defendants assaulted him,

6  beat him ruthlessly, relentlessly for no apparent reason on

7  two occasions at least, in February and March of 2003, and

8  that they knowingly or willfully or deliberately violated his

9  constitutional rights.  And you're going to have to ask

10  yourself, why would corrections officers, why would these

11  defendants do such a thing?

12          MR. MILLER:  Same objection.

13          THE COURT:  Overruled.  I'll give him a little

14  latitude; I gave you plenty.

15          MR. MULVEY:  May I proceed?

16          THE COURT:  Yes.

17          MR. MULVEY:  Officer Thompson was sitting at

18  his desk.  He was admittedly, and the plaintiff will tell

19  you, we believe the facts will show, a replacement, what they

20  call a resource officer.  He was in the M dorm, M as in Mary,

21  dormitory supervising the inmates who live there at a desk

22  inside the facility.  He did not see the plaintiff before he

23  came on his shift.

24          The officer is responsible, you will hear

25  Officer Thompson explain he is responsible, for control of

1   the inmates coming in and out of the unit.  The inmates have

2   to be held accountable for where they are, they cannot be out

3   of place if they're supposed to be in a certain part of the

4   facility.  Officer Thompson will tell you that when the

5   plaintiff returned from that medical trip, the story is going

6   to stay consistent up to a point, that he allowed him into

7   the unit, did not recognize him, that the plaintiff went down

8   to his cubicle, he summoned him back, and there is a board

9   with the inmates' names on it so that the officer who is

10  manning the station can tell if the inmate is present or is

11  either out of the facility or at least out of the dormitory

12  area, so that they can keep track, because they have to keep

13  an account of where all the inmates are and report that as

14  part of the their supervisory duties.

15          So he asked the plaintiff, Mr. Martinez, to

16  take his name off the board, said he was present, and to see

17  his identification, so that he can confirm, which was his

18  responsibility, that Mr. Martinez was supposed to be in that

19  M dorm at that time.

20          For whatever reason, and we don't know, that

21  Officer Thompson said as he approached Mr. Martinez from

22  behind, Mr. Martinez turned and struck him, at which time

23  Officer Thompson tackled him and called for assistance.  He

24  then moved the inmate out into the outside of the dormitory

25  away from the inmates, not because he didn't have witnesses

1   but because that was an appropriate step to take to maintain

2   control and custody of the situation at that time.

3                    Other inmates came upon the scene.  Excuse me,

4   other corrections officers.  And those were, as you've heard

5   already, Officer Sisco and then Meyers and Novak and finally

6   Sergeant Temple, all within a minute or two.  There was a

7   struggle, there was an altercation.  There was, as you will

8   see, a use of force by these officers, no one is disputing

9   that.  And as a result an unusual incident report was made, a

10  use of force report was made, a report of inmate injury was

11  made, photographs were taken, medical attention was given,

12  and a misbehavior report was issued.  There was no -- there

13  is no allegation that all of the participants were not

14  required to make written statements and to disclose exactly

15  what happened.  And the photographs were taken by the

16  facility of Mr. Martinez and a nurse saw him and documented

17  all of the injuries that he appeared to have sustained as a

18  result of that use of force.

19                   You will hear from officers Sisco, Meyers and

20  Novak, as well as Sergeant Temple, that they will tell you

21  their version is that inmate Martinez continued to struggle

22  and resist, and that they used the minimal amount of force

23  necessary to gain control of him.  He is on the floor, he is

24  thrashing around, he is moving his arms and legs, and they

25  were attempting to pin him down by holding his legs down,

48

1    getting control of his arms so that they can handcuff him.

2              You will hear that in that process one cuff

3    went on his hand, not in the normal procedure of double

4    locking and using a finger to create a space, but one cuff

5    was placed at inmate Martinez struggled, he was given orders

6    to stop struggling and he yanked on the cuff and it did

7    tighten his arm, and you will see a picture of the reddened

8    cuff mark it left because he was struggling.  If he had not

9    been struggling, according to my clients, he would not have

10   sustained that injury.

11             The allegation then is that Officer Sisco

12   dragged him handcuffed down the stairs.  Officer Sisco will

13   flat out deny such abuse of treatment.  The inmate was stood

14   up and escorted by Sergeant Temple and other staff not

15   involved with the use of force first to the infirmary for

16   medical attention and then to the special housing unit

17   pending disciplinary action.

18             Officer Temple -- excuse me, Sergeant Temple

19   will tell you what she observed and what happened between the

20   time she escorted the plaintiff from the M dorm to the

21   infirmary and then to the special housing unit, and she will

22   not include in that any observations that she made of use of

23   force by any staff against Mr. Martinez during that time

24   period.

25             You will hear from officers LaBrague and

49

1  Duvall and Sipley about what transpired in the special

2  housing unit on March 5th.  Because inmate Martinez had been

3  charged with assault on staff, and those charges were

4  pending, he was subjected to what is called a deprivation

5  order.  You will see the document.  In effect, he was

6  deprived of even minimal accommodation and initially while he

7  was in the SHU severe punishment pending a determination.

8  And so he didn't get his personal property.  He was severely

9  restricted for several days in the SHU consistent with

10 corrections guidelines and policy.

11         After he had been there approximately a week,

12 he was allowed out of his cell for the purpose of viewing his

13 property, things he had had in his cube, his papers, his

14 clothing, and that was at the other end of the hallway in the

15 SHU.  Officer Sipley assisted in viewing the property and two

16 officers escorted him from his cell to the property viewing

17 area, that was now Sergeant Duvall and Officer LaBrague.

18         At the time the policy at Oneida was not --

19 you'll hear it was not to have him handcuffed but to escort

20 keeping his hands in his pockets and the two officers would

21 stand behind him as he made his way down the hallway to view

22 his property.  He did view his property, and according to

23 officers Sipley and LaBrague and Duvall, he had a problem or

24 concern about some of this property was missing.  He

25 verbalized that concern.  They directed him to file a claim

1    or request for reimbursement with the facility.  He stated it

2    several times.  Officer Duvall will tell you that as he

3    returned to his cell, he had a mesh bag with the property

4    that was issued to him on his shoulder, he had his hand in

5    his pocket.  He again complained.  These are officers in the

6    special housing unit who have to maintain strict discipline

7    and order within that unit with inmates who are being

8    subjected to either detention or pending a hearing.

9                Officer Duvall will tell you that the

10    plaintiff dropped his arm with his bag and turned with a

11    closed fist toward him, toward Officer Duvall, at which time

12    Officer Duvall in the same fashion that Officer Thompson had

13    done reached around his torso and fell forward into the cell.

14    He was assisted by Officer LaBrague, who then calmed the

15    plaintiff down and sat him on the bed.  And they calmed him

16    down by holding his legs and arms down and verbally telling

17    him to stop struggling.

18                There was a use of force report made, there

19    was a report of injury made, there were photographs taken, it

20    was documented, and reports were written by Officer Duvall

21    and Officer LaBrague detailing what I just told you is the

22    facts of the case from their perspective.  Force was used.

23    And I believe you will see from the photographs that there

24    were not visible injuries to the plaintiff on that occasion

25    that was reported.

1          Now, our proof that we will present to you

2   with respect to the disciplinary process, the hearing that

3   come afterwards, will be as follows.  Captain Lane initiated

4   a hearing on or about I believe it's February 28th for the

5   charges of assault on staff and the like by Officer Thompson

6   against the plaintiff with other lesser charges.  He heard

7   Mr. Martinez's version of events, then he adjourned the

8   hearing so that witnesses who inmate Martinez wanted to bring

9   to the hearing could be located, and there is some logistical

10  considerations because the hearing was held in the special

11  housing unit, the disciplinary wing of the public facility.

12          Before that hearing was reconvened, a second

13  hearing was begun and finished with respect to the incident

14  in the SHU involving Duvall, LaBrague and Sipley.  And I

15  understand that this may be confusing, I'm trying to give you

16  an overview now of what our proof will be.  That first

17  hearing was for the second incident, and the proof is, the

18  facts will show that that second hearing was completed, a

19  sentence of 180 days special housing unit penalty was imposed

20  and that the plaintiff began serving that 180 days.  That was

21  challenged the same way that the first hearing was going to

22  be challenged, and that challenge was denied and the

23  plaintiff served legitimately fully appropriately 180 days in

24  the special housing unit beginning in February of 2003.

25  Those are the facts that we'll present in that respect.

1          The second hearing was then concluded the

2    following day by Captain Lane where he imposed -- found the

3    plaintiff guilty of assault on staff and imposed a penalty of

4    two additional years in the special housing unit.  That

5    hearing was modified by defendant Selsky, Deputy Commissioner

6    Selsky, to one year.  He reduced -- not the finding, he

7    reduced the penalty from two years to one year, from 24

8    months to 12 months, but he did not reverse in the first

9    instance.

10          After the case went through the court system

11   all the way to the appellate court, state appellate court in

12   Rochester, my office in consultation with Commissioner

13   Selsky -- I want to remind you my office is not a defendant

14   in this action.  My office in consultation with the defendant

15   Selsky decided to withdraw or to not contest the court

16   challenge for reasons that will be explained to you by

17   Commissioner Selsky.  Commissioner Selsky will also tell you

18   that at no time did Captain Lane or he believe or in any way

19   have an opinion that inmate Martinez was denied his

20   fundamental due process rights at his hearing, and we believe

21   that a careful review of the tape and the transcript will

22   indicate that he was given every opportunity that needs to be

23   afforded to mount a defense to the charge of excessive force

24   or assault on staff.

25          Now, with respect to the criminal prosecution,

1    you will hear from Captain Lane and the officers involved

2    that the procedure in the department when an assault on staff

3    occurs where staff are required to receive outside medical

4    attention, that is they went to the infirmary after the

5    incident and they were sent to outside hospital for injuries,

6    that the facility reports that assault on staff with injury

7    to the state police.  That was done in this instance.  The

8    watch commander, the lieutenant, the ranking lieutenant at

9    the facility you will hear had those officers fill out a

10   statement that can be used to support a criminal charge.

11            They did not request that criminal charges be

12   brought, they will tell you that.  That was a decision made

13   to transfer the information to the state police.  The state

14   police conducted an investigation.  The state police went to

15   the Oneida County District Attorney, the Oneida County

16   District Attorney made a decision as to whether or not to

17   present that to the Grand Jury.  The Grand Jury presentment

18   was a decision not made by any of the defendants in this

19   case, not requested by any of the defendants in this case.

20   And at all times each of these defendants will tell you they

21   believed that they were proceeding in good faith without

22   malice to provide the information to the state police and the

23   district attorney of what occurred at Oneida Correctional

24   Facility in February of 2003.  And we will allow for that to

25   be explained to you as well.

1          Finally, Commissioner Selsky will explain to

2    you his role and function at the time in reviewing all

3    administrative appeals of prison disciplinary cases and what

4    the parameters were that he used to determine whether or not

5    a decision should be set aside and why his modification, not

6    reversal, his initial modification was made in good faith

7    belief that the case had been proven of assault on staff by

8    the plaintiff and that on the legal advice of my office with

9    respect a court case, he withdrew it and expunged the

10   plaintiff's record, but at no time did he do so because he

11   believed that Mr. Martinez had been denied his fundamental

12   due process rights in that hearing.

13          So that is an overview of what we submit to

14   you is the proof that will be adduced at this trial.  And

15   coming back to my points of agreement with Mr. Miller, I'd

16   ask you not to judge these defendants based on the uniform

17   they wear or the duty that they're sworn to uphold to

18   maintain care, custody, control, order and protection within

19   a correctional facility, but on their credibility as

20   individuals that they proceeded in good faith to use a

21   minimal amount of force in dealing with the inmate in this

22   case, that they fully disclosed that use of force in their

23   reports and that they were truthful in all proceedings as

24   they will be here today, and at the end --

25          MR. MILLER:  Objection to that last statement,

1   Your Honor.

2                   THE COURT:  Overruled.

3                   MR. MULVEY:  And in the end I trust you will

4   come to the appropriate conclusion.  Thank you.

5                   THE COURT:  Thank you.  At this time I'm going

6   to ask anyone who is not a party to the action that is

7   anticipated to testify as a witness to leave the courtroom

8   and we will pass out our note pads.  Are we good to go for

9   about another half hour before we take your mid afternoon

10  recess?  Okay.

11                  Mr. Miller, would you kindly call your first

12  witness?

13                  MR. MILLER:  Yes.  I call Mr. Martinez to the

14  stand.

15                  *ANGEL MARTINEZ*, called as a witness and being

16  duly sworn, testifies as follows:

17                  THE COURT:  Good afternoon, Mr. Martinez.

18                  THE WITNESS:  Good afternoon, sir.

19  *DIRECT EXAMINATION BY MR. MILLER:*

20      Q     Angel, can you tell us your current residential

21  address?

22      A     It's on 2775 Kingsbridge Terrace, Bronx, New York.

23      Q     And for how long have you resided at 2775

24  Kingsbridge Terrace?

25      A     Before I went to, I was incarcerated I lived there

*Angel Martinez - Direct*

1    for -- from 1999 up to 2002, and then I went to prison, when

2    I got released from prison that was -- that is my current

3    residence.

4        Q    Are you married?

5        A    Yes, now, yes.

6        Q    Currently married?

7        A    Currently married.

8        Q    What is your wife's name?

9        A    Altagracia, A-L-T-A-G-R-A-C-I-A, Pena, P-E-N-A.

10       Q    For how long have you and Altagracia Pena been

11   legally married?

12       A    Since June 22nd, 2007.

13       Q    And before you entered prison in 2002, what was

14   your relationship, if any, with Altagracia?

15       A    She was my girlfriend.

16       Q    And for how long had she been your girlfriend at

17   that point?

18       A    Since 1992 -- 1999.

19       Q    Do you currently go to school?

20       A    Yes.

21       Q    What are you studying?

22       A    Case, I'm taking a case on certification which

23   means counseling for alcohol substance abuse certification.

24       Q    And are you currently employed?

25       A    Yes, I am.

*Angel Martinez – Direct*                                        57

1    Q    What type of work do you do?

2    A    I do surveys over the phones.

3    Q    Just tell us a little bit more about that job.

4    A    We call to -- I'm the person who call you to your

5  home and ask you to give us your opinion about some products

6  or service.

7    Q    And for how long have you held that job?

8    A    Since October 16, 2007.

9    Q    What is the name of your employer?

10   A    Universal Survey.

11   Q    Angel, how old are you?

12   A    I'm 45.

13   Q    What is your date of birth?

14   A    March 4, 1963.

15   Q    Can you tell us about your educational background?

16   A    When I was in Puerto Rico I went only to eighth

17  grade.  Then I -- when I went to prison in 1985, immediately

18  I took GED and I got the GED in Elmira, opened the door for

19  precollege and I immediately went to Sullivan County

20  Community College in prison.

21   Q    Did you receive any degrees from college?

22   A    My Associate Degree.

23   Q    Now, when did you move from Puerto Rico?

24   A    I was 16 years old, that was 1979.

25   Q    What were the circumstances of your moving from

*Angel Martinez - Direct*                                    58

1   Puerto Rico to New York?

2       A    I started getting into trouble, you know, I started

3   using, smoking marijuana, drinking.  My sister she was my

4   protector, where I have a big family, we are all 14 all

5   together, and she was my protector.  She would defend me of

6   my brothers' abuse all that kind of stuff, so she left to

7   New York, and when she left, you know, I felt empty, I felt

8   like something was missing.

9               MR. MULVEY:  Objection, Your Honor; not

10  responsive.  We're getting a narrative now instead of why he

11  left.

12              THE COURT:  Overruled.  I'll ask you that you

13  keep this brief, this is background information I assume.

14      A    She moved over here to New York and then I wrote a

15  letter to her and she sent for me and I went to live to her

16  apartment with my brother-in-law who is there.

17      Q    And what's your sister's name?

18      A    Teresa, T-E-R-E-S-A, Bramble, B-R-A-M-B-L-E.

19      Q    After you made that move to New York, you had some

20  drug abuse problems, correct?

21      A    That's correct.

22      Q    I'd like you to tell us all the history of your

23  drug abuse.

24      A    I started with marijuana, smoking marijuana and

25  drinking alcohol, and then at the age of 15 I experimented

*Angel Martinez – Direct*                                    59

1   with heroin for the first time, but I didn't use drugs,

2   heroin until I was like 19 years old.  And but I was, I was

3   smoking marijuana in between all that kind of stuff, drinking

4   heavily, and then I started using heroin again, shooting

5   heroin.

6       Q    Now, just give us sort of a time line as far as

7   your using heroin and whether or not there was an occasion

8   where you entered detox.

9       A    Can you repeat that?

10      Q    Yes.  What I'm asking you now is to give us sort of

11  a time line, meaning like the years in which you were using

12  heroin and whether or not during that period you went into

13  detox at all?

14      A    After I got released from my previous

15  incarceration, I got -- I was working doing everything fine,

16  then in 1995 I started using drugs again.  Actually, 1996 I

17  started using drugs again.  And I would use like three months

18  here, then I will stop, I will go to a detox, and then I will

19  use drugs again, I will go to a rehab.  It didn't work for

20  me.  I would stay clean for three or four months, I would

21  keep using drugs regardless.  I was a mess, I was a mess

22  using drugs, yes.

23      Q    When is the last time, Angel, that you used drugs?

24      A    It was April 25th, 2007.

25      Q    Have you used any drugs at all since then?

*Angel Martinez – Direct*                                              60

1      A     No, not at all, none whatsoever.

2      Q     Have you drunk alcohol at all since then?

3      A     No.

4      Q     Can you tell us how you've been able to stay away

5    from that stuff since then?

6                MR. MULVEY:  Your Honor, at this point I'm

7    going to object.  While he certainly gets some background,

8    unless counsel has an offer of proof as to the relevance of

9    the claim here, this is personal narrative that doesn't go to

10   any of the causes of action that are being asserted.

11               MR. MILLER:  I can respond if you want me to.

12               THE COURT:  May I see counsel and the court

13   reporter at sidebar, please?

14           **(Sidebar discussion held on the record.)**

15               THE COURT:  Let me set the tone by saying that

16   I would like to avoid at all costs the argument of

17   evidentiary issues in front of the jury, and to the extent

18   that we anticipate any will arise, let's deal with them

19   before or after the court session with the jury.

20               Now, everything that you said up to now is

21   fine, useful as background, but not highly probative.  What

22   are you driving at here and how is it relevant?

23               MR. MILLER:  The injuries of a psychological

24   nature are ongoing to present, and I think that it's

25   important in order to incorporate his psychological treatment

*Angel Martinez – Direct*                                    61

1    and condition, it's important to let the jury know that he

2    has not been using drugs and why not.  In other words, there

3    will be an inconsistency if he is going to therapy, he is on

4    drugs, I need to bring this all together.  It's not going to

5    take much longer, maybe one more question.

6                    THE COURT:  Mr. Mulvey.

7                    MR. MULVEY:  I have an outstanding objection,

8    Your Honor, in the sense that what you're now contemplating

9    ruling on, that clearly I would expect that the plaintiff

10   would get into, you know, some background of who he is.  I

11   understand that he has got to give them some familiarity.  I

12   would do the same with my clients.  But the damages come

13   after we establish there is some injury and I think it would

14   be incumbent upon Mr. Miller to first establish what the

15   injuries were, he still has his client on the stand, he can

16   get into that once he established that he sustained some

17   injury and fill in the blanks as it were.  To kind of

18   front-load that information to gather sympathy from the jury

19   I think is inappropriate.

20                    THE COURT:  I'm going to sustain the

21   objection.  I think it is not relevant to the claims and

22   defenses.  And I'll leave open the possibility that if

23   something that arises during the course of his direct

24   examination regarding damages convinces me that this is

25   probative, I can reverse myself.

*Angel Martinez – Direct*

62

1        MR. MULVEY:  Thank you, Your Honor.

2        **(Sidebar discussion concluded.)**

3        THE COURT:  Proceed.

4    Q    Angel, can you tell us your employment history?

5    A    Since I came over here to New York?

6    Q    Yeah.

7    A    When I was 16 I worked for Tazadeoro,

8  T-A-Z-A-D-E-O-R-O.  And then eventually I moved to Elizabeth,

9  New Jersey, because my mother was living there.  I worked for

10 a mattress factory, and then I moved back to New York and I

11 worked for another factory for a couple years, like four

12 years.  And then a few years later after I got released from

13 my prior incarceration I worked for the National Puerto Rican

14 Forum, I worked for a monitoring service, I worked for Candis

15 Incorporated, I worked for Stop & Shop, for Toys R Us, for

16 Payless, I worked for Hometown Buffet, for Howard Johnson,

17 and now I'm working for Universal Survey.

18   Q    Now, you mentioned that you had been in jail before

19 2002, correct?

20   A    That's correct.

21   Q    Could you tell us when that was?

22   A    That was in 1985.

23   Q    And was that for a felony conviction?

24   A    That's correct.

25   Q    And before that you actually received five years

*Angel Martinez – Direct*                                    63

1   probation for another case, right?

2        A    That's correct.

3        Q    That was also for a felony conviction?

4        A    That's correct.

5        Q    That was in 1980?

6        A    Around 1980.

7        Q    All right.  Now, during all the time up until

8   February 25th, 2003 that you were incarcerated, had you ever

9   been written up at any time by a correction official?

10       A    No, sir, not at all.

11       Q    How many years did you spend in jail the first

12  time?

13       A    Seven and a half years to fifteen.

14       Q    And during those years did you ever have any type

15  of a dispute with a corrections officer?

16       A    Not at all, sir, no.

17       Q    How did you manage to stay away from trouble during

18  the years that you were in jail?

19       A    Well, the first time it was -- I was in a college,

20  I want to do better with myself, with my life.  You know, I

21  stayed away from people, from other inmates, those

22  troublemaker inmates because, you know, I'm not a gang member

23  either, I never got involved in any gang related stuff at

24  all.

25       Q    Did you say gang related?

*Angel Martinez – Direct*

64

```
 1      A      Yeah.  I'm not, never been a gang member at all
 2  whatsoever.  So just being by myself, you know, reading,
 3  studying.
 4      Q      Okay.  Now, the last sentence you served, could you
 5  tell us the month and year that it began and the month and
 6  year that it ended?
 7      A      The last sentence?
 8      Q      The last sentence.
 9      A      You mean this one now?
10      Q      Yeah.
11      A      Okay.  I was sentenced -- I went back to prison
12  September 12th and on September 25th, I think it was, I was
13  sentenced to five years and up to December 1st, 2006.
14      Q      You didn't tell us the year that you entered; you
15  said September.
16      A      September 2002.
17      Q      And from September of 2002 up until February 25th
18  of '03, how did you manage to stay away from trouble while
19  you were at Oneida?
20      A      Just I want to get out from prison, I just want to
21  be -- I want to be released from prison.  I just didn't want
22  to bothered no one.  I just didn't socialize much with
23  inmates or no one at all practically, stay away from those
24  things that I knew that would bring me any trouble.
25                   THE COURT:  Can we establish when Mr. Martinez
```

*Angel Martinez – Direct*                                    65

1   entered the Oneida Correctional Facility?

2          MR. MILLER:  Yes.

3      Q    Tell us the actual date, if you remember the actual

4   date that you started at Oneida.

5      A    October 25th, 2002.

6      Q    We'll get to this later, what is the last date that

7   you were at Oneida?

8      A    Oneida, March 6th, 2003.

9      Q    When you started your incarceration in September of

10  '02, what was your relationship with Altagracia like?

11     A    She helped me so much.  I mean, she was everything

12  for me.  She is everything for me right now and she always

13  been.  When I was on my drug use and I was a big mess, she

14  was the only one who helped me, you know, who give me a hand,

15  who helped me in general, who saw somehow something in me,

16  and --

17         MR. MULVEY:  Objection at this point, Your

18  Honor.  The question has been answered and I believe the

19  Court's already ruled that we're going to focus on the causes

20  of action at this point and the claims in the case, unless

21  this has some bearing directly on the allegations.

22         THE COURT:  Well, I suspect he is laying the

23  groundwork for some additional questions of this witness and

24  of the plaintiff's wife concerning the effect on their

25  relationship of certain alleged acts, but I would like you to

*Angel Martinez – Direct*

1    keep this brief and I'll give you a short rope on this so we

2    can move this forward.

3         Q    From the time that you started in Oneida in October

4    of '02 up until February 25th of '03, did Altagracia ever

5    visit you at Oneida?

6         A    Yes, every month.

7         Q    And what was the frequency in which you spoke to

8    her by phone, if any?

9         A    About three or four times a week, sometimes more.

10        Q    From October 25th of '03 up until February -- I'm

11   sorry, from October 25th of '02 to February 25th of '03,

12   where were you assigned at Oneida?

13        A    When I arrived to Oneida I was -- I was transferred

14   from Downstate to Oneida and I went to Q dorm, which is like

15   a reception area, and that Q dorm they would send inmates to

16   the near prison, near vicinity prison, Mohawk, and some

17   inmates stayed at Oneida, and I stayed at Oneida, and I think

18   I stayed at Q dorm for like three, three weeks, I'm not sure

19   right now, and then I was trying -- I was moved to M dorm.

20        Q    M, as in Mary?

21        A    M, as in Mary, M dorm.

22        Q    So, approximately what was the date that you moved

23   into M dorm?

24        A    I would say like November, middle of November, but

25   I'm not sure.

1     Q    Could you describe M dorm?

2     A    M dorm is -- it has like 60 cubicles.  Every inmate

3 at least in M dorm, I later found out that other dorms there

4 have double bunk, but in M dorm all inmates, you're assigned

5 to one cubicle with a wall like three, three and a half feet

6 tall and every inmate has their own cubicle.  These are very,

7 I've got to say was very clean dorm.  When you get into the

8 dorm when you open the door, there is a rec room to your

9 right side.

10    Q    Don't describe the layout yet, we'll get to that.

11 I just want you to describe in general, was it a minimum

12 security, medium security, maximum security?

13    A    It was a medium security.

14    Q    Okay.  And was it in a building with other floors?

15    A    Yes.  It was on the third floor, there was another,

16 second floor with another dorm.

17    Q    What was on the ground floor?

18    A    I'm not sure but I think it was -- recently I was

19 told that it was like a print shop.

20           MR. MULVEY:  Objection.

21           THE COURT:  Sustained.

22    Q    Don't tell us what they told you, just tell us if

23 you know independently, and if you don't, just say you don't

24 know.

25    A    Okay, yeah.

*Angel Martinez - Direct*

1    Q    I'm going to pass up to you what's been marked as

2  Plaintiff's 40 for identification.  And just first tell us

3  whether or not you recognize this item.

4    A    Yes.

5    Q    And could you tell us what that item depicts?

6    A    Could you repeat that, please?

7    Q    Could you tell us what that item is?

8    A    That's the layout of M dorm.

9                MR. MILLER:  Could I just consult with counsel

10  for a second, Your Honor?

11                THE COURT:  Yes.

12    Q    Does that diagram fairly and accurately depict the

13  layout of the -- let me finish the question, Angel.

14                THE COURT:  One at a time.

15    Q    Does that diagram fairly and accurately depict the

16  layout of the M dorm as it appeared on February 25th of '03?

17    A    Yes.

18    Q    Now, who drew that diagram?

19    A    I did.

20    Q    And how did you do it?

21    A    Computer.

22    Q    Be more specific.

23    A    I went to in the computer I choose a software, I

24  think it was SmartDraw, that's SmartDraw, and by everything

25  that I remember the layout of, you know, of like I was there

*Angel Martinez – Direct*

69

1   again and I draw everything, the door over here, the bathroom

2   over here, the rec room over here, the officer desk over

3   here, the cubicles over here and so on.

4               MR. MILLER:  I offer Plaintiff's 40 into

5   evidence.

6               MR. MULVEY:  I object; insufficient

7   foundation.  I don't believe it can come into evidence unless

8   it's established as to scale and that the maker, in this case

9   the plaintiff, of the exhibit had some personal knowledge,

10  took measurements or in some way was able to configure this

11  other than by memory.  It's a computer-aided sketch that he

12  could have hand drawn.  We haven't established that it

13  factually depicts the exact configuration of the facility.

14              THE COURT:  Well, I think he's made a

15  sufficient showing of foundation by his statement that this

16  fairly and accurately depicts the areas that it portrays.  If

17  you would like to ask questions on voir dire that you believe

18  will establish that there isn't sufficient foundation, I will

19  give you that opportunity now.

20              MR. MULVEY:  Briefly then, Your Honor.

21  *VOIR DIRE EXAMINATION BY MR. MULVEY:*

22      Q    Mr. Martinez, is that drawing to scale?

23      A    I'm sorry?

24      Q    Is the drawing to scale?  Are the measurements of

25  the distances drawn to scale so that 1 inch represents a

*Angel Martinez – Direct*

1    distance of a foot or 2 feet so that the distances are

2    accurate based upon some sort of measurement?

3         A    No, not really.  It was drawn by memory but I

4    remember -- what I remembered the distance what I believe was

5    almost the distance between point A to point B.

6         Q    So what's on the exhibit are approximations based

7    on your memory, is that correct?

8         A    That's correct.

9         Q    And in terms of the sizes of the rooms or the

10   distance between the rooms, that's not based on any

11   measurement you made, it's just your best estimate, correct?

12        A    That's correct.

13        Q    And in terms of the number of cubicles, you didn't

14   count them and put that depiction on the exhibit, did you?

15        A    Actually, I think I have like 57 cubicles and M

16   dorm I think they have 60 cubicles.

17        Q    So the number of cubicles is not accurate either,

18   correct?

19        A    Maybe I have like one, three missing cubicles, yes.

20        Q    And with respect to more importantly the area

21   around the officer's station and the landing outside the door

22   at M dorm, those exact dimensions are not depicted on the

23   exhibit, are they?

24        A    I'm sorry, can you repeat that?

25        Q    The area on your exhibit that shows the officer's

*Angel Martinez – Direct*

71

1    desk near the door entrance to the M dorm, the size is not

2    depicted exactly to scale, correct?

3        A    No, it's not.

4            MR. MULVEY:  I renew my objection based on

5    that voir dire, Your Honor.

6            THE COURT:  Mr. Mulvey, do you have a drawing

7    that you intend to offer that is you believe to scale and

8    accurate that would assist the parties in understanding the

9    testimony as it comes in?

10           MR. MULVEY:  No, Your Honor.  For safety and

11   security reasons we tend not to do that, but I do have

12   photographs that I was allowed to take, which I did share

13   with counsel on Friday, that depict all of the areas that are

14   described in the complaint in the prior pleadings.

15           THE COURT:  I'm going to overrule the

16   objection and allow it.  I think we all understand that this

17   is an approximation but I think he has laid a sufficient

18   foundation and I think this will be, frankly, useful when the

19   witnesses testify for the jury to understand where these

20   relevant events occurred.

21           MR. MULVEY:  Thank you, Your Honor.

22           MR. MILLER:  Will the item be marked next or

23   should I continue with my questions?

24           THE COURT:  It's received.

25           (Plaintiff's Exhibit 40 was received in

*Angel Martinez – Direct*                                    72

1    evidence.)

2    *BY MR. MILLER:*

3              MR. MILLER:  I'm wondering if I could use the

4    TV now to put the diagram on?

5              THE COURT:  The ELMO, yes.  Now, can you see

6    that television monitor?

7              MR. MILLER:  I think it's better to use it

8    without the ELMO.  With the Court's permission, can

9    Mr. Martinez step down here as I hold it in front of the

10   jury?

11             THE COURT:  Yes.  We're using the exhibit

12   instead; we've abandoned the ELMO.

13   Q    Angel, what I would like you to do --

14             MR. MULVEY:  Excuse me, Your Honor.  Could I

15   step around so that I could observe?

16             THE COURT:  Absolutely.

17   Q    Can you describe for the jury the layout of the M

18   dorm?  And what I would like you to do is start out at the

19   bottom right-hand corner, okay, and describe each item that's

20   important with regard to your incident.

21   A    Okay.  This is the stairs over here, it's like a

22   zigzag stairs.  This is like a platform before you go into

23   the M dorm.  This is the door over here which opens like

24   coming to you, coming toward you.

25   Q    Going out?

*Angel Martinez – Direct*

73

1      A      Going out.  Over here this is the door for the rec

2  room area, which is always kept closed, they always keep it

3  closed for maybe for the noise don't go out to the dorm area.

4  This is another door over here.  This one over here is the

5  officer desk.  And over here this is like --

6      Q      Can I stop you there for a second?  Let's go back

7  to the door entrance.  Is there a bell outside that door?

8      A      Yeah, there is a bell over here.  Any inmates that

9  want to go into the dorm, they have to ring the doorbell to

10  let the officer know that there is someone outside waiting to

11  enter, waiting to be going in.

12      Q      Continue.

13      A      Over here is like a see-through window, the officer

14  can see all this that's happening over here.  This is the

15  cubicle area, this is the beds, cubicles, like three, taller

16  than this over here, the walls.

17      Q      The walls of the cubicles?

18      A      The cubicles, okay, the black mark are the walls.

19  And this is another see-through window over here, the officer

20  can see anything that happen through all this place over

21  here.  Over here, this is a door to go to the bathroom.  This

22  one over here is the toilet, the sink, and the showers are

23  over here.  And over here, this is the officer bathroom.  I'm

24  not sure whether -- yeah, the door opens like I think it is

25  like, you know, like instead of toward you, it goes inside.

*Angel Martinez – Direct*                                    74

1      Q     Does it go into the bathroom or out of the

2  bathroom?

3      A     Into the bathroom.

4      Q     Okay.

5      A     Over here is like a blackboard or a board where

6  inmates signed out their names when they go out for any

7  reason.  If they go to the mess hall, next to their names

8  they got to put either by initial or if you go to the mess

9  hall, mess hall is like a diner area where inmates eat, if

10  you got to go to the mess hall, I just put mess hall, MH, and

11  the officer, he would know where I am all the time.  When I

12  come back from the mess hall, I erase the name.  If I go to

13  the vocational or any other place, I just have to put where I

14  was or where I'm going to.  And when the inmate come back,

15  they got to erase the name, so that way if he don't see

16  anything next to your name, he is assuming that you are in

17  the dorm.  So this is the board over here.

18          The other door over here always kept closed.  This

19  is the TV for sport.  Over here they have like microwave,

20  table.  Over here they have two telephones where I call my

21  wife like two, three, four, five times a week.  Another table

22  over here, inmates play dominoes, play chess over here or

23  cards, over here they also play, same thing, dominoes, cards,

24  whatever.  And this one over here, this is like a TV room,

25  this door is always closed so the noise from here don't go to

*Angel Martinez - Direct*

1   the TV room so if you are watching a movie it would not

2   affect the noise.

3       Q    You said there was a TV here and a TV here?

4       A    That's correct.  A movie TV and a sport TV.  Over

5   here is like a laundry room, okay.  Inmates, they send

6   assigned porter to wash the inmates' clothes, so you will

7   give your dirty clothes to -- actually, yeah, you will give

8   the dirty clothes to the porter and he will wash it for you.

9   And over here cubicles.  Okay, all this, they are cubicles.

10          This door over here goes to another dorm which is

11  over here but you are not, inmate not allowed to cross over.

12  Any inmate that leave over here, they got to go to this door

13  over here which is on the other side of the building.  Over

14  here there is more cubicles, more cubicles over here, and

15  this cubicle over here, I was assigned to this cubicle later

16  on.  First I had this cubicle over here, over here.  When I

17  got to M dorm I was over here, and then I was assigned to

18  this one over here, and then I went from here to there

19  because they have a lot of --

20      Q    Just let me indicate, it says number 52?

21      A    Number 52.

22      Q    That was your cubicle on February 25th of '03?

23      A    That's correct.

24      Q    Go ahead.

25      A    Because over here it was so close to this area

*Angel Martinez - Direct*

1   sometimes when CO call for mail, all the inmates they would

2   gather around this area, so if you're reading or whatever it

3   would disturb you, so I was moved.  When this cubicle over

4   here got empty, I asked to get moved to this cubicle and they

5   put me over here to this cubicle.  There is another door over

6   here that's always kept closed.  This area over here is like

7   a room, I don't think they use it for anything.

8       Q    Okay.  Great, thank you.  On a typical day in M

9   dorm, how many COs would be within the confines of the M

10  dorm?

11      A    One.

12      Q    And tell us, give us an idea of where the CO would

13  be during the time that he is stationed in M dorm?

14      A    Sorry, can you repeat that?

15      Q    It wasn't clear, let me rephrase it.  When the CO

16  assigned to M dorm was on his shift, where would he be?

17      A    On his desk.

18      Q    And was there ever a time during his shift that you

19  would see the CO anywhere else other than his desk?

20      A    Yeah, they would walk around and they also, many CO

21  they would stay in the rec room area watching TV as well,

22  sport TV.

23      Q    What observations prior to February 25th of '03 did

24  you make of the M dorm CO as far as his functions were

25  concerned?

*Angel Martinez – Direct*                                    77

1      A    They would check around.  They would inspect the

2  cubicle to see if they are clean.  They would give the mail.

3  They would do anything after they give like a turnaround, you

4  know, when they go checking the cubicle, they write in the

5  log book, they write their observations of the M dorm.

6               MR. MILLER:  Your Honor, I'm about to go on to

7  a new subject.  Would this be an appropriate time to take a

8  break or should I continue?

9               THE COURT:  Does anyone object?  Why don't we

10  take about a ten minute afternoon recess.

11               (Recess at 3:31 p.m.)

12               (Reconvene at 3:45.)

13  *BY MR. MILLER:*

14      Q    Angel, do you remember February 25th, 2003?

15      A    Yes, clearly.

16      Q    Could you describe generally your emotional state

17  on that day before the incident?

18               MR. MULVEY:  Objection; relevance, Your Honor.

19               THE COURT:  No, overruled.

20      A    I was in a good state of mind.  I was good, I was

21  happy, I wanted to do my time, be able to go home.

22      Q    Were you in any way agitated before the incident?

23      A    No, sir, not at all.

24      Q    Were you in any way angry at anybody before the

25  incident?

*Angel Martinez – Direct*

1      A      Not at all, sir.

2      Q      Was your ability to speak English about the same as

3  today or different back in February of '03?

4      A      No, it's different now.  Now I can communicate

5  better than before.  Before it was more like the basic, you

6  know, basic English speaking, reading or writing.

7      Q      But you were able to speak and understand English

8  back then?

9      A      I could understand very good, but speak it I will

10  have some problems.

11      Q      Could you describe how you felt physically on

12  February 25th before the incident?

13      A      Physically?

14      Q      Yeah.

15      A      I was weak.  I was skinny.  I was like 148 or

16  149 pounds.  I was still withdrawing from the methadone that

17  I was given on Riker's Island.  It takes time, sometimes

18  months to withdraw from methadone, you can't sleep, you feel

19  weak.

20      Q      Were you in any way feeling any type of pain in

21  your back before the incident?

22      A      No.

23      Q      Were you in any way feeling any type of pain in

24  your ribs area before the incident?

25      A      No, not at all.

*Angel Martinez – Direct*
79

1    Q     Were you in any way suffering from any type of

2    headache before the incident?

3    A     No, not at all.

4    Q     Were you having any physical pain or physical

5    complaints at all before the incident?

6    A     No.  Just this finger, this finger.

7    Q     Indicating the left ring finger?

8    A     The fourth finger.

9    Q     Prior to February 25th, 2003, and years before, did

10   you ever have any type of back pain?

11   A     Back on maybe on 1987 I used to play a lot of

12   handball, basketball, baseball, volleyball, and I sprained my

13   back on one occasion and I went to sick call, infirmary, and

14   they gave me I think it was some Motrins.

15   Q     And after that did you have some problems with your

16   back?

17   A     Maybe on like another two occasions I went to the

18   infirmary because of the back.

19   Q     I mean after that year did you ever have any

20   problems with your back?

21   A     No, not at all.

22   Q     And was there a time before February 25th, '03 that

23   you had fractured ribs?

24   A     Yes.

25   Q     Do you remember which ribs were fractured before

*Angel Martinez - Direct*

1  February 25th, 2003?

2      A    It was five, six, seven and eight, I believe, yes.

3      Q    Which side?

4      A    Left side, I think it was left.

5      Q    During your incarceration that started in 2002 up

6  until February 25th of '03, did you ever go to the infirmary

7  with complaints of back pain, rib pain, headaches?

8      A    No.  I went to the infirmary for a cold that I had,

9  for my hearing and for this finger.

10     Q    Could you explain, just so the jury gets some

11 background, the treatment that you were receiving for your

12 finger in February of '03.

13     A    I went to the infirmary complaining about this

14 finger, that I cannot put it straight, and I was recommended

15 to get physical therapy by the regional doctor who made the

16 surgery back on Lincoln Hospital in the Bronx, and he

17 recommended physical therapy.  From Oneida they would

18 transport me to Mohawk, which is like a medical facility in a

19 way.  I think it's Walsh, it's called Walsh Medical Center,

20 it's like an infirmary or a hospital for inmates close to

21 Oneida, many inmates they go there to receive medical

22 treatment.  So I was in Oneida and I was transported to

23 Walsh, which takes about five minutes, seven minutes, no more

24 than eight minutes to get transported from Walsh to Oneida or

25 from Oneida to Walsh.  I go there, get physical therapy --

*Angel Martinez – Direct*                                    81

1          THE COURT:  Can I stop there a moment?

2  Mr. Miller, how is this at all relevant to the claims and

3  defenses in this case?

4          MR. MILLER:  The next question will lead into

5  that.  I think he answered the question so I will ask another

6  one.

7      Q    Do you remember the last time that you went to

8  Walsh for a physical therapy appointment?

9      A    Yes, sir.

10     Q    What was the date?

11     A    February 25th, 2003.

12     Q    And what time that day did you leave the M dorm?

13     A    Officer Thompson --

14         MR. MULVEY:  Objection.  The question is what

15  time, Your Honor.

16     A    What time?

17         THE COURT:  Do you know what time you left?

18     A    I think it was like 7:00 in the morning, 7:30, no

19  more than 8:00 in the morning.

20     Q    Okay.  And when you left the M dorm that morning to

21  go to Walsh, was there a corrections officer on duty in the M

22  dorm?

23     A    Yes, sir.

24     Q    And who was it?

25     A    Officer Thompson.

*Angel Martinez – Direct*

1    Q    And had you ever seen Officer Thompson before that

2    morning?

3    A    Before that morning, no.

4    Q    In other words, he had never been in charge of the

5    M dorm before?

6    A    None that I know, but I never seen him while I was

7    in M dorm, I never saw him as an officer.

8    Q    Okay.  Now, could you describe Officer Thompson's

9    physical appearance as you remember it from February 25th,

10   2003?

11   A    To me he was like six-one, 210 pounds, I believe,

12   or around 200, 210 pounds, well built.

13   Q    Now, when you left the dorm to go to Walsh, did you

14   write something on that board that you described?

15   A    Yes, sir.

16   Q    And after your physical therapy at Walsh, were you

17   then transported back to Oneida?

18   A    Yes, sir.

19   Q    Could you tell us all the procedure -- strike that.

20        Had you made that trip on previous occasions?

21   A    Yeah, many occasions.

22   Q    Could you tell us the procedure for returning to

23   the M dorm from a medical visit at Walsh?

24   A    You would be transported by two, in my case was by

25   two corrections officers and other inmates would be

*Angel Martinez - Direct*

1  transported from Walsh to Oneida Correctional Facility.  They

2  would in the draft room, they call it the draft room, they

3  would shackle or unhandcuff, you know, the handcuffs and the

4  shackles.  They would ask you to go to your dorm if you come

5  like the time that's almost time to tell you to go back to

6  your dorm.  If you come early like 10:00 in the morning or

7  11:00 in the morning, they will ask you to go sometimes back

8  to your vocation program.

9      Q    So, on February 25th did you return to the dorm?

10     A    Yes, sir.

11     Q    And, by the way, that morning when you left the

12 dorm, did you have any type of dispute or argument,

13 disagreement, anything with Officer Thompson?

14     A    Not at all, sir.

15     Q    On February 25th, 2003, did you follow the

16 procedure that you've just described to us in going back to

17 the dorm?

18     A    Yes, sir.

19     Q    Did you do anything different than you had done on

20 prior occasions?

21     A    Not at all.

22     Q    Do you recall approximately what time you arrived

23 back at the M dorm that day?

24     A    I think it was like 2:45, 2:50.

25     Q    Could you please tell us now, Angel, what happened

*Angel Martinez – Direct*                                    84

1    on February 25th, 2003 as you proceeded back to the M dorm?

2         A    I got to the building, I opened the door, the

3    building door, then I walk the stairs, like zigzag stairs,

4    and I got to the platform, then I rang the doorbell once to

5    let the officer know that I was outside.

6         Q    Let me just stop you there for a second.  I'm going

7    to hand up to you what's been previously marked as

8    Defendants' 39.  And I'll call this just for specificity 39A.

9              THE COURT:  Is it different than what was

10   marked as 39?

11             MR. MILLER:  Well, it's a whole stack of

12   different photos, so I'll call this one A.

13             MR. MULVEY:  Can I see which one it is first?

14             MR. MILLER:  I move it into evidence.

15             MR. MULVEY:  No objection.

16             THE COURT:  Received.

17             (Defendants' Exhibit 39A was received in

18   evidence.)

19        Q    Take a look at this photo, 39A.  Do you recognize

20   that?

21        A    Yes.

22        Q    Can you tell us what it depicts?

23        A    The door of M dorm, the stairs that goes to the M

24   dorm platform, to the dorm.

25        Q    And could you hold it up and point?  Do you see the

*Angel Martinez – Direct*

1  bell that you rang in the photo?

2      A    Yes, right over here.

3      Q    Could you hold it up and show us?

4      A    Right over here (indicating).

5      Q    Indicating on the right side of the black door a

6  little more than halfway up the wall?

7              MR. MILLER:  Can I just walk in front of the

8  jury with this photo?

9              THE COURT:  Yes.

10     Q    Take it from there, Angel.  You went up the stairs

11  and rang the door?

12     A    Rang the doorbell once while I was outside.  I wait

13  like four, five minutes and nobody open the door.

14     Q    What did you do during that four to five minutes?

15     A    Wait outside.

16     Q    Go on.

17     A    Nobody opened the door so I rang the doorbell

18  again.  I wait a couple more minutes, I'm not sure, maybe

19  two, three minutes more, and nobody opened the door, so at

20  this point I'm thinking that the officer he was in the rec

21  room area where he may -- where you cannot hear the doorbell

22  being rang, at least I never heard it being rang.  I rang the

23  doorbell again, a third time.  This time Officer Thompson

24  came out, he was upset, he pushed me.

25     Q    Let me stop you there.  When you say he was upset,

*Angel Martinez – Direct*

1    what made you think he was upset?

2        A    His facial expression, he was very upset.  And then

3    he pushed me with both hands and he said, what, I can't take

4    a shit, mother fucker, I was using the fucking bathroom.

5        Q    Stop right there.  Where were you standing when he

6    pushed you?

7        A    I was outside the door.

8        Q    And could you describe the manner that he pushed

9    you?

10       A    The manner, he pushed me like this.

11       Q    Indicating he used both of his hands?

12       A    Both hands.

13       Q    And what part of your body did those two hands make

14   contact with?

15       A    My chest.

16       Q    Okay.  So, after he made that statement to you,

17   what's the next thing that happened?

18       A    I said to Officer Thompson, I thought that you were

19   in the rec room.  Then I attempted to proceed to go inside of

20   the dorm, but he held me one hand on my chest, he had a hand

21   on my chest and he said, I think that you're going to the box

22   tonight.

23       Q    Go on.

24       A    Then I went inside to the dorm.  When I got to in

25   front of the officer desk, I said to him, if I'm going to the

*Angel Martinez – Direct*

87

1   box then I want to speak to the sergeant for you pushing me.

2       Q    Why did you say that?

3       A    Because he pushed me for no reason whatsoever.  He

4   pushed me for -- he is screaming, screaming at me for no

5   reason, he pushed me for no reason.  And the reason was

6   because he threatened me to send me to the box, and I said to

7   him if I am going to the box, then I want to see --

8               MR. MULVEY:  Objection at this time, Your

9   Honor, this is repetitive, because he has given us this

10  narrative once.

11              THE COURT:  Overruled.  But if we can move

12  things along, that would be appreciated.

13      Q    Now after you said to Thompson that I want to speak

14  to a sergeant, what's the next thing that happened?

15      A    I walk to my cubicle area, which is located all the

16  way to the back.

17      Q    Just indicate with your finger the route that you

18  took from the point that he -- that you said to him I want to

19  speak to a sergeant, to your cubicle, what route did you

20  take?

21      A    I walked through here (indicating).

22      Q    Indicating going up the diagram straight towards

23  the laundry room?

24      A    Right.  And then I turn over here and I walk over

25  here and then to my cubicle area over here.

*Angel Martinez – Direct*

1    Q    Indicating then made a left going down the sleeping

2    area and then made a right going up the sleeping area to

3    cubicle number 52?

4    A    That's correct.

5    Q    Okay.  Now, at that point when you proceeded to

6    your cubicle, do you know where Officer Thompson was?

7    A    He was at his desk.

8    Q    And did you actually enter your cubicle?

9    A    I left my coat on top of my bed, yes.

10    Q    And after you put your coat on your bed, what's the

11    next thing, if anything, that you did?

12    A    I walked back again to use the bathroom.

13    Q    Now, did you take the same route back to the

14    bathroom that you took going to your cubicle?

15    A    Yes, sir.

16    Q    And just indicate again for the jury where the

17    bathroom is.

18    A    That's right, located right over here.  I had to

19    walk -- in order for an inmate to go to the bathroom, he had

20    to walk through the CO desk, there is no way to go around it.

21    Q    Okay.  And did you actually get into the bathroom?

22    A    No.

23    Q    What happened before you had the opportunity to go

24    into the bathroom?

25    A    When I was about to open the door, Officer

*Angel Martinez – Direct*

1    Thompson, he said, what, are you not going to erase your name

2    from the board, and then I went and I complied and I erased

3    my name from the board.

4        Q    Let me stop you there.  Wasn't it proper procedure

5    for you to have erased your name when you first entered?

6        A    Yes.

7        Q    And is there a reason why you did not?

8        A    What just happened, I was nervous all this happened

9    and I forgot to erase my name.

10       Q    So, when you were returning toward the bathroom,

11   you then erased your --

12              MR. MULVEY:  Objection to the form, Judge.

13   There has been leading quite a bit.

14              THE COURT:  There has been quite a bit of

15   leading and I wish you would keep it to a minimum, please.  I

16   will overrule the objection at this point.

17       Q    What happened at this point?

18       A    I erased my name.  After I complied, Officer

19   Thompson, he said, give me your ID.  I walked to the cubicle,

20   I got my ID from my coat and then I walked back again but I

21   took a different direction from the M dorm.  I gave Officer

22   Thompson my ID.  He looked at my ID for a couple second and

23   then he said, let's go outside, I want to speak to you.

24       Q    At that point did you have any idea as to why he

25   wanted to go outside with you?

*Angel Martinez - Direct*

1    A    I think that he wanted to that I don't go to the

2    sergeant and I speak to the sergeant about his pushing, so he

3    wanted to calm down things, and I want to go outside to

4    accept his apologies but he has something else in mind.

5    Q    What happened?

6    A    He walk in, he walk first outside the door, then I

7    follow.  When the door closed behind me, he pull a pin from

8    his radio which they call Code 20, I believe, officer needed

9    backup.  He pulled the pin, threw the radio to the floor and

10   he swung a punch at me but I was able to --

11   Q    Indicating the right hand?

12   A    The right hand.

13   Q    Was his right hand fist closed or opened or

14   something else?

15   A    Closed.

16   Q    What happened at that point?

17   A    I back off and then I started running back to the M

18   dorm again, you know, like I made a move to open the door

19   again to run back inside of the dorms.

20   Q    Let me stop you there.  I'm going to show you

21   Plaintiff's 39A again.  Does this picture indicate the area

22   where he took that swing at you?

23   A    Yes.

24   Q    Could you just -- maybe if we have a marker you can

25   put an X where that happened.  On Defendant's 39A, could you

*Angel Martinez – Direct*

1    just put an X in the area where Officer Thompson took that

2    swing at you?

3         A    Where he was standing?

4         Q    Yeah.

5         A    Okay.  He was like --

6         Q    Put the X first and then you can explain.  Now you

7    can hold it up?

8         A    (Indicating).

9         Q    Just touch the X; it's hard to tell from a

10   distance.

11        A    I was standing over here.

12        Q    What happened after he took that swing?

13        A    Started running back to the M dorm, I opened the

14   door but he held me.

15        Q    Why did you try to run back into the dorm?

16        A    So other inmate can see what was happening.

17        Q    Was there anyone else in that little alcove other

18   than you and Thompson?

19        A    No, not at all.

20        Q    Was the door open or closed?

21        A    The door was closed at the time.

22        Q    What happened as you tried to reenter the M dorm?

23        A    He held me to my back and then I tried to push

24   myself inside to the dorm, and as a consequence I fall to the

25   floor and Officer Thompson, he fall on top of me.

*Angel Martinez - Direct*

92

1    Q    Take us from there, tell us what happened next.

2    A    Okay.  Then somehow we got -- we were sitting

3    facing each other, he was holding both hand on my hand and I

4    was saying to Officer Thompson, please let me go, I know what

5    you're trying to do, please, let me go.

6    Q    What happened?

7    A    He said, I told you that you was going to go to the

8    box tonight.  And I look to the back, there was an inmate

9    with braids, long braids, he look at me and I make eye

10   contact with him, and the impression was like he felt sorry

11   for what was happening to me, and then I heard a lot of steps

12   coming up from the stairs, from the -- from here.

13   Q    Let me ask you, at this point are you in the

14   vestibule or inside the dorm at this point?

15   A    At this point I was inside of the dorm.

16   Q    And was the door to the dorm open or closed?

17   A    It was closed.

18   Q    Go ahead, what happened next?

19   A    I heard the steps coming up, and then Officer

20   Sisco, he punched me right here in my temple area, my left

21   temple area, and I lost it, I lost consciousness.

22   Q    Now, what's the next thing that you remember after

23   you lost consciousness?

24   A    Outside facing --

25            THE COURT:  Mr. Martinez, can you back up a

*Angel Martinez – Direct*

1  little bit?

2      A    Facing --

3      Q    Angel, this is a very strong microphone, so you

4  don't need to lean into it.

5      A    I'm sorry.  I was facing the floor being beat up,

6  punched, kicked.  I was in pain.  I was in pain.

7      Q    Who was punching and kicking you?

8      A    I can't remember right now, but Thompson, he was.

9  I remember Thompson, seeing him on the floor punching me on

10 the right rib area.

11     Q    And for how long were you being beaten when you

12 were on the floor outside that door?

13     A    To me looks like a year, but it was, you know,

14 maybe two minutes, two minutes.

15     Q    During that two-minute period were you doing

16 anything to defend yourself?

17     A    No, sir.

18     Q    Were you in any way kicking or flailing your arms

19 or doing anything with your body?

20     A    Not at all.

21     Q    What position was your body in during this

22 two-minute period?

23     A    Facing the floor.

24     Q    And what parts of your body did you feel impact?

25     A    My back, my ribs, my head.

*Angel Martinez – Direct*

1    Q    Could you tell the jury how you were feeling

2  physically during that beating?

3    A    I was in pain.  I was –– it's like I had an

4  elephant on my back.  I was in pain.  I was in pain.

5    Q    What do you mean you felt like you had an elephant

6  on your back?

7    A    I felt the pressure.  I felt the pain.  I felt the

8  punching.  I felt the kicking.  I felt that they were just

9  destroying my life.

10    Q    Did you hear them say anything to you during this

11  approximate two-minute period?

12            MR. MULVEY:  I am going to object and at this

13  point request who the they are be identified, if they're

14  defendants or not.

15    Q    Did you hear anyone say anything to you during this

16  two-minute period?

17    A    I was on the floor facing the floor and someone put

18  a foot on my back, pressing my chest against the floor, and I

19  couldn't breathe.  I couldn't breathe.

20            MR. MULVEY:  Objection; nonresponsive.  The

21  question is did someone say something.  The question was not

22  whether someone was exerting force.

23            THE WITNESS:  I was about to go to that.

24            THE COURT:  I'll sustain the objection and

25  strike that portion of the answer.  If you would just answer

*Angel Martinez - Direct*

1   the question, please.

2       Q    What did you hear someone say?  I'm not asking you

3   what led up to that, just tell me what you heard anyone say

4   to you at that point.

5       A    Die, mother fucker, die.

6       Q    And what was physically happening to you right

7   before --

8               MR. MULVEY:  I'm going to object to that

9   response unless we can identify which of the defendants

10  allegedly said that.

11      Q    Well, where were you facing?

12      A    Facing the floor.

13      Q    So, could you see who was doing that to you?

14      A    No.

15      Q    Okay.

16              MR. MULVEY:  Renew my objection, Your Honor.

17              THE COURT:  Why is it not hearsay?

18              MR. MILLER:  I'm sorry?

19              THE COURT:  Why is it not hearsay unless you

20  can establish that one of these defendants made that

21  statement?

22              MR. MILLER:  Well, first of all, it's res

23  gestae.  Secondly, they're all there, they're all witnessing

24  this incident, and the fact that it's said to him is enough

25  since they were all there.  He was facing down, his eyes were

*Angel Martinez – Direct*

1   against the floor, there is no way he could have known who

2   was saying that, but we can establish that these defendants

3   were there at the time.

4            MR. MULVEY:  Thus far the testimony is only

5   two named defendants, Judge.  So what we can distinguish so

6   far only two defendants have been identified, Officer

7   Thompson and Officer Sisco, those are the only two defendants

8   that the plaintiff has identified as being present.

9            MR. MILLER:  I will get to that point.

10           MR. MULVEY:  But he is testifying now about

11  alleged statements.

12           THE COURT:  I understand the arguments.  I'll

13  overrule the objection.  I believe it may not be hearsay at

14  all because it's not being offered necessarily for the truth

15  of the matter asserted.  And, secondly, I believe it is an

16  exception, in any event, the res gestae, so I will overrule

17  the objection.

18  Q    What was happening at the time when someone said to

19  you, die, mother fucker?

20  A    They were pressing a foot on my back, pressing my

21  chest against the floor, and I couldn't breathe, couldn't

22  breathe.  And I was saying I can't breathe, I can't breathe,

23  and that officer, he was saying, die, mother fucker, die.

24           MR. MULVEY:  Objection.  Which officer is it?

25  Same objection.  If he is going to continue to refer to a

1    defendant, we're entitled to know who it is.

2              MR. MILLER:  It's the same res gestae, Your

3    Honor.

4              THE COURT:  Same ruling; overruled.

5        A    And it felt, it felt like you're suspended, you

6    know, like between life and death, life is over here and

7    death is over here and there is a black mark over here, you

8    see that black mark.  It's like you're dying, that's it,

9    you're dying.

10       Q    Let me stop you there just for a second.  At the

11   time of this occurrence, did you know the names of any of

12   these officers?

13       A    No.

14       Q    Did you later come to learn the names of any of the

15   officers who were there at the time?

16       A    Yes.

17       Q    Could you tell me the names of the officers that

18   you came to learn later were there at the time?

19       A    Meyers, Novak, Thompson and Sisco and Temple.

20       Q    When did you learn the name of Officer Thompson as

21   the person who was stationed at the M dorm?

22       A    By his misbehavior report.

23       Q    And when was that?

24       A    I was served with the misbehavior report on

25   February 27.

*Angel Martinez – Direct*

1    Q    And when did you learn the name Sisco as being one

2    of the people that were there?

3    A    When I did learn?

4    Q    Yes.

5    A    By the criminal complaint, the criminal complaint.

6    Q    And how do you know it was Sisco that punched you

7    in the face?

8    A    Because I saw Sisco before on the vocational

9    building and he had like four stripes, so it had meaning that

10   he had over twenty years in prison working for the Department

11   of Corrections, and his statement to the criminal

12   persecution, he has stated that he was twenty, over twenty,

13   working over twenty years with the Department of Corrections

14   service.  And also when I requested on numerous occasions the

15   production of the photograph, they produced their photograph

16   of Sisco.

17   Q    And when you saw the picture of Sisco, what did you

18   recognize that picture to be?

19   A    A picture.

20   Q    Did you recognize the person in the picture as

21   having been there on the 25th?

22   A    Yes.

23   Q    And what can you state specifically that that

24   person, Sisco, did on the 25th, other than being there?

25   A    Can you repeat the question again, sir?

*Angel Martinez - Direct*

99

```
1      Q      You said earlier that someone punched you in the
2  face.
3      A      Uh-huh.  In the temple area.
4      Q      In the temple.  Did you ever recognize that person
5  in any of the photos that you looked at?
6      A      Yes.
7      Q      And who was it?
8      A      Sisco.
9      Q      Did you recognize any other photographs that they
10 showed you?
11     A      They showed me --
12            MR. MULVEY:  Objection as to context, Your
13 Honor.  What photographs, when, under what circumstances?
14            MR. MILLER:  I believe he just testified to
15 that.
16     Q      In the same circumstance when they showed you the
17 photo of Sisco, what were the circumstances of them showing
18 you those photos?
19            THE COURT:  Mr. Miller, can we cut this short?
20 We are going pretty far afield.  What we are trying to
21 establish is who was present, does he know who was present,
22 how does he know.  You don't have to get into the background.
23     Q      Tell us who was present.
24     A      When they produced the photograph?
25     Q      No.  In the M dorm outside when they were beating
```

*Angel Martinez – Direct*

100

1    you, who was there besides Thompson and Sisco?

2                    THE COURT:  He has already stated this;

3    Meyers, Temple, Thompson, Sisco and Novak.  Can we move on?

4                    MR. MILLER:  Yes.

5                    THE COURT:  If you want to ask him how he

6    knows that, that's fine, but you're spending too much time on

7    this.

8                    MR. MILLER:  Thank you.

9        Q    How do you know that?

10       A    By the documents that they produced and by the

11   criminal complaint.

12       Q    Now, what happened next after the person said to

13   you, die, mother fucker?

14       A    Sisco, he pull the handcuff, they pulled me by the

15   hand.  You know, I was still facing the floor and he pull me

16   by the hand, and then I was slammed against the gate, this

17   gate over here, and this wall over here.

18       Q    Hold it up, please.

19       A    I was slammed against this gate, the wall, okay.

20       Q    Who slammed you against the gate and the wall?

21       A    Sisco.

22       Q    Could you point out Sisco?

23       A    Right here.  Right there (indicating).

24       Q    Describe him.

25       A    The one with the glasses, white shirt, black suit,

*Angel Martinez – Direct*                                    101

1   who is looking at me.

2       Q    Indicating fourth from the end?

3       A    That's correct.

4       Q    What happened next?

5       A    He didn't push me, literally he didn't push me, but

6   he make me run to the stairs and then when I was about to get

7   to the platform, to the platform that is over here --

8       Q    At the bottom of the stairs?

9       A    -- he let me go.

10      Q    Angel, I want you to be more specific in describing

11  what he did to you.  Was he behind you?  Was he in front of

12  you?  Was he to your side?

13      A    I was on the floor, facing the floor and he pull --

14      Q    I mean when you went down the stairs.

15           MR. MULVEY:  Your Honor, the witness was

16  answering.

17           MR. MILLER:  Go ahead.  It's going to be

18  repetitive, but that's fine.

19      A    He didn't push me but he run with me to the stairs,

20  and when I was about to get to the platform, he let me go, he

21  let me loose, and I hit the floor and I got hit over here.

22      Q    Indicating the left side of the face, I guess,

23  right at the top of the cheekbone?

24      A    Cheekbone, that's correct.

25      Q    Does that picture depict the area of the floor that

*Angel Martinez – Direct*

1  you fell, the picture you have in front of you, 39A?

2      A    No.  This is missing the platform which is over

3  here.

4      Q    At the bottom of those stairs?

5      A    Yes.

6      Q    What happened next after you hit that floor?

7      A    From that point on I don't remember how I got to

8  the van, you know, transporting van.

9      Q    The van?

10     A    To the van.  When I got to the van, I don't know

11 whether it was Sisco or I don't know how I was -- I don't

12 know who, they push my face against the van window, pow.

13         MR. MULVEY:  Objection, Your Honor.  If the

14 witness's testimony is he doesn't know which of the

15 defendants did it, then I believe the Court's ruled already

16 on that type of testimony.

17         THE COURT:  Well, I'll permit the testimony,

18 but I will admonish and charge the jury that they're only to

19 consider any acts allegedly committed by the defendants in

20 this case and they're not to consider for purposes of

21 liability any acts taken by unidentified corrections

22 officers.

23     Q    Do you know the names of any of the officers who

24 were present when you were pushed up against the van?

25     A    No.

*Angel Martinez – Direct*                                    103

1    Q    Okay.  What happened next?

2    A    I was transport to the infirmary by Sergeant Temple

3  and another corrections officer that I can't recall his face

4  at all at this moment.

5    Q    How were you feeling at that point, Angel, when you

6  were being transported to the infirmary?

7    A    Physically or emotionally?

8    Q    Let me start with physically.  We'll break it down.

9  How were you feeling physically at that point?

10   A    I was in pain.  I was a mess.  I was in pain.  I

11 was in pain.

12   Q    Do you recall what parts of your body were hurting?

13   A    Whole body.  My head, my head was killing me.  My

14 back was killing me.  My rib area over here was killing me,

15 you know, the ribs over here, the right side of my rib cage.

16 I was in pain.

17   Q    How did you appear physically?  Not how did you

18 feel, but how did you appear physically at that time?

19   A    How I did -- I don't understand your question.

20   Q    If one were to look at you at that time, could you

21 describe your physical appearance?

22   A    They would say that I --

23            MR. MULVEY:  Objection; they would say.  That

24 calls for a hearsay.

25            THE COURT:  It calls for speculation.

*Angel Martinez – Direct*

1   Sustained.

2       Q    Tell us what you know.

3       A    I was like a 15 round boxer being beat up.

4       Q    What does that mean?  Tell us what you mean by

5   that.

6       A    Like I was -- my face was bruised, blood coming

7   out, bruise all over my body, and pain.

8       Q    How were you feeling emotionally at that point?

9       A    I think it was better to just let me die instead of

10  doing all this stuff to me.

11              MR. MULVEY:  Objection; nonresponsive.

12              THE COURT:  Sustained.  Can you rephrase?

13      Q    Tell us how you were feeling.  When you were in the

14  van, what was going through your mind?  I think you answered

15  it but I can ask it again.  How did you feel?

16      A    I was destroyed, I was emotionally destroyed.  I

17  was like, what's going on with my life?  What the hell is

18  going on with me?  I mean, what the hell is going on?  What

19  they doing?  Why when doing all these things to me?  Why?

20  Why?  I haven't done anything but ring the doorbell three

21  times.  Why they doing all this stuff to me, why?  I was

22  confused.  I was emotionally destroyed.

23      Q    Where did you go from the van?

24      A    To the infirmary.

25      Q    And do you know who escorted you to the infirmary,

*Angel Martinez – Direct*                                    105

1    the names of anybody?

2        A    It was Temple and another officer who I can't

3    remember his face at all.

4                MR. MILLER:  Can I just have one second?

5                THE COURT:  Yes.

6        Q    What happened when you arrived at the infirmary?

7        A    There were a few officers, I can't remember their

8    faces.  Sergeant Temple was there.  Sergeant Temple asked me

9    to face the wall.  I was handcuffed, handcuffs were extremely

10   tight, extremely tight, and she noticed that my hands were

11   turning black and she --

12                MR. MULVEY:  Objection.  The question was who

13   was there.

14                THE COURT:  Sustained.  And I'll strike the

15   last portion of the answer.

16       Q    What happened when you got to the infirmary?  You

17   said you were handcuffed?

18       A    I was handcuffed.

19       Q    Take it from there.

20       A    Sergeant Temple, she noticed that my hands were

21   turning black and she asked one of the officers to take off

22   my handcuff.  When they removed the handcuff, my hands

23   stopped bleeding through here.

24       Q    Indicating the left.

25       A    The left hand.  Then there was a corrections

*Angel Martinez – Direct*                                                    106

1   officer with a video camera, another one taking with a

2   camera.  The nurse cleaned my face from blood or whatever.

3       Q    Let me stop you there.  When did you first notice

4   the video camera?

5       A    That's when I got to the infirmary.

6       Q    Was that before or after they cleaned your face?

7       A    I think it was after, after they cleaned my blood,

8   yeah.

9       Q    Now, what happened?  They cleaned your face, what

10  happened next?

11      A    They cleaned my face, and officers started taking

12  pictures of my body, okay.

13      Q    Let me stop you there.  I'm going to pass up to you

14  Plaintiff's 16.

15              MR. MULVEY:  Your Honor, I just note for the

16  record that those exhibits correspond exactly to Defendants'

17  proposed number 8.  I have them in 8 and a half by 11 format.

18  So, whichever preference counsel has, the smaller ones, these

19  are the exact same.  Your copy is right in your binder there.

20              THE COURT:  You've assembled a second set?

21              MR. MILLER:  I'll use mine.  I'll offer

22  Plaintiff's 16 into evidence.

23              MR. MULVEY:  I think they're the same.  No

24  objection.  They're no different, they're just different

25  size, mine are enlargements.

*Angel Martinez – Direct*                           107

1          THE COURT:  So what you've given us are the

2     original exhibits that you intend to offer?

3              MR. MULVEY:  That's correct, Your Honor.

4              THE COURT:  They're not an extra set for the

5     Court?

6              MR. MULVEY:  I have an extra set for the Court

7     as well.  If you want, I do have another set.

8              THE COURT:  Thank you.  Then any objection to

9     P16 being received?

10             MR. MULVEY:  No, Your Honor.

11             THE COURT:  Received.

12             (Plaintiff's Exhibit 16 was received in

13     evidence.)

14     Q    Angel, have you seen the photos that are in

15     evidence as Plaintiff's 16?

16     A    Yes.

17     Q    I'm going to show you an item that I'm going to

18     mark as 16A.  And I'm going to ask you, take a look at this

19     picture, and could you describe for us what that picture

20     depicts?

21     A    That was when I was in M dorm I was being beaten --

22             MR. MULVEY:  Objection, Your Honor.  That's a

23     narrative, it's not -- he has already testified this was

24     taken in the infirmary, it doesn't have anything to do --

25             MR. MILLER:  Your Honor, this answer is

*Angel Martinez – Direct*

1   responsive, and I ask that counsel not give a long-winded

2   objection each time he has an objection.  I believe you gave

3   us an instruction on that.

4               THE COURT:  Well, I mean, I will overrule the

5   objection, but I'm going to ask you if you would avoid

6   repetition for all of us, that would be appreciated.

7       Q    I'm just asking you, what does that picture depict?

8       A    My defecate when I was being beaten in M dorm.  I

9   defecated in M dorm when I was being beaten, kicking,

10  punching, and they took this picture.

11      Q    Okay.

12              MR. MILLER:  Your Honor, I would like to

13  publish all of the photos as Plaintiff's 16 to the jury.

14              THE COURT:  Yes.

15              MR. MILLER:  How about if I give half to this

16  end and half to that end?

17              THE COURT:  That would be fine.  Mr. Miller, I

18  would ask that you continue with your examination.

19      Q    Other than them taking photos at the infirmary, did

20  anything else happen at the infirmary?

21      A    They were like playing, like playing with me.  An

22  officer, he slapped me on the head.

23              MR. MULVEY:  Objection, Your Honor.  Again,

24  the Court's ruled on this and I would ask --

25              THE COURT:  Sustained.  I will ask you to

*Angel Martinez – Direct*

1    limit your questions to any acts that can be established that

2    these defendants committed.

3        Q    Was Sergeant Temple still there at the infirmary?

4        A    Yes.  As a matter of fact, she asked me to write in

5    a statement of what happened.  I wrote or at least I attempt

6    to write everything that happened in M dorm, but Sergeant

7    Temple, she stopped me short and she said, that's enough,

8    that's enough, that's enough.

9        Q    Tell me everything that happened in the presence of

10   Sergeant Temple while you were in the infirmary.

11       A    I was being -- officers, they were playing, you

12   know, hitting me on my head, there were -- they cleaned my

13   blood, the nurse cleaned my blood from my face and there was

14   on my body.

15       Q    And did you receive any treatment while you were at

16   the infirmary?

17       A    A nurse, there was a nurse there who I asked for, I

18   said to her, nurse, I'm in pain, please help me.  And she

19   just walk away.

20       Q    How long were you in the infirmary?

21       A    To me it was like maybe seven minutes, eight

22   minutes.

23       Q    And where did you go next?

24       A    To the box, to the SHU.

25       Q    And who, if anybody, escorted you to the box?

*Angel Martinez – Direct*

1    A    It was Sergeant Temple and an officer with tattoos,

2  a lot of tattoos, I don't know his name.

3    Q    And tell us what happened once you got -- you

4  called it the box?

5    A    Yeah.

6    Q    Tell us what happened once you got to the box.

7    A    When I got to the box, there was a -- there were

8  three corrections officers --

9    Q    Before you tell us what happened, was Sergeant

10 Temple still with you?

11   A    Yes.

12   Q    What happened?

13   A    They put me in the draft room.  Sergeant Temple was

14 still there.  There were three corrections officers.  They

15 asked me -- one of the officer, he took the handcuff from my

16 hands, but the way he pulled it, he took it out, he was like

17 he wanted to slice my hand, like this, causing more pain.

18 And there was another like 300-pound officer at SHU, and

19 another one with a red beard, and another officer in the SHU.

20 One of the officers --

21   Q    What happened in the draft room when Sergeant

22 Temple was still there?

23   A    They were, you know, punching me, they were

24 punching me, and then they took the handcuff.  And then the

25 red beard officer, he asked me to face the wall and in the

*Angel Martinez - Direct*                                    111

1   search position like this, and then he said that -- I

2   couldn't understand, I was so confused I couldn't understand

3   or hear everything that he was saying but he was saying

4   something like --

5               MR. MULVEY:  Objection; not a named defendant.

6               MR. MILLER:  This is in the presence of

7   Sergeant Temple and it's as much res gestae as the other

8   statement.

9               THE COURT:  Let me hear the testimony and I

10  may strike it.  I'll defer my ruling.  Continue.

11      A    Then he asked me to take my shoes, my boots with

12  one hand, but I couldn't understand, so I went with both

13  hands and they started punching me, kicking me.  One of the

14  officers --

15              MR. MULVEY:  Objection.  The question was what

16  was said by this officer, Your Honor.  Now we're having

17  repetition of the previous testimony.

18              MR. MILLER:  The question is not what was

19  said.  When he was saying what was said, he objected.  The

20  question is what happened.

21              THE COURT:  I'll overrule the objection and

22  permit him to continue with his narrative as to what

23  happened.  I don't think it's repetitive, because I think he

24  is sequentially describing and now he is saying he was kicked

25  and punched after being told to pick up his boots with one

*Angel Martinez – Direct*

1  hand.

2      A    An officer, like 300-pound, he twist my arm like

3  this, you know real hard, and somehow, I can't remember how,

4  I got to the floor and I was on the floor like in a fetal

5  position blocking, they are kicking and they are punching, I

6  was like this.

7      Q    Indicating covering your face?

8      A    Covering my face, yes.  And then I don't know

9  whether they pull me up or I got up again to the search

10  position.  They took my green shirt, the green pants, and

11  that's it.

12      Q    At some point did anything happen once you had your

13  clothes off?

14      A    They asked me also to take off my underwear, and

15  when I -- when I took my underwear, they were doing like, oh,

16  oh, because I was defecated.  They were, you know, making fun

17  of me being defecated, and then one of the officers, he

18  touched me on my butt with something that felt like a baton.

19      Q    Did you say button?

20      A    A baton.  And he touched me softly but they didn't

21  do anything else.  They asked me to put the underwear, which

22  were defecated still, put the underwear, the green pants and

23  put the green shirt and they escort me to my cell, which is

24  going to be my cell for the next couple days.

25      Q    Just take a deep breath for a second.  Just so

*Angel Martinez - Direct*

1    we're clear, we're still on February 25th of '03, correct?

2        A    That's correct.

3        Q    What I would like you to do now, Angel, is describe

4    what it was like for you to be in the SHU from February 25th

5    of '03 up until March 4th of '03.  This might be hard, but

6    try to tell us everything you remember about that period of

7    time and do your best to go in chronological order.

8        A    After I was put in the cell, I asked for medical

9    attention to the officer, and I said to him that I was in bad

10   pain, that I need to see a nurse, and he said --

11               MR. MULVEY:  Objection.

12               THE COURT:  Sustained.  Counsel, this is not a

13   medical indifference case.  I won't permit you to inquire

14   concerning what treatment he requested and was denied.

15               MR. MILLER:  Then I cannot ask him what

16   happened in the SHU sequentially because -- in other words,

17   he could say something and it could be also clear that there

18   is not a claim, let's say, for medical indifference, but it's

19   still part of his suffering in the SHU and that's the purpose

20   for which it's being offered.

21               THE COURT:  Didn't we have this discussion?

22               MR. MILLER:  On this I don't think so.

23               MR. MULVEY:  Well, Your Honor, the objection

24   on another basis is that it was just a he said, we haven't

25   identified the party, whether it's a defendant, and that

*Angel Martinez – Direct*

1 would be a hearsay objection as well as the Court's previous

2 ruling in limine.

3     MR. MILLER:  Can we have a sidebar?

4     THE COURT:  Yes.

5     **(Sidebar discussion held on the record.)**

6     THE COURT:  I thought I made my ruling very

7 clear, but let me repeat it.  I will not permit you to elicit

8 testimony about anything that happened to him that is not

9 directly related to the incidents involved or is an ordinary

10 incident of SHU confinement.  The fact that he requested and

11 was denied medical treatment is a separate claim which is not

12 a part of this case.  Any beatings that occurred are fair

13 game, if they were either perpetrated by either of the

14 defendants in this case or they were present and failed to

15 protect, because I do understand that to be one of the claims

16 in the case, but I will not permit anything that is not a

17 claim in this case.

18     MR. MILLER:  Now, the purpose of -- I was not

19 going to go into the beating of the 25th or the 26th because

20 of the ruling you made earlier today.  I don't want you to

21 think that I intentionally elicited testimony against your

22 ruling.  What I'm eliciting at this point is nothing to do

23 with anything but the pain and suffering taking place in a

24 place that he should not have been in.  We're not making a

25 claim against any of the individual officers, nor the nurse,

*Angel Martinez − Direct*

1  but if he suffered as a result of being in pain and not

2  getting treatment, that goes to pain and suffering.

3            It's going to be very hard to carve out

4  various aspects of his stay in SHU and leave others out.  If

5  I ask for a narrative, which I think is encouraged to move

6  things along, he is then going to mention things that causes

7  us to have this conference.  I think that it's better to let

8  him bring it out, he won't bring out the assaults, and then

9  if an instruction is necessary later to say that there is no

10  claim for this, then I think that's -- in fairness to the

11  plaintiff I think that's the way to do it.  Otherwise, it's

12  going to be very tedious and it's going to be almost

13  impossible.

14            THE COURT:  I don't think it will be at all.

15  I think you can ask him how he felt, was he in pain, you've

16  asked that, concerning the February 25th incident.  If you

17  want to ask, you know, going forward, fine, but the fact that

18  he requested and was denied treatment is not in this case and

19  I will exclude it.

20            MR. MULVEY:  And may I for the record, Your

21  Honor, that specific allegation was made against Officer

22  Pilmore, that was in the complaint, that's what was

23  testified.  The case against Officer Pilmore has been

24  withdrawn.  If they want to pursue that, they can pursue it,

25  they had a defendant, they made a decision to drop the

*Angel Martinez – Direct*                                    116

1   charges against him.

2                    MR. MILLER:  No, it was the wrong one, it was

3   the wrong correction official.

4                    MR. MULVEY:  That's what the claim was.

5                    MR. MILLER:  We're not disagreeing on what the

6   claims are, we're disagreeing on what is relevant at this

7   point.  I'll do my best to follow your instruction.  I have a

8   full understanding at this point and I will proceed.

9                    THE COURT:  Thank you.

10   Q     I want you to tell the jury how you felt when you

11   were first taken to your cell in the SHU on the 25th.

12   A     I was confused.  I was afraid.  I was like, what's

13   going on, what's going on.

14   Q     Have you ever been to the SHU before?

15   A     No, never in my life.

16   Q     Could you describe what –- sorry if this sounds a

17   little cavalier, but what was life like in the SHU during

18   that week that I asked you to describe from the 25th to

19   March 4th, describe what it was like.  Don't tell us about

20   any interactions with anybody, but tell us what life was like

21   during that seven or eight day period.

22   A     I was very, very afraid for my life.  I thought

23   that I was going to get killed in Oneida.  Any time that any

24   officer walked by to my cell and I hear their keys, keys

25   making noise, I was afraid that they would come inside of my

*Angel Martinez - Direct*

1    cell again and beat me up again.  On occasions when I receive

2    the misbehavior report I would try because I didn't have

3    anything to write with.  I was not provided with anything.  I

4    was not given my personal property.  I was not allowed to go

5    to the one hour of recreation that inmates get when they're

6    in SHU.  I was not allowed to take any shower, and on

7    occasion I was even denied three full meals, and on occasion

8    I asked for where's my tray of food, and one officer said you

9    are not --

10              MR. MULVEY:  Objection.  Objection.

11              THE COURT:  I'll move to strike the last

12   portion as in violation of my ruling.

13        Q    Don't talk about conversations with officers.  Just

14   tell us, you know --

15        A    And so when I was served with the misbehavior

16   report, I wrote with toothpaste, they are going to kill me.

17   And then when I was transferred to Mohawk later on, one of

18   the officers --

19              MR. MULVEY:  Objection, Your Honor.  This is

20   outside the scope, way outside the scope of the question.

21              MR. MILLER:  I agree.

22              THE COURT:  Sustained.

23        Q    We're trying to keep the things in the SHU up until

24   March 4th.  Could you describe further what it was like there

25   or do you feel that you've given as best an answer as you

*Angel Martinez - Direct*

1    can?

2        A    It was -- I was very afraid.  I was very afraid for

3    my life, yes.

4        Q    When did you first shower?

5        A    When they -- I think it was March 5th when they --

6    I had a doctor appointment for this finger, I think it was,

7    and my hearing, and the sergeant, he came in the morning and

8    he said you got to --

9                    MR. MULVEY:  Objection.

10                   THE COURT:  Sustained.

11       Q    Just tell us when did you take --

12       A    Sorry.

13       Q    That's okay, just do your best.  Just tell us when

14   you took a shower.

15       A    March 5th.

16       Q    For the first time that you were in the SHU.

17       A    March 5th.

18       Q    Okay.  You mentioned something about not getting

19   three meals.  Could you just be more specific about that?

20       A    Inmates, even though that they are in the SHU, you

21   know, they fed, you get food to eat, of course, to survive,

22   and they serve you three meals; breakfast, lunch and dinner.

23   Sometimes I won't get one --

24                   THE COURT:  Can I stop you there?  I'm going

25   to strike this testimony, it's in violation of my ruling.

*Angel Martinez – Direct*

1  The fact that he was not given meals, you haven't attributed

2  it to any of these defendants, and I will sustain the

3  objection that I made.

4          MR. MILLER:  Okay.

5     Q    Could you tell us how you felt physically during

6  that period of time up until March 4th in the SHU?

7          MR. MULVEY:  Objection; asked and answered,

8  Your Honor.  I believe that this line of inquiry has been

9  pursued.

10          THE COURT:  Yes, it is repetitive.  Sustained.

11    Q    Tell us what happened on March 5th?

12          THE COURT:  Would this be a good time to take

13  our evening break?  It sounds like you're moving into a new

14  area.

15          MR. MILLER:  Logical, yeah.

16          THE COURT:  Members of the jury, we're going

17  to take our evening recess and reconvene tomorrow at 9:00.  I

18  have four rules for you to follow between now and then.

19  First, please don't discuss this case with anyone, including

20  among yourselves.  Secondly, don't read or listen to any

21  media accounts regarding this case.  Third, I'd like you to

22  keep an open mind until all the proof is in and you've heard

23  the instructions that I will give you at the close of the

24  case.  And fourth, I hope you have a great evening.  Do you

25  think you can do all those?  All right.  Thank you.  We'll

*Angel Martinez – Direct*

1    see you tomorrow.

2                  (Court adjourned at 5:00.)

3                  *              *              *

4

5            C E R T I F I C A T I O N

6

7

8            I, EILEEN McDONOUGH, Registered Professional

9    Reporter and Certified Realtime Reporter, DO HEREBY CERTIFY

10   that I attended the foregoing proceedings, took

11   stenographic notes of the same, that the foregoing is a

12   true and correct copy of same and the whole thereof.

13

14

15

16

17

18

19

20

21            _____

22                  EILEEN McDONOUGH, RPR, CRR

23

24

25