UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------x

ANGEL L. MARTINEZ,

                         Plaintiff,

vs.

SCOTT THOMPSON; LARRY SISCO;
SCOTT MEYERS; THOMAS NOVAK;
R. LABRAGUE; MICHAEL DUVALL;
DONNA TEMPLE; DONALD LANE;
DONALD SELSKY; R. SIPLEY,

                         Defendants.

--------------------------------------------x

                         Transcript of Jury Trial held on
September 11, 2008, at the James Hanley Federal Building,
100 South Clinton Street, Syracuse, New York, the HONORABLE
DAVID E. PEEBLES, United States District Judge, Presiding.


                    A P P E A R A N C E S

For Plaintiff:        SIVIN, MILLER LAW FIRM
                      Attorneys at Law
                      170 Broadway
                      Suite 600
                      New York, New York 10038
                         BY:  GLENN D. MILLER, ESQ.
                              EDWARD SIVIN, ESQ.


For Defendants:       OFFICE OF THE ATTORNEY GENERAL
                      STATE OF NEW YORK
                      615 Erie Boulevard West
                      Syracuse, New York 13204
                         BY:  TIMOTHY P. MULVEY, AAG


                    *Eileen McDonough, RPR, CRR*
              *Official United States Court Reporter*
                      *100 S. Clinton Street*
                    *Syracuse, New York 13260*
                         *(315)234-8546*

1              (In chambers, 8:40.)

2              THE COURT:  Counsel, last evening I provided you

3      with some draft jury instructions and a draft jury verdict

4      form.  Since then I've made some revisions to both documents.

5      I've made some minor revisions to the jury instructions.  The

6      one substantive revision that I've made to both is to refine

7      my thinking concerning the impact of 42, United States Code,

8      Section 1997e(e), because I think it applies equally to the

9      component of plaintiff's retaliation claim which relates to

10     the alleged false misbehavior reports.

11             Since there is no physical injury associated with

12     that claim, I have also indicated to the jury in the charge

13     and in the revised verdict sheet that if they award damages

14     and find liability with respect to that portion of the

15     retaliation claim, the result should be either nominal

16     damages or zero.

17             And I guess I would ask at this time if you have

18     any philosophical and substantive requests having had an

19     opportunity now to review the draft jury charges.

20             MR. MULVEY:  The charges we're going to start with,

21     Your Honor?

22             THE COURT:  Yes.  And I'll ask the plaintiff first.

23             MR. SIVIN:  First with respect to the damages

24     charge, does Your Honor intend to charge the jury that they

25     are not entitled to award damages for emotional pain and

1    suffering for any injuries sustained by plaintiff?

2            THE COURT:  No.

3            MR. SIVIN:  Because it appears that way from page

4    20.

5            THE COURT:  Yes.  That was one of the substantive

6    revisions that I made, and that clearly was taken -- it was

7    taken from an earlier case where there was only a claim

8    involving no physical injury, and I have revised that, and I

9    appreciate you pointing that out, but I did find that last

10   night.

11           MR. SIVIN:  We lost plenty of sleep last night on

12   that one.  So you will be charging the jury that plaintiff is

13   not entitled to recover for any emotional pain and suffering

14   as a result of any time that he spent in the SHU?

15           THE COURT:  That's the end result.  I will be

16   charging that they are entitled to award damages for mental

17   anguish and emotional distress with respect to the excessive

18   force claim and the portion of the retaliation claima that

19   relates to excessive force, yes, that's correct.  Because the

20   due process claim has been dismissed and because the false

21   misbehavior report did not result in any physical injury,

22   then that is the end result, yes.

23           MR. SIVIN:  I would take exception to that charge

24   for two reasons.  Number one, if I understand Your Honor

25   correctly, the Court's stating that because the claim against

1    Lane was dismissed, that plaintiff -- that's one of the

2    reasons why plaintiff cannot recover damages for emotional

3    injury sustained while he was in the SHU.

4         THE COURT:  I think the reason now, the prevailing

5    reason now is that he did not suffer any physical injury as a

6    direct result of the alleged filing of the false misbehavior

7    reports.  Any injuries that he incurred while in the SHU,

8    such as, for example, the alleged assault on March 5, was an

9    intervening independent act, and so it's my position and it

10   is my intention to charge the jury, accordingly, that there

11   is no physical injury associated with the false misbehavior

12   report component of the retaliation claim; therefore, the

13   jury cannot award damages for mental anguish and emotional

14   distress on that claim.

15         MR. SIVIN:  We take exception on additional grounds

16   that I believe there is case law that one can suffer physical

17   injury in the SHU for things as relatively innocuous as being

18   subjected to noxious feces being thrown.  I think the courts

19   also consider the length of time that an inmate is wrongfully

20   confined to the SHU, as to whether or not that constitutes

21   physical injury.  And certainly we feel that the beatings he

22   sustained in the SHU should also be considered an element.

23         I understand Your Honor's argument that that is not

24   necessarily connected to his having been sentenced to the

25   SHU.  I would disagree with that as well, because he never

1    received these beatings before and it was certainly part and

2    parcel and a component of him being in the SHU subject to

3    retaliation, so I don't see how the Court can separate that

4    out.

5            In the prior seven years he has not been assaulted,

6    and then sent to the SHU based on this retaliation and then

7    he is assaulted in the SHU.  So I think that's a physical

8    injury in and of itself, and for the additional reasons that

9    I mentioned.

10           THE COURT:  If you have any cases that you would

11    like to cite that I can take a look at, I would be happy to

12    do that this morning.

13           MR. SIVIN:  The case regarding the noxious feces is

14    *Zechner*, and I'm trying to find the full cite.  It says supra

15    at 464.  I'm trying to find the cite.  I can get that for you

16    in a couple of minutes.

17           THE COURT:  All right.  Well, if you can provide

18    that for me this morning, I will certainly take a look at the

19    case.  What other concerns do you have?

20           MR. SIVIN:  On the charge?

21           THE COURT:  Yes.

22           MR. SIVIN:  I think you probably corrected this

23    based on our discussions yesterday, but when we talk about

24    what was the protected conduct, in your initial charge talks

25    about retaliated against him for threatening to complain of

1    prison conditions.  I think we agreed including the actions

2    of corrections officer.

3            THE COURT:  I've done my best to go through and

4    make those revisions.

5            MR. SIVIN:  There is two pages.

6            THE COURT:  Can you tell me the page numbers?

7            MR. SIVIN:  Page 20 at the top.

8            THE COURT:  Yes, I've added including staff

9    misconduct there.

10           MR. SIVIN:  And the second full paragraph on page

11   20, the fifth line down, it also says, regarding conditions

12   of confinement, and there it should be added as well.

13           THE COURT:  Can we go off the record?

14           (Discussion held off the record.)

15           MR. SIVIN:  Page 21, paragraph beginning, the first

16   element of plaintiff's retaliation claim.

17           THE COURT:  Yes.

18           MR. SIVIN:  Second sentence, plaintiff alleged that

19   defendants retaliated against him for threatening to file

20   grievances or complaints against --

21           THE COURT:  That's been changed.

22           MR. SIVIN:  To Thompson.

23           THE COURT:  You want to limit it to complaints

24   concerning the misconduct on the part of Corrections Officer

25   Thompson?

```
 1            MR. SIVIN:  Yes.

 2            MR. MULVEY:  If I may, Your Honor, I was going to

 3    raise that sentence as well.

 4            THE COURT:  Then it's unanimous.

 5            MR. MULVEY:  Well, may I?

 6            THE COURT:  Yes.

 7            MR. MULVEY:  My concern, which we raised

 8    preliminary yesterday, is plaintiff alleges that defendants

 9    retaliated against him for filing or threatening to file

10    grievances, and I raised the issue on behalf of defendants

11    that there was no mention in plaintiff's case in chief of

12    grievances at all.

13            THE COURT:  Grievances has been taken out.  The

14    sentence now reads, plaintiff asserts that defendants

15    retaliated against him for complaining or threatening to

16    complain regarding alleged misconduct on the part of

17    Corrections Officer Scott Thompson.

18            MR. MULVEY:  Okay.

19            MR. SIVIN:  Page 22, the third element of

20    plaintiff's claim, that's just another instance where you

21    mention prison conditions.  I just want to make sure that

22    that's been changed also to reflect --

23            THE COURT:  Yeah, I think by then that the jury

24    will have gotten that it includes staff misconduct, but I

25    will add.
```

1          MR. MULVEY:  And filing or threatening to file

2    grievances has been changed to --

3          THE COURT:  To complain or threatening to complain

4    regarding.

5          MR. MULVEY:  Okay.

6          MR. SIVIN:  And the next paragraph, plaintiff's

7    retaliation claim is two components.  The first relates to

8    alleged issuance.  There is no dispute that misbehavior

9    reports were issued.

10         MR. MULVEY:  Well, how about false?

11         THE COURT:  To the issuance of allegedly false, how

12   is that?

13         MR. SIVIN:  Okay.

14         MR. MULVEY:  Okay.

15         MR. SIVIN:  Page 24, second element, plaintiff's

16   retaliation claims, and then about ten lines down it's just

17   another instance where it just says prison conditions.

18         THE COURT:  That's been changed.

19         MR. SIVIN:  Okay.  And then two further paragraphs,

20   if you find that -- this is on the bottom of 25; if you find

21   the defendant under consideration of force against the

22   plaintiff was motivated by plaintiff's complaints regarding

23   prison life.  I would take out regarding prison life, because

24   plaintiff never complained in general about prison life.

25         THE COURT:  Off the record.

```
 1              (Discussion held off the record.)

 2              THE COURT:  I will also make that change.

 3              MR. SIVIN:  And I just notice above, that the

 4    paragraph above that starts with the same language, regarding

 5    prison conditions.

 6              THE COURT:  I changed that as well.

 7              MR. SIVIN:  Okay.  Under malicious prosecution, the

 8    last line in the second full paragraph, we discussed this

 9    briefly yesterday.  I looked at the PJI charge again and I

10    have it here, I don't see the word actual.

11              THE COURT:  You're quite correct, although the

12    Second Circuit case that I relied upon for the elements does

13    use actual malice, and I think I have a citation.  I relied

14    on the Second Circuit's decision in Russell versus Smith,

15    which is reported at 68 F.3d, 33, it was decided in 1995.

16              Although I think the end result is that it will not

17    prejudice you or your client because the balance -- when I

18    describe actual malice, the balance of that charge comes

19    directly from the PJI, and essentially it is equivalent.

20    Actual malice is really a term of art that in the First

21    Amendment jurisprudence is different from malice, but in

22    reality as I go through the balance of the malicious

23    prosecution charge, I think you'll see that it's directly out

24    of PJI.

25              MR. SIVIN:  It just might confuse the jury because
```

1    if you read the PJI charge, it really is not talking about

2    actual malice, talking about inferred or circumstantial

3    malice, so there seems to be -- how about changing the word

4    actual?

5              THE COURT:  I'm going to leave it in only because I

6    prefer to follow the Second Circuit rather than New York

7    courts.

8              MR. SIVIN:  And the last paragraph of malicious

9    prosecution somewhere in the middle says, if you find that

10   the defendant gave an incomplete statement of facts to the

11   district attorney.

12             THE COURT:  I revised that a little bit last night.

13   What page are you on?

14             MR. SIVIN:  Mine is 29, it's above the proximate

15   cause.

16             THE COURT:  And I changed it to read that, if you

17   find that the defendant under consideration gave an

18   incomplete or false statement of facts to the New York State

19   Police.

20             MR. SIVIN:  That's what I was going to request.

21             THE COURT:  My question to you is, do you also

22   contend that they testified falsely before the Grand Jury,

23   and if so, is there any proof of that?

24             MR. SIVIN:  Sure.  There was testimony elicited

25   from Thompson that he testified the same way in his Grand

1  Jury as he did in his deposition.

2          THE COURT:  Because I've also added to that, or

3  testified falsely before the grand jury, your finding will

4  be.

5          MR. MULVEY:  Limited to Thompson?

6          MR. MILLER:  I believe I elicited that from the

7  others as well.

8          THE COURT:  I think I'll let the jury decide that

9  based on their recollection.

10          MR. SIVIN:  26, personal involvement.

11          THE COURT:  Page 26?

12          MR. SIVIN:  Number 26.  The second sentence, there

13  just might be something confusing in there.  It says, the

14  defendants in this case are not responsible for the acts of

15  any other employee of the New York State Department of

16  Correctional Services.  The jury might find that inconsistent

17  with your previous charge that if they failed to intervene to

18  protect the plaintiff from excessive force by another

19  officer, that they could also be liable.

20          THE COURT:  But that's an independent act.  That is

21  their act of failure to intercede.

22          MR. SIVIN:  Could I recommend that the Court say,

23  other than as I've charged earlier with respect to failing to

24  protect?

25          THE COURT:  No.  I think it's clear and I think

1   this personal involvement provision is consistent with the

2   law on personal involvement in 1983 actions.

3          MR. SIVIN:  And you have our objection to the

4   compensatory damages charge?

5          THE COURT:  Yes.

6          MR. SIVIN:  And I'll try to get you that

7   information.

8          In the punitive damages charge, the Court charges

9   the jury that in deciding whether to award punitive damages,

10  they should consider whether the defendant may be adequately

11  punished by the award of actual damages only.  In this case

12  since the state is indemnifying the individual defendants for

13  actual damages, you know, it's not going to sufficiently

14  punish them.  The state's not required to indemnify them for

15  punitive damages.

16         THE COURT:  I don't know.  Is it a guarantee under

17  any circumstances that there will be indemnification in a

18  case such as this?

19         MR. MULVEY:  I'm sorry, Judge, with respect to

20  which class of damages?

21         THE COURT:  Compensatory damages.

22         MR. MULVEY:  A guarantee?

23         THE COURT:  Yes.

24         MR. MULVEY:  If the defendants cooperate, and

25  that's a term of art under Public Officer's Law 17, they are

1     entitled to indemnification, absent extreme circumstances

2     such as it's learned sometime between the award and the

3     process by the comptroller that they perjured themselves.

4             THE COURT:  So under the Public Officer's Law, no

5     matter how outrageous the conduct is, if it's performed while

6     they're working as corrections workers they're entitled?

7             MR. MULVEY:  Compensatory, I was limiting myself to

8     that at this point, yes, Your Honor.  But also it's my

9     understanding, and we've -- well, I can address it now, that

10    I be allowed a charge that the jury is not to consider

11    indemnification as a factor in making their determination.

12            THE COURT:  And I saw you requested that and I

13    think it's unwise to even bring into the picture the question

14    of indemnification.  I don't think the jury should consider

15    that.  But I am concerned about plaintiff's last point, and I

16    think it's well-taken in light of indemnification, so I may

17    take that out.  What is your position on that?

18            MR. MULVEY:  With respect to the request?

19            THE COURT:  With respect to the request that I take

20    out the part about one of the factors could be that the

21    defendant has been adequately punished by the award of

22    compensatory damages.  If there is to be indemnification,

23    then that's really not true?

24            MR. MULVEY:  I believe that the defense is

25    comfortable with the instruction of the classification of

600

1    damages and, candidly, Your Honor, keep it uncomplicated with

2    the jury that compensatory damages are just that, and

3    punitive is a different class, and that should make their

4    awards consistent with the class of damages that they're

5    considering at the time.  I don't think that the plaintiff is

6    entitled to say, well, if you don't compensate me adequately,

7    then you should give me more damages in the punitive

8    category.

9            THE COURT:  He is looking at it from the other

10   point of view; the point of view of punishing the defendant,

11   not compensating the plaintiff.

12           MR. MULVEY:  And that's exactly what a punitive

13   damage award is, it's intended as punishment, and that

14   instruction is in here.  If we're not going to be allowed

15   to -- you can't have it both ways; either indemnification

16   comes in and it shouldn't be a factor or they get charged on

17   the two classes.

18           MR. SIVIN:  But this kind of implies to the jury

19   that the defendant will not be indemnified.  In other words,

20   you're saying, hey, Thompson has to pay whatever amount of

21   money out of his pocket, do you think that's enough to punish

22   him or do you think we have to give him punitive in addition

23   to this.

24           THE COURT:  Let me cut this short.  I agree with

25   your point and I'm going to take out the initial portion at

1   the bottom of page 40.

2          MR. MULVEY:  Paragraph, Your Honor?

3          THE COURT:  We are in the punitive damage charge

4   and the paragraph that begins, that I instruct you that even.

5   I'm going to take out -- I'm going to take out from, whether

6   a defendant may be adequately punished by an award of actual

7   damages only, and we will jump from there to, whether the

8   conduct was so extreme and outrageous that actual damages are

9   inadequate to punish.  I'm going to take out that whole

10  sentence.  What about the next sentence?

11         MR. SIVIN:  That's the same thing.

12         THE COURT:  I want to think about this point before

13  I make any changes.  You've raised it, and at the end of the

14  charge if I leave it in, you can simply state that you have

15  an exception based on what was said on the record in

16  chambers.

17         MR. SIVIN:  Okay.  And then I just have one

18  additional request to charge.  I ask that the Court charge

19  the jury with 7 NYCRR 254.7(a)(3), which reads, when a

20  confinement penalty is being served and a more restrictive

21  confinement penalty is imposed as a result of another

22  hearing, the more restrictive penalty shall begin to be

23  served immediately and any time owed on the less restrictive

24  penalty shall be served after the completion of the more

25  restrictive penalty period.

```
1              THE COURT:  How is that relative to any of the

2     claims remaining in the case?

3              MR. SIVIN:  The issue about the SHU confinement and

4     the duration.

5              THE COURT:  But that only relates directly to the

6     due process claim which was dismissed.  How does it relate to

7     any of the remaining claims?

8              MR. SIVIN:  Retaliation claims, he is in the SHU

9     for consequence of the retaliation.

10             THE COURT:  Let's go off the record.

11             (Discussion was held off the record.)

12             THE COURT:  Your request in that regard is denied.

13    What about the defendant?

14             MR. MULVEY:  Thank you, Your Honor.  First would be

15    on credibility, 13.  I believe that, hopefully, and I believe

16    we requested a charge that in evaluating credibility, that

17    the jury can take into consideration a felony conviction of

18    any witness.

19             THE COURT:  That's included in my section on

20    credibility, there is a section on felony.

21             MR. MULVEY:  I missed it, sorry.

22             THE COURT:  In fact, I think it's even in the

23    title.  Number 14, impeachment, inconsistent statements or

24    conduct.

25             MR. MULVEY:  I looked at 13, my apologies.
```

1          THE COURT:  Let me ask you this, though, did you
2  ever ask him if he was convicted of a felony?
3          MR. MULVEY:  He testified on direct that he was,
4  too.  He is in state custody.  You can't be in state custody
5  on a misdemeanor.
6          THE COURT:  Okay.
7          MR. MULVEY:  Your Honor, under the introduction
8  regarding substantive claims, point 16, you enumerate --
9          THE COURT:  What page?
10         MR. MULVEY:  Old page 13.  I'm trying to give you
11 the heading numbers, it's substantive law, Roman III, point
12 16.
13         THE COURT:  I took out the due process.
14         MR. MULVEY:  Thank you, Your Honor.  This is a
15 minor editorial, point 18, the state is not a defendant, last
16 sentence, the defendants are all DOCS employees, including, I
17 just inserted, past and present members of the staff at
18 Oneida.  Just because they heard some people were at other,
19 and then the former deputy commissioner is no longer, and
20 period.  And then strike as the former deputy.
21         THE COURT:  Good point.  I wasn't sure.  Is he
22 still the former deputy?
23         MR. MULVEY:  He is a deputy commissioner.
24         THE COURT:  But he is no longer --
25         MR. MULVEY:  He is no longer in charge of special

1    housing.  This would be point 23, retaliation, it's very far

2    into -- it's on page, what was page 22, at the top, element

3    three, whether the plaintiff was vindicated at a hearing

4    concerning the matter.  I don't understand why we would keep

5    that in.  There are no longer issues as to the outcome of the

6    issues.

7              MR. SIVIN:  Actually, I would agree, but I would

8    ask that it be changed consistent with the evidence, whether

9    he was vindicated ultimately with respect to the hearing.

10             THE COURT:  No.  I understand both points.  I'm

11   going to leave it because I think that's a fair statement of

12   the law.  There is a case that specifically relates to false

13   misbehavior reports and the evidence that can be considered,

14   and one is the outcome of the hearing.  And so I think the

15   jury has the full flavor of the outcome, including the

16   results of the appeal and why it was reversed, and I think

17   they can consider that as one of the elements of whether the

18   misbehavior reports were false.

19             MR. MULVEY:  Next would be the point 24, malicious

20   prosecution.  I'm going to request -- and then it would be

21   the second paragraph of point 24, the third item --

22             THE COURT:  Go off the record.

23             (Discussion held off the record.)

24             MR. MULVEY:  At the time the prosecution was

25   initiated, the defendant did not have probable cause.  I'm

1    going to ask that commence be stricken and insert, cause the

2    district attorney to commence -- or it's not commence, but

3    insert caused the district attorney to commence the

4    proceeding.  Those defendants have no ability, right or

5    authority to commence any proceeding.  They did participate

6    in it, but why want to leave the jury with the impression

7    that they had the ability to initiate it.  And I think in

8    fairness the testimony was that they were sought out and they

9    cooperated.

10              THE COURT:  Let's go off the record.

11              (Discussion held off the record.)

12              THE COURT:  Plaintiff has proposed some alternate

13    language.  Can you state that again for me?

14              MR. SIVIN:  Instead of saying, the defendants did

15    not have probable cause to commence the proceeding, I propose

16    the Court charge, the defendants did not have probable cause

17    to believe that plaintiff was guilty of the crimes of which

18    they accused him.

19              THE COURT:  Mr. Mulvey.

20              MR. MULVEY:  May I hear that again, please?

21              (The record was read back by the court reporter.)

22              MR. MULVEY:  I won't object to that, Your Honor.

23              THE COURT:  All right.  I've made that change.

24              MR. MULVEY:  And then let's take that up at the

25    bottom -- well, the next -- skip one paragraph and then go to

1    the next, plaintiff alleges that the four defendants, same

2    wording, in this claim initiated a prosecution.

3            THE COURT:  I put cooperated in a prosecution, I've

4    changed it.

5            MR. MULVEY:  Thank you, Your Honor.  And which then

6    brings us to the next sentence, the defendants contend that

7    at the time they initiated the prosecution.

8            THE COURT:  And I've changed that to, the

9    defendants contend that at the time they gave statements and

10   testified before the Grand Jury.

11           MR. MULVEY:  Okay, thank you.  Then on that same

12   point heading, Your Honor, it would be the last full

13   paragraph, probably in the middle, sentence begins, if you

14   find that the defendant gave an incomplete statement of facts

15   to the, and in this case I believe it would have to be New

16   York State Police.  That's all the testimony revolves around,

17   the state police, or testified falsely before the Grand Jury.

18           THE COURT:  I've made those changes.

19           MR. SIVIN:  Can we just make that in their

20   supporting depositions, just because it may be some

21   uncertainty.  I don't want a juror to conclude, well, did

22   they actually make this to the state police.  I don't think

23   that's been established definitely.  All that's important in

24   that they made the statement in their supporting depositions.

25           THE COURT:  I think that's clear.  Gave an

1    incomplete or false statement of facts to the New York State

2    Police or testified falsely before the Grand Jury, is how I

3    intend to present it.

4           MR. MULVEY:  That's all I have, Your Honor.  Thank

5    you.

6           THE COURT:  On the jury verdict sheet you'll see

7    that I inserted two notes from the version that I gave you

8    yesterday at the damages question, which is number 9.  The

9    first under retaliation, I've indicated that if your finding

10   of retaliation is based solely upon the filing of false

11   misbehavior reports, your answer to this question must be

12   either zero or one dollar.  And I understand the plaintiff

13   has an exception with regard to the concept and that

14   restriction, but that is how I intend to present it.

15          And then malicious prosecution, I've indicated,

16   your answer to this question must be either zero or one

17   dollar, because I don't think there is any evidence of

18   physical injury associated with that charge.

19          Does anyone have any conceptual problems with the

20   jury verdict form?

21          MR. SIVIN:  Yes.  Let me start with the malicious

22   prosecution.

23          THE COURT:  What question?

24          MR. SIVIN:  The damages.  And I have some

25   difficulty with this issue, but it is very unclear to me

1   whether one is required to prove a physical injury in a

2   malicious prosecution case, even if it's premised solely on

3   1983.   I think there is a line of cases that says that where

4   a constitutional violation is not the type that ordinarily

5   would result in any physical injury, then the Prison

6   Litigation Reform Act's requirement of physical injury should

7   not be applied.

8           I think of an example.   If a corrections officer

9   takes a Muslim inmate and flushes his Quran down the toilet

10  and forbids him from speaking for a year or saying the word

11  Mohammed under penalty of death, no question but that that's

12  a violation of his First Amendment, which would cause, could

13  potentially cause extreme emotional distress.   I don't think

14  the legislature intended for that defendant to have to prove

15  a physical injury.   I think it's more for the cases where the

16  inmate says, oh, prison life, I don't like it, you know, this

17  officer was mean to me and frivolous claims.

18          THE COURT:   Do you have a case?   I went back, by

19  the way, and looked at your amended complaint, and the

20  malicious prosecution claim is specifically characterized as

21  a constitutional claim.   So addressing your argument that it

22  also could be a pendent state law claim, which might or might

23  not be subject to the Prison Litigation Reform Act, I did not

24  see pendent state law malicious prosecution claim in your

25  complaint.

1          MR. SIVIN:  I think that complaint should be
2    interpreted under the standards that apply to a pro se
3    litigant.
4          THE COURT:  No; this is the amended complaint that
5    your office prepared.
6          MR. SIVIN:  I didn't make any application to amend
7    the complaint in that regard.  I think plaintiff was entitled
8    to -- I think he sufficiently stated a state law cause of
9    action for malicious prosecution in the initial complaint
10   than the second complaint.
11         THE COURT:  Off the record.
12         (Discussion held off the record.)
13         THE COURT:  What other issues do you want to raise
14   regarding the verdict form?
15         MR. SIVIN:  I think the words, under color of state
16   law, should be taken out from all of the questions because I
17   think the Court as a matter of law should find that all of
18   these defendants acted under color of state law, there has
19   been no question about that.
20         THE COURT:  They're going to be charged that I find
21   as a matter of law that that element has been satisfied.  I'm
22   going to leave it in.
23         MR. SIVIN:  Question number two, I would ask that
24   the Court not charge the jury with qualified immunity as it
25   relates to defendant Scott Thompson.  If the jury credits

1  plaintiff's version of what happened regarding the

2  interaction with Scott Thompson, he is not entitled to

3  qualified immunity under any reasonable view of the evidence.

4  If the jury finds it was a battery, I don't see how they can

5  find that what Scott Thompson did entitles him to qualified

6  immunity.

7            THE COURT:  I am going to charge qualified

8  immunity.  The Second Circuit case law is rather unclear

9  regarding whether that's a question for the Court or the

10 jury, and so it's my present intention, because I think their

11 last pronouncement indicated that it really is more a

12 question for the Court, I intend to take the answers to

13 questions 2, 4, 6 and 8 as advisory verdicts regarding

14 qualified immunity and we can sort that out in post-trial

15 motions.

16           MR. SIVIN:  And I have the same objection with

17 respect to item 4, I ask that the Court not charge qualified

18 immunity with regard to Duvall and LaBrague.

19           THE COURT:  Exception noted.

20           MR. SIVIN:  Question 5, my same objection with

21 respect to the qualified immunity charge under number 6; I

22 would ask that the Court determine that as a matter of law.

23 And I believe that's it.

24           THE COURT:  Your objections are duly noted.

25 Mr. Mulvey, do you have any concerns?

1          MR. MULVEY:  Do you mind if we just go off?  I'll

2    restate them in a moment, Your Honor.

3          THE COURT:  Yes.

4          (Discussion held off the record.)

5          MR. MULVEY:  Number 5, Your Honor, by retaliating

6    against him for filing of grievances, I guess there is no

7    testimony that there is anything concerning filing of

8    grievances.

9          THE COURT:  I've changed that, for complaining or

10   threatening to complain regarding --

11         MR. MULVEY:  Okay, thank you.  Then it also

12   includes, either by issuing false misbehavior reports or

13   using or permitting excessive force.  Of all the listed

14   defendants, only the three at the top had anything to do with

15   misbehavior reports.

16         THE COURT:  I considered splitting that up but in

17   the end I decided that it was sufficiently clear that there

18   were two possible grounds for the retaliation claim, and I

19   think that to the extent that it might be unclear, which

20   basis for Scott Thompson, for example, or which basis they

21   rely on, it will be clarified in their response to the

22   damages.

23         MR. MULVEY:  One minor typographical correction.

24   Officer LaBrague's first name is Roland, R-O-L-A-N-D, in

25   questions 3, 4, 5, 6 and on.

1              MR. SIVIN:  Are all the other names correctly

2    spelled?

3              MR. MULVEY:  I believe so.

4              MR. SIVIN:  At this time I move to amend the

5    complaint to conform to the evidence and to the counsel's

6    representation to the correct spellings of the names of the

7    defendants.

8              THE COURT:  Any objection?

9              MR. MULVEY:  None.

10             THE COURT:  Granted.  Shall we adjourn to the

11   courtroom?  Anything else you wanted to add, Mr. Mulvey?

12             MR. MULVEY:  No.  Thank you, Your Honor.

13             THE COURT:  All right.

14             MR. SIVIN:  One additional point.  Assuming I'm not

15   successful in persuading Your Honor on the issue of nominal

16   damages with respect to retaliation and malicious prosecution

17   within the next half hour, I am fairly certain that the law

18   is at least unclear on this, although I admit I don't have

19   all the law for you, my recommendation is that you allow it

20   to go to the jury, and then if it turns out I'm right, the

21   damages can stick, and if it turns out I'm wrong, it can be

22   subject of a post-trial motion to get rid of that portion of

23   the jury's verdict.

24             THE COURT:  Well, as appealing as that might sound

25   to avoid the possibility of a retrial, I think I'm bound to

613

1    apply the law, and I think the jury should know what the

2    limitations are that might affect their thinking.  For

3    example, it may actually hurt you in the end to have them

4    award compensatory damages that in the end they couldn't have

5    awarded, they may decide not to award further punitive

6    damages, so I don't think that's fair to the jury.  Okay.

7              (Court convenes at 9:30.)

8              THE COURT:  Good morning, ladies and gentlemen.

9    How are you?  Well, good news, looks like we're winding down

10   and we should have this case to you for your deliberations

11   possibly early this afternoon.  There are three additional

12   witnesses to be called by the defendants.  Plaintiff may or

13   may not have any rebuttal.  I have a proceeding at 11:00, so

14   we'll go right to 11 and then take a break for about a half

15   hour and then we'll continue until our lunch hour break.

16   Does that work for you?  Thank you.

17             Proceed, Mr. Mulvey.

18             MR. MULVEY:  Thank you, Your Honor.  The defense

19   calls Raymond Sipley.

20             *RAYMOND SIPLEY*, called as a witness and being duly

21   sworn, testifies as follows:

22   *DIRECT EXAMINATION BY MR. MULVEY:*

23             Q    Officer, where are you currently employed?

24             A    Oneida Correctional Facility.

25             Q    What is your position there?

614

*Raymond Sipley - Direct*

1        A    Corrections officer.

2        Q    How long have you been employed by the

3   Department of Corrections?

4        A    Over twenty years.

5        Q    How long have you been an employee at Oneida

6   Correctional Facility?

7        A    Over twenty years.

8        Q    What is your current post or assignment at

9   Oneida Correctional Facility?

10       A    I work in the SHU on the protective custody

11  floor.

12       Q    I know we've been over this before, but why

13  don't we just start by briefly telling us again what SHU

14  stands for and what that means in the correction setting.

15       A    It's a special housing unit where they house

16  disciplinary inmates, and there is one floor also in that

17  particular building where they house inmates who are under

18  protective custody status.

19       Q    And which of those two categories of inmates

20  are you currently responsible for?

21       A    The inmates under the protective custody

22  status.

23       Q    Why don't you briefly tell the jury how those

24  differ from inmates in the SHU who are there for disciplinary

25  reasons?

615

*Raymond Sipley - Direct*

1       A    In that particular building the inmates that

2    are being housed there are directed to do so through Albany,

3    they are either high profile inmates or they are inmates who

4    may have enemies within the facility or other facilities.  So

5    we house them there to create a safe environment where they

6    will not come in contact with inmates in general population

7    where they may be harmed.

8       Q    Tell the jury presently what your day-to-day

9    duties and responsibilities entail as an officer handling

10   protective custody or special types of inmates in the SHU at

11   Oneida?

12      A    Well, again, we must make sure that they're

13   segregated and kept from general population, so we have to

14   have different things like medical staff come to them,

15   teachers come to them, counselors come to them, because

16   they're not allowed out in the compound.  I supply them with

17   their daily needs, personal cosmetics or soaps and

18   toothpastes, along those lines, and then send them to their

19   work assignments.  But their work assignments involve right

20   in the protective custody area, that includes porter cleaning

21   and things of that nature.

22      Q    Do you have a regular shift that you report to

23   for that job?

24      A    Yes, it's 7:30 in the morning to 3:30 in the

25   afternoon.

*Raymond Sipley - Direct*

1    Q    How long have you been on that assignment?

2    A    Probably about six months now.

3    Q    Prior to being the protective custody officer

4  in the SHU at Oneida, did you have a different posting?

5    A    I was the first officer on the disciplinary

6  housing unit is.

7    Q    That would be in the SHU?

8    A    That would be within the same SHU, yes.

9    Q    How long did you hold that position?

10   A    Approximately 12 years.

11   Q    Would that include the time of February and in

12  this case March of 2003?

13   A    That would be correct.

14   Q    What was your position as the first officer in

15  the special housing unit overseeing disciplinary inmates?

16   A    Okay, well, I had a lot of functions.  One of

17  the main functions was to maintain the log book and chart

18  everything that happened during that eight-hour shift;

19  filling out forms, ordering some supplies, maintaining

20  security rounds, visibly checking in the cells as often as I

21  deemed necessary to make sure that the inmates were not

22  harming themselves or causing any damage, supervise shower

23  periods when they were allowed to take their shower, they

24  were allowed to have materials to clean theirselves, and to

25  supervise preparation and serving of their separate meal.

617

*Raymond Sipley - Direct*

1          Q     In March of 2003 do you recall what regular

2    shift you worked as first officer in the SHU?

3          A     Yes.  I worked at that time from 3:30 to 11:30

4    in the evening.

5          Q     Officer, as best you can, just give a general

6    physical description to the jury of how the SHU disciplinary

7    area is configured at Oneida.  What's the setup?

8          A     Well, there is actually two floors, one of

9    them is on the bottom level and the second one is on the top

10   level.  I worked on the bottom level.  There was two

11   entrances to the building.  There was a long hallway, two

12   actual hallways, a short one and a long one where the cells

13   were located.  There was a shower room in the corridor where

14   the short hallway was, and then there was a big room on the

15   very end of it where we would do our I-64 and again inventory

16   of inmate's property, they would have their shower supplies

17   stored in that room which we would make available to them at

18   their shower time.

19         Q     Officer, now tell us about the process that's

20   followed when an inmate is first admitted to the SHU and

21   given a cell assignment and how that would differ from an

22   inmate in a cube in general population as far as property,

23   clothing, restrictions, et cetera.

24         A     Okay.  When an inmate arrives to the SHU for a

25   disciplinary status, he would come to the back door, he would

*Raymond Sipley - Direct*

1    be delivered by an escort officer and a sergeant from in the

2    compound itself.  We would take control of that inmate.  We

3    have our own supervisor in the SHU who doesn't -- his main

4    job is the SHU, he stays there throughout the night making

5    rounds up and down in the building.

6              When the inmate comes into the building, we

7    would put him in a room which is at the end of the hall,

8    which we call our strip frisk room.  The inmate must remove

9    all of his clothing and we have to visually inspect his

10   person to make sure that he doesn't have any contraband on

11   him, drugs, weapons or anything of that nature, so we're

12   confident that when he goes into a cell, he won't have any

13   unauthorized items.

14             We give him a change of clothing and we escort

15   him into a cell.  There is a rule book in his cell, he is

16   asked to read it.  And if he has any questions on how he is

17   going to receive his supplies and what's going to take place

18   throughout the day, he may question us for clarification.

19        Q    Now, would you please describe that same set

20   of circumstances for an inmate who arrives on a deprivation

21   status or with a deprivation order?

22        A    Only, well, the same procedure's followed but

23   when he is placed into a cell, he is given a different set of

24   instructions.  He is told that he is going to be deprived of

25   some in-cell, not all in-cell, property because of his

*Raymond Sipley - Direct*

1    status.   Inmates who are put on deprivation order and/or

2    restraint orders are done so for the protection of staff and

3    the protection of the inmate because of history of violent

4    conduct, and that status will remain in effect and reviewed

5    daily by the superintendent or the deputy superintendent to

6    determine when he should be removed from this; in other

7    words, when the facility feels that he no longer is going to

8    act out in a violent manner.   Usually he is also seen by

9    clergy and/or counselor and medical staff too, they all make

10   that determination.

11            Many times I'm called again by the

12   superintendent or deputy superintendent for my opinion on my

13   shift, has he had any problems acting out or has he done

14   anything that he should remain on that deprivation order.   He

15   does have some supplies in his cell, he is not deprived of

16   everything.   He does have cosmetics in his cell, he is

17   allowed to have soap and a washcloth and toothpaste, a

18   drinking cup.   He is allowed to have clothing that he has to

19   wear.   Every other day we'll exchange that clothing for clean

20   clothing.

21            So, basically, the only thing that he is

22   really being deprived of is out-of-cell activity and maybe

23   reading material or anything that could be construed as a

24   weapon, like a pen, along those natures.   He does have his

25   own bathroom in his cell, his toilet.   He does have running

*Raymond Sipley - Direct*

1   water and a sink.  He does have a cup to drink from.  So if

2   he needs to clean himself, he does have a washcloth and he

3   does have soap and he does have running water, so he is not

4   deprived of personal hygiene.

5        Q    Officer, tell us now about how an inmate's

6   status would change with good behavior from that initial

7   intake as he remains in the SHU at Oneida.

8        A    When I make my relief on my shift, I have a

9   conversation with the officer I'm relieving and he will tell

10  me the problems or the procedures that he went through that

11  day.  I also have a chart in front of me, and in this

12  particular case or on a deprivation case as I'm explaining,

13  there is paperwork and I have to review that paperwork to see

14  if that order of deprivation has been signed for that day.

15  It must be signed every day and viewed every day to make sure

16  that the inmate is on that status.  When he is taken off that

17  status, there will also be the form saying that he has been

18  removed from that status.

19       Q    Once an inmate is taken off of deprivation

20  status, are there any activities or things that he would be

21  allowed to do now that he wasn't while he was on deprivation?

22       A    Yes.  They have what they call a go-around in

23  the SHU, and that's where an officer every shift goes from

24  cell to cell, an inmate may request things that he is allowed

25  to have.

*Raymond Sipley - Direct*

1           Every shift is a little bit different.  The

2     day shift he would request writing supplies, personal

3     cosmetic items, he would request his one hour of outside rec,

4     things of that nature.  On the afternoon shift he may request

5     a shower, if it's a shower day, which is every other day in

6     our SHU.  He may also request cell clean-up, which is every

7     other day, where we allow him to take cleaning supplies into

8     his cell, mop his floor, clean his sink and toilet and of

9     that nature.

10          And he is also able to request library reading

11    material which is provided on Tuesdays and Thursdays on our

12    SHU.  He can exchange our books, and Saturday we keep his own

13    personal books in a storage area where he may trade his books

14    in this exchange.  They're limited on the amount of books

15    they can have in their cell at any one time, so we have to

16    maintain that also.

17          Q    Now, Officer, could you briefly tell us what

18    the process was at Oneida in March, February, March of 2003

19    for collecting and storing an inmate's personal property when

20    they were taken from general population and brought to the

21    SHU?  What happens to whatever they had in their cube in

22    their general population housing area?

23          A    Okay.  The officer on the housing unit where

24    the inmate was removed from is responsible for taking all of

25    the inmate's property and putting it in what we call draft

622

*Raymond Sipley - Direct*

1   bags.  They're basically nothing more than feed bags.  He

2   puts all the property into those bags, he marks the names,

3   seals them up and they are shipped over to the SHU.  He will

4   also fill out an SHU property transfer form which will state

5   whether the inmate's property was secured or unsecured at the

6   time.  Inmates are responsible to secure their property in

7   their cube areas.  They have lockers and they're supplied

8   combination locks.  Many times inmates are remiss in locking

9   those locks, so if they have left their locker open, that may

10  make them subject to someone stealing some of their personal

11  property.

12          Q    Let me stop you there, Officer.  Now, let's

13  turn our attention to late February, early March 2003.  Do

14  you have any recollection of having seen or having had any

15  interaction with the plaintiff Angel Martinez, who is present

16  here today, prior to him coming to the SHU on or about

17  February 25th, 2003?

18          A    No.  I never seen him.  In the building I work

19  in is a separate building, I rarely if ever get out in the

20  general population.

21          Q    Do you recall coming into contact with him in

22  that same time period when you were working in the SHU back

23  in 2003?

24          A    Absolutely.  It would have been a daily

25  contact, I would make security rounds to make sure that he is

*Raymond Sipley - Direct*

1    safe and not causing any problems.

2              Q    What I want to ask you, Officer, is do you

3    remember him?  Do you remember seeing him there in the SHU,

4    independent of any other inmate, other than if he was there

5    you would have seen him.  I mean, do you remember him

6    personally?

7              A    Yes, I do, because of the deprivation order.

8    Very few inmates in our SHU have ever been placed on

9    deprivation orders.

10             Q    Did there come a time after he arrived when

11   that deprivation order was lifted?

12             A    Yes.  There was a time period when I made my

13   relief in and the deprivation order was lifted, yes.

14             Q    Would access to one's personal property be one

15   of the things that an inmate could request or was entitled to

16   after a deprivation order had been lifted in the SHU?

17             A    Yes.  He didn't need to request it, it would

18   have been an automatic thing.  Inmates coming to the SHU, we

19   normally give them their in-cell issue within a 72-hour

20   period, and in this particular case he had gone by his

21   72-hour period because of his deprivation order.  So the day

22   I come in and seen that the deprivation order was lifted, I

23   told inmate Martinez that after his supper meal he would be

24   receiving whatever he was entitled to for in-cell property as

25   a disciplinary inmate.

*Raymond Sipley - Direct*

Q    And describe the process that you would have followed then for allowing an inmate such as inmate Martinez access to his personal property that had been packed from his cube and brought to the SHU.

A    Well, those items are stored when they come to the SHU in a locked room.  We retrieve those bags, his property, and the officer, one other officer and myself, sometimes two, depends on how much help we have, would take the property into this room, which we call our property room.  There is tables there.  We unpack all of his property, separate everything, shoes, clothes, personal cosmetics, along that nature, inventory everything, how many books he has, how many toothpastes he has, how many shoes he has, entirely right down to the pencils and pens that he has in his possession.  We keep those laid out and separated with his inventory sheet.  And then when we're done with that, we would retrieve the inmate from his cell to come out, view all of his property, go down his inventory sheet to see if he was missing anything.

Q    Did you follow that process with inmate Martinez on March 5th, 2003?

A    Yes, I did.

Q    Let's start from the beginning of that day. Tell us the first thing you recall about encountering inmate Martinez with respect to let's limit it just to the property

*Raymond Sipley - Direct*

1   issue and access to his property.

2           A    Okay.  Myself and Officer Duvall went to

3   inmate Martinez's cell.  Any time an inmate is out of his

4   cell in SHU, two officers must be present to escort him, so

5   it was myself and Officer Duvall went to inmate Martinez's

6   cell, opened the door and instructed him to place his hands

7   in his pants pockets, he would be coming out to view his

8   property.  Inmate Martinez walked out of his cell, went into

9   the property room and had the opportunity to view all of his

10  property.

11          Q    Were you present at that time?

12          A    Yes, I was.

13          Q    Were you performing any function with respect

14  to the inventory, the form I-64 that's maintained by the

15  department with respect to inmate Martinez's property?

16          A    I probably actually wrote everything down and

17  signed it.  I'm not 100 percent sure but I usually do.

18          Q    Was any other corrections officer present in

19  the property room other than you and Officer Duvall at that

20  point?

21          A    Yes.  Officer LaBrague come in.  He was a

22  building rover at the time, he floated between all the

23  floors.  And he came in to that room to assist us.

24          Q    And was there anyone else present besides

25  yourself, Officer Duvall, Officer LaBrague and inmate

*Raymond Sipley - Direct*

1  Martinez?

2          A    No, there was nobody else present.

3          Q    Tell us, once all four of you were in the

4  room, describe exactly what happened.

5          A    Well, he inventoried his property or he looked

6  it all over and I gave him a copy of his inventory sheet,

7  it's a multiple copy form he gets to take into his cell and

8  also review it and hang on to it.  He stated that he did not

9  see a pair of his personal sneakers that were there.  I told

10  him there was nothing I could do about that, to ask for a

11  property claim form, fill it out and send it in and it would

12  be investigated, and if deemed appropriate, he would be

13  reimbursed for those sneakers.

14          Q    Was inmate Martinez allowed to retrieve and

15  take any of the property that he viewed back with him to his

16  cell in the SHU?

17          A    Yes.  The property would be allowed in his

18  cell, certainly changes of clothing, his own personal reading

19  material, which is limited, family pictures, which is

20  limited, some cosmetic items, not a lot but a few.

21          Q    Tell us exactly how he would gather up that

22  material to take it back.  Did he just pile it in his hands?

23          A    No.  Actually, I supply a bag for them and

24  everything is put into that bag.

25          Q    Describe the bag.

627

*Raymond Sipley - Direct*

1          A    It's actually nothing but a large clear

2    plastic garbage bag.

3          Q    Did you allow inmate Martinez to do that,

4    collect property and put it in a bag on that date?

5          A    Yes, I did.

6          Q    Tell us what happened next.

7          A    Again he complained about his sneakers.  He

8    seemed a little agitated over it but there was nothing I was

9    about to do about it.  He already had his instructions and

10   Officer Duvall and Officer LaBrague told the inmate you're

11   going back to your cell now, pick your bag of property up,

12   place it on your shoulder, put your other hand in your pants

13   pocket, and they escorted him back to his cell.

14         Q    Did you follow?

15         A    No, I did not.

16         Q    Did you have any further contact directly or

17   indirectly with inmate Martinez over the course of the next

18   15 to 20 minutes?

19         A    No, I did not.

20         Q    Where did you go after you completed the

21   property viewing inventory?

22         A    I stayed in that room and was repacking the

23   property he was not allowed to take to his cell back into the

24   property bags so I could seal and send them back to storage.

25         Q    From inside that room could you see the escort

*Raymond Sipley - Direct*

1    taking place with Officer Duvall and Officer LaBrague?

2          A    No.  It's a large room with a small doorway

3    and I was not in view of the doorway.

4          Q    Did you observe, and this would include hear

5    or see, anything further with respect to inmate Martinez

6    after he left the property room over the course again of the

7    next 15 or 20 minutes?

8          A    Well, actually did.  I don't know how much

9    time passed, it was certainly only a minute or two.  The SHU

10   can be loud, the inmates that are housed there sometimes can

11   be disruptive, so there is many inmates in the SHU at the

12   time.  But at some point in time, like I say probably only a

13   minute or two, I thought I heard Officer Duvall's voice in a

14   loud manner, so I left that particular room to go

15   investigate.

16         Q    What did you observe?

17         A    Okay.  As I observed, I was walking down and

18   when I got to within sight of inmate Martinez's cell, I seen

19   Officer Duvall and Officer LaBrague coming out of the cell

20   and they shut the cell door.

21         Q    Did you have at that point any verbal contact

22   or instruction given to inmate Martinez?

23         A    I didn't at that time, no.

24         Q    After the property viewing up until the point

25   when officers Duvall and LaBrague exited inmate Martinez's

*Raymond Sipley - Direct*

1  cell, did you have any instruction or make any comments or

2  say anything to inmate Martinez?

3      A    No, none.

4      Q    After they came out of the cell and closed the

5  door, did you go over and say anything to inmate Martinez?

6      A    I went to his cell and Officer Duvall told me

7  that they had had a problem and had a use of force.  I

8  stepped to the door and looked into the viewing window into

9  the cell to observe what was going on with inmate Martinez

10  and I witnessed him sitting on his bed.

11      Q    Did you witness any of the interaction between

12  officers Duvall and LaBrague and inmate Martinez in the cell

13  itself?

14      A    No, I did not.

15      Q    Did you see anything relative to the use of

16  force by those two officers that day, you, directly,

17  personally see it?

18      A    No, I did not.

19      Q    At any time that day did you make physical

20  contact with inmate Martinez?

21      A    No, I did not.

22      MR. MULVEY:  Thank you.

23      THE COURT:  Cross-examination, Mr. Miller.

24      MR. MILLER:  I just have a few questions.

25  *CROSS-EXAMINATION BY MR. MILLER:*

630

*Raymond Sipley - Cross*

1      Q    You mentioned something about a log book?

2      A    Yes.

3      Q    At the SHU?

4      A    Uh-huh.

5      Q    Is that log book that you described the same

6  type of a log book that would be in the other sections of the

7  prison?

8      A    Yes, it is, same exact log book.

9      Q    Okay.  And so when an officer comes on duty,

10 either in the SHU or in M dorm or anyplace else, he needs to

11 sign in and indicate the time that he comes on duty, correct?

12     A    That's correct.

13     Q    In fact, there is like a stamp that goes in

14 the log book indicating when there is a change of shift?

15     A    That's correct, for now, it wasn't always like

16 that.

17     Q    Well, I'm talking about 2003.

18     A    I'm not sure that stamp was involved then or

19 not, it probably was.

20     Q    Would this refresh your recollection?

21          THE COURT:  Would you just describe for the record

22 what you're showing him?

23          MR. MILLER:  Yeah.  It's a log book from 2003.

24          THE COURT:  Not marked as an exhibit?

25          MR. MILLER:  No, just to refresh recollection.

631

*Raymond Sipley - Cross*

1          A     Yes, that's exactly what it is.

2          Q     And once that stamp goes in the log book, it

3     will indicate who's on duty, what his job is, who's the area

4     sergeant, and whoever is on duty during that tour, that name

5     would go within the stamp template that goes in the book,

6     right?

7          A     It should be, yes.

8          Q     And then underneath that stamp template,

9     anything that happens during that tour would be written down

10    in chronological order, correct?

11         A     That's correct.

12         Q     And therefore, anything that happens during

13    that tour, we would know which officer was there because his

14    stamp and name would be above that activity, correct?

15         A     It should be, yes.

16         Q     And so, therefore, let me give an example from

17    SHU.  When Angel Martinez entered the SHU, from the log book

18    we would know exactly what time he entered, correct?

19         A     We should, yes.  There is a different stamp

20    for that entry, but yes.

21         Q     I'm just talking about we would know what time

22    he entered, right?

23         A     Uh-huh, yeah.

24         Q     And we would know who was on duty at the time?

25         A     Yes.

632

*Raymond Sipley - Cross*

1          Q     Just to give another example.  If Angel

2    Martinez were to go out on a medical visit, which I think he

3    did on March 5th, correct, from SHU?

4          A     He possibly did, I'm not aware of that.

5    Again, if he did, it would have been during the day shift

6    hours and I wasn't there.

7          Q     Okay.  I want you to assume that the testimony

8    that Angel Martinez gave the other day about going to Walsh

9    that morning is correct, okay?

10         A     Well, I can assume that but I don't know that.

11         Q     I understand that, that's why I'm just asking

12   you to assume that.  Okay?

13         A     Okay.

14         Q     Now, when he left the SHU on the 5th to go out

15   to Walsh, there would have been an entry in the log book

16   indicating that he left the facility, right?

17         A     There should have been.

18         Q     Yeah, that's all I'm asking you.  I'm not --

19   you weren't there, I understand that, I'm asking what should

20   have been done.

21         A     Well, it should have been done but that's an

22   officer's discretion on what he writes in that log book and

23   what he feels is important to document.

24         Q     But I guess the more important question would

25   be, we would know who was on duty at the time that he went to

*Raymond Sipley - Cross*

1    Walsh, right?

2         A    We should have, yes.

3         Q    And that would be the case whether it be the

4    SHU or M dorm or any other place, right?

5         A    Should be kept like that, yes.

6         Q    Let me just ask you a few questions about the

7    SHU.  You did state on direct there are various designations

8    for those inmates who are in the SHU complex, correct?

9         A    Yes.

10         Q    And let's first talk about those who are on

11    deprivation.  Those who are on deprivation are not allowed

12    out of their cell at all, correct?

13         A    No, that's not correct.

14         Q    Well, when are they allowed out of their cell?

15         A    Well, they're deprived from all out-of-cell

16    activity unless it's determined by -- I'm going to give you

17    an example here.  If he had to go on a medical trip or if he

18    had a dental visit or even a legal visit or something like

19    that, they may allow him out of his cell.  That's not the

20    officer's call, that would come up from an administrative

21    call.

22         Q    But as to the activity of daily life in the

23    SHU, deprivation means that they're not entitled to any

24    outside yard activity or anything like that, right?

25              A    That's correct, for the safety of the inmate

*Raymond Sipley - Cross*

1    and the officers.

2            MR. MILLER:  Move to strike as unresponsive.

3            Q    You know, you already said that, safety.  We

4    all agree that safety is important, okay.  We're talking

5    about the issues in this case now.

6            MR. MULVEY:  Your Honor, may I request that a

7    question be asked to the witness?

8            THE COURT:  Yes.  Let's not have a conversation.

9    You're motion to strike is denied.  Why don't you ask a

10   question, please.

11           Q    Once they are off deprivation, once inmates

12   are off deprivation, you mentioned that they're entitled to

13   one hour of yard activity?

14           A    Upon request, yes.

15           Q    Upon request, okay.  And the other 23 hours of

16   the day, unless there is a medical visit, a medical need,

17   they are in their cell, correct?

18           A    Except for shower time, too.

19           Q    Yeah, okay.  But they're entitled to one hour

20   of activity outside yard activity?

21           A    Yes, that's correct.

22           Q    Now, when Angel Martinez entered the SHU on

23   the 25th, were you on duty that day?

24           A    I don't believe so.

25           Q    I want to just follow up a little bit on what

635

*Raymond Sipley - Cross*

1    Sergeant Temple said yesterday about the transfer of a

2    prisoner.  I believe it was her testimony that she literally

3    stopped at the front door to the building and passed Angel on

4    to somebody else on the other side of the door.

5            A    Yes, that's protocol.

6            Q    Is it your testimony that that's what

7    happened?

8            A    Well, I wasn't there when Sergeant Temple --

9            Q    Is it your testimony that that's what happens

10   when someone goes to the SHU?

11           A    That's what happens, yes.

12           Q    Is it your testimony that when an escorting

13   officer or escorting sergeant takes someone from one facility

14   to the other, protocol disallows them to enter the facility

15   and walk the inmate to the draft room?

16           A    I'm not familiar with that process.

17           Q    Okay.  Now, at some point you became aware of

18   Angel Martinez's existence in the SHU, correct?

19           A    Yes, that's correct.

20           Q    And would you be able to tell us as you sit

21   here today what day that was?

22           A    No, I would not.

23           Q    Would you be able to, prior to March 5th,

24   2003, describe his physical condition at any time between

25   February 25th and March, let's say, 4th?

636

*Raymond Sipley - Cross*

1          A     His physical condition?  Obviously, he was

2    healthy as far as I know.  I make security rounds, I look

3    through the viewing window, I observe each inmate to make

4    sure that they're safe.  And, you know, if they got a problem

5    they would complain to me and I would address it.  But his

6    physical condition, he probably looks like he does now, I

7    would guess.

8          Q     Okay.

9          A     I didn't note anything that would be unusual

10   to notify anybody over, that's for sure.

11         Q     Officer, I'm not asking you to guess, I'm not

12   asking you to speculate based on the written protocol.  I'm

13   asking you if you have any independent recollection as you

14   sit here today as to the physical condition of Angel Martinez

15   any time between February 25th and let's say March 4th?

16         A     I'm still not understanding what you want as

17   far as physical condition.  If he was healthy, that's his

18   physical condition, that's how I would describe it.  If

19   you're asking me was he weak or was he sick, I would say no,

20   he wasn't, or I would have notified medical.

21         Q     That's not my question.  My question was, do

22   you have as you sit here today without guessing, without

23   speculating, as you sit here today do you have an independent

24   recollection of Angel Martinez's condition back in February

25   up to March 4th of 2003?

637

*Raymond Sipley - Cross*

1          A     No, other than appearing healthy.

2          Q     Well, is that other than appearing healthy

3   independent recollection or speculation?

4          A     No, that would be independent recollection.

5          Q     Do you know what I mean by independent

6   recollection?

7          A     Yeah.  What I remember viewing him.

8          Q     Yes.

9          A     Yes.

10         Q     As you sit here today you can visualize Angel

11  Martinez in those days before March 5th?

12         A     Yes.

13         Q     Do you have any notes, any memoranda, anything

14  that you reviewed about his condition before you testified

15  here today?

16         A     No, I have no memorandums or documents.

17         Q     Okay.  Were you aware, sir, that he was

18  complaining about pain in the rib area?

19         A     He never complained about pain in the rib area

20  to me or I would have notified medical.

21         Q     Well, then let me ask you this, sir.  What

22  brought him to the infirmary on March 3rd for X-rays of his

23  ribs?

24         A     What time of day was that?

25         Q     Well, do you know about that?

*Raymond Sipley - Cross*

1        A    No.

2        Q    Okay.  But it's your testimony that he never

3   complained about pain?

4        A    Not to myself.

5        Q    Okay.  Do you know of whether or not he ever

6   complained to anybody else?

7        A    No, I would not know that.

8        Q    Well, when you go on duty, do you review the

9   log book to see how your prisoners are doing?

10       A    I do review the log book and I take a verbal

11  accounting from the officer I'm relieving, yes.

12       Q    And obviously this is five years ago, you

13  don't have independent recollection of any officer telling

14  you that Angel was finally taken to the infirmary on March

15  3rd because of his physical complaints?

16       A    No, I wouldn't.

17       Q    And we wouldn't expect you to remember that,

18  sir.

19            MR. MULVEY:  Objection to that statement.

20            THE COURT:  Yes.  Please ask a question, no

21  commentary.

22       Q    Do my questions in any way refresh your

23  recollection about any complaints about pain that he was

24  suffering?

25       A    No.

*Raymond Sipley - Cross*

1    Q    Would you consider complaints of pain to the

2    rib cage that turned out to be broken ribs a condition or a

3    complaint that you as an officer would view as being serious?

4    A    Absolutely.

5    Q    Okay.  I want you to assume that as of March

6    3rd, that was the first time he had been to -- he went to the

7    infirmary from the SHU.

8    A    Yes.

9    Q    Is that proper protocol as you described, if

10   he was complaining about his pain to the ribs, his head, and

11   his back from February 25th through March 3rd?

12        MR. MULVEY:  Objection, Your Honor, because the

13   witness has already testified that he doesn't have any

14   knowledge of any of those complaints.

15        MR. MILLER:  But he testified to protocol.

16        MR. MULVEY:  But I believe the question was made

17   specific to the inmate, the plaintiff, not just in general.

18        THE COURT:  And I think there is a lack of

19   foundation.  I'll sustain the objection.

20   Q    After March 3rd, March 3rd, March 4th, March

21   5th, did you ever learn that Angel Martinez was taken to the

22   infirmary for complaints of pain?

23   A    I don't believe so, no.

24   Q    When he was in that property room on March

25   5th --

*Raymond Sipley - Cross*

1              A      Yes.

2              Q      -- it's your testimony that you have an

3      independent recollection of him being in what property room,

4      right?

5              A      Yes, I do.

6              Q      Let me go back and ask you again.  Do you have

7      an independent recollection of anything about Angel Martinez

8      before that day in the property room?

9              A      Yes, I do.

10             Q      And is it your testimony that when he was in

11     the property room that day, he appeared healthy and just the

12     way he looks today?

13             A      Yes.

14             MR. MILLER:  Thank you.

15             THE COURT:  Redirect?

16             MR. MULVEY:  No.  Thank you, Your Honor.

17             THE COURT:  Thank you.  You can step down.

18             MR. MULVEY:  Michael Duvall, Your Honor.

19             *MICHAEL DUVALL*, being called as a witness and being duly

20     sworn, testifies as follows:

21             MR. MILLER:  Mr. Mulvey, I have a copy of something

22     you might be looking for.

23             MR. MULVEY:  P13?

24             MR. MILLER:  I don't have the one in evidence.  We

25     have a copy.

641

*Michael Duvall - Direct*

1          THE COURT:  P13 is missing?

2          MR. MULVEY:  Yes, Your Honor.  It's the witness's

3    inmate misbehavior report.

4          THE COURT:  Proceed.

5    *DIRECT EXAMINATION BY MR. MULVEY:*

6          Q    Sergeant, where are you currently employed?

7          A    Wallkill Correctional Facility.

8          Q    What is your position there?

9          A    I'm afternoon assistant watch commander.

10         Q    How long have you been afternoon watch

11   commander at Wallkill?

12         A    About three months.

13         Q    How long have you been a corrections sergeant?

14         A    About five months.

15         Q    And prior to attaining the rank of sergeant,

16   what was your position within the department?

17         A    I was a corrections officer.

18         Q    How long have you been an employee of the

19   Department of Corrections?

20         A    Fifteen years.

21         Q    What was your last posting or facility

22   assignment?  Where were you assigned prior to attaining the

23   rank of sergeant?

24         A    Oneida Correctional Facility.

25         Q    And tell us the time frame that you worked at

Case 9:04-cv-00440-DEP    Document 178    Filed 10/06/08    Page 56 of 197

*Michael Duvall - Direct*

1  Oneida, please.

2       A    I got transferred there January of '01 to I

3  made sergeant in April of '08.

4       Q    In April of '08, before you left Oneida, did

5  you have a fixed assignment or job responsibility at that

6  facility as a corrections officer?

7       A    Yes, I did.

8       Q    What was that?

9       A    I worked afternoon shift, which is 3:45 until

10  11:45, 11:30.  I was a C and D rover escort.

11       Q    Would you please explain for the jury what

12  that means?

13       A    Well, I go to line-up, then I report to the

14  units that I work on, which is Charlie dorm and Dog dorm

15  which is -- I'm trying to remember which building.  I believe

16  it's 21 building, if I remember correctly.  I back up the

17  counts with the officers that work the units.  I then go

18  cover chow, which is the mess hall run for supper.  I watch

19  the walkway to make sure there is nobody hanging out when the

20  chow is done.  I go back to the units and rove around the

21  units and make sure everybody is healthy, safe, the care,

22  custody and control thing that you heard about.  Movements, I

23  go out to the walkway when they drop a movement.  I go back

24  to the units and then I'm responsible for roving the whole

25  building, which is A dorm, Banker dorm, Charlie dorm, Dog

*Michael Duvall - Direct*

1    dorm, Echo dorm, and Frank dorm, and I also respond to any

2    emergency responses, if there is any.

3         Q    Those names that you gave us, do those

4    correspond to the letters of the alphabet that are assigned

5    to those dormitory areas?

6         A    Correct.

7         Q    How long did you hold that position in Oneida

8    prior to April of this year?

9         A    I don't recall.

10        Q    Do you recall if you had a different

11   assignment back in March of 2003?

12        A    Yes.

13        Q    In between March of 2003 and April of this

14   year, did you have a different job assignment other than the

15   C and D rover that you just described?

16        A    Several.

17        Q    Just very briefly name them.  Don't tell us

18   what they were, just name them.

19        A    I could work anywhere from the arsenal, to our

20   programs outside the facility, to any housing unit, to any

21   escort, to the gym, to SHU, to infirmary.  Possibly if I was

22   an extra officer on the shift and there was an emergency trip

23   that come up, I would take that, possibly.

24        Q    You mean escorting an inmate outside of the

25   facility?

*Michael Duvall - Direct*

1         A      Outside of the facility, yes.

2         Q      Now, do you recall whether or not you had a

3    fixed assignment, a regular assignment job in March of 2003?

4         A      I'll explain it the best I can.  I was in a

5    temporary bid for six months.

6         Q      Let me stop you there.  Explain when you say

7    the term bid, please explain to us what you mean.

8         A      There is an officer assigned to the job but he

9    is currently outside the facility working, be it military, be

10   it special training that he is doing, maybe he is an

11   instructor or a trainer, so his job, his bid is open.  So I

12   place a bid form in, and if I have the most time on the job,

13   I'm awarded that job for six months or until he returns to

14   work, which at the time was -- do you want me to tell you

15   what my job was?

16        Q      Please, go ahead.

17        A      It was a relief job where I covered three

18   different officers who were off from work on their regular

19   days off, which we refer to as RDO's.  It was 19 building SHU

20   first officer on certain days, 19 building SHU second officer

21   on other days, and then there was other time I was outside

22   the building, I was in I think it was 18 building, I was rec

23   officer which is outside SHU, general population.

24        Q      Before March 5th of 2003, do you recall having

25   any interaction or knowing the plaintiff Angel Martinez who

*Michael Duvall - Direct*

1   was an inmate at Oneida back in 2003?

2           A    No.

3           Q    You recall there was an incident, use of force

4   and misbehavior report by you involving inmate Martinez at

5   that time, correct?

6           A    At what time?

7           Q    In March of 2003.

8           A    Yes, correct.

9           Q    If you remember that incident, do you remember

10  which of those many assignments you were carrying out that

11  day when you reported to work March 5th, 03?

12          A    Well, being that Sipley was there, I was the

13  second officer on U dorm, 19 SHU second housing unit.

14          Q    Tell us with more particularity what your duty

15  and responsibilities would have been as the second officer at

16  the second unit in Oneida on March 5th, '03?

17          A    Well, the best I can recall, because part of

18  my responsibility was once we got there I would be relieving

19  the officer I relieve, getting keys and radio from him, we

20  would do the count, I would help Sipley do the count, we

21  would assist in many tasks for the day, laundry -- not

22  laundry, property issuing, showers, feeding chow, any

23  admissions that come in.  I don't remember them all.  I mean,

24  I wasn't there on a regular basis all the time so I don't

25  remember all the details of the duties to do.  Let's see,

*Michael Duvall - Direct*

1    issuing property, cell clean-up, assist Officer Sipley with

2    anything that needs to be done, make regular rounds, make

3    sure everybody is breathing, alive, safe and secure.

4         Q    Now, are you familiar with the protocol for

5    allowing inmates to retrieve their personal property that had

6    been moved from their cubes after they have been brought to

7    the SHU at Oneida?

8         A    Well, if they want to retrieve their personal

9    property, they have to put a request in to the sergeant, if

10    that's what you're asking me.  They just can't get their

11    personal property any time they want.

12        Q    Tell us what you recall about how that would

13    take place.  If an inmate had been brought to the SHU, was

14    under disciplinary confinement and their property from their

15    cube had been packed and brought to the SHU as well, what was

16    the procedure for them to have access to that or to obtain

17    some of it once they had settled into the SHU?

18        A    It would be in 72 hours they would be issued

19    what is allowed, what's called their in-cell issue.  The

20    property would be brought from the locked room into our

21    property room, spread out, we would separate it, shoes, you

22    know, pants, shirts, food, and then we would inventory it,

23    I-64 it, and then the inmate would be brought in to view it.

24        Q    What is the first recollection you have of

25    encountering the plaintiff in the SHU at Oneida on March 5th,

*Michael Duvall - Direct*

1    2003?

2            A    It would be the time of the incident.

3            Q    Well, I appreciate that.  Can you be more

4    specific?  What's the first thing you recall at all about

5    interacting with inmate Martinez on that day?

6            A    When officer Sipley and I went to his cell to

7    tell them he is coming out to get his property.

8            Q    Who originated that order or that request?

9    How did that come about?

10           A    His deprivation order was lifted so it's

11   automatic, we got to get him his property, it's part of the

12   rules.

13           Q    Tell me when you first met up with -- let me

14   withdraw that.

15                Did you initiate that process or someone else?

16           A    The deprivation order, no.

17           Q    No.  Once it had been lifted, the process by

18   which inmate Martinez was going to be given access to his

19   property.

20           A    Oh, I don't recall who went to his cell.  I

21   don't recall if it was me or --

22           Q    So, what's the first thing you remember with

23   interacting with Officer Sipley as far as attending to inmate

24   Martinez's access to his property, where were you?

25           A    I don't understand what you mean.

648

*Michael Duvall - Direct*

1        Q    What's the first thing you can remember

2    happening that day that related to you and Officer Sipley

3    going to inmate Martinez's cell for the purposes of carrying

4    out the property view?

5        MR. MILLER:  Objection to form.

6        THE COURT:  Overruled.

7        A    I'm not understanding your question so I will

8    answer it this way.

9        Q    No, don't.

10       MR. MULVEY:  If that's all right?

11       THE COURT:  Please rephrase.

12       Q    Did you have any interaction with Officer

13   Sipley concerning inmate Martinez prior to going to the

14   inmate's cell that day?

15       A    I might have.  I might have been the one who

16   got his property out of the locked room and brought it to the

17   property room.  I don't know other than that.

18       Q    Fine.  At what point do you remember what

19   happened?  What's the first thing you can sit here today and

20   remember what happened as far as this whole incident?

21       A    The exact thing that happened from reviewing

22   everything?

23       Q    No.  Tell us as you sit here today what you

24   can recall, the very first thing you recall coming into

25   contact with inmate Martinez that day.

*Michael Duvall - Direct*

1    A    The day of March 5th.

2    Q    Right.

3    A    Officer Sipley and I went and escorted him to

4    get his property.

5    Q    Describe as best you can what happened from

6    the moment you approached his cell with Officer Sipley.

7    A    We would have told him that he is going to --

8    MR. MILLER:  Objection to would have.

9    THE COURT:  Overruled.

10    A    Continue?

11    Q    Please.

12    A    We would have -- one of us would have told him

13    Officer Sipley said to be ready for to come out for his

14    property, he would then have exited his cell and we will

15    would have escorted him into the property room.

16    Q    Describe the protocol or procedure that

17    inmates were to follow in exiting their cell and proceeding

18    to another area of the SHU in March of '03?

19    A    To be fully dressed in greens, state greens,

20    have something on their feet and to have their hands kept in

21    their pockets at all times.

22    Q    How would they exit the cell?  Physically what

23    would they do, face first, backwards, sideways, how?

24    A    That would depend on the officer.

25    Q    Do you recall how inmate Martinez was allowed

*Michael Duvall - Direct*

1   to come out of his cell that morning?

2           A    No, I don't recall that, you know, what

3   direction he was facing.

4           Q    What happened after you arrived at his cell

5   and unlocked it?  Take it from there and tell us what

6   happened.

7           A    He exited the cell with his hands in his

8   pockets.  Officer Sipley and I escorted him down the hall to

9   the property room.

10          Q    Let me stop you there.  Describe when you're

11  escorting him where each of you would be in relation to the

12  other, the three of you.  Who's in front?

13          A    Inmate.

14          Q    Where are you in relation to him?

15          A    Me?

16          Q    Yes.

17          A    At that time I would have probably -- I mean,

18  I was -- I'm trying to visualize it.  It would have been

19  Martinez, probably Officer Sipley and then myself back to the

20  left a little more off to the side.  One officer directly

21  behind and one to the left off to the side.

22          Q    Did you have any dialogue or verbal

23  interaction with inmate Martinez, other than the instructions

24  you have already told us about, at any time from when he came

25  out of his cell until you arrived in the property viewing

*Michael Duvall - Direct*

1  room?

2       A    No.

3       Q    Do you recall anything out of the ordinary?

4       A    No.

5       Q    What happened when you arrived in the property

6  viewing room?

7       A    The inmate sat down, Officer Sipley went over

8  the property with him, and he was complaining about sneakers

9  missing.

10      Q    How long did that process take once you

11 arrived at the property room?

12      A    Not long.  I don't know, a few minutes.  I

13 don't know.

14      Q    Was it longer than half an hour?

15      A    Oh, no.

16      Q    Was it longer than 15 minutes?

17      A    I don't believe.  I want to say, you know,

18 maybe five, ten minutes, I don't know.

19      Q    So, who did inmate Martinez direct his concern

20 about his sneakers to?

21      A    At first officer --

22      Q    In the property room.

23      A    Officer Sipley.

24      Q    Was anyone else present at that point beside

25 you, Officer Sipley and the plaintiff?

*Michael Duvall - Direct*

1      A    Yes, Officer LaBrague.

2      Q    At what point do you recall Officer LaBrague

3  arriving?

4      A    He was already in there.

5      Q    After the property was viewed and the

6  statements made about the sneakers by Mr. Martinez, what

7  happened next?

8      A    After he viewed his property and he complained

9  about the sneakers?

10      Q    Right.  What happened next.

11      A    He was given his property, he was allowed to

12  take it back to his cell.

13      Q    Describe for me, or for us, please, exactly

14  how inmate -- what inmate Martinez was instructed to do in

15  terms of getting standing up from the chair and returning to

16  the cell?

17      A    Well, first his property would be put in a

18  clear plastic bag.  He would then be told to take his left

19  hand and put the bag over his shoulder and keep his right

20  hand in his pocket and stand up.

21      Q    Did he comply?

22      A    Yep.

23      Q    Tell us now in as much detail as you can

24  recall what happened next.

25      A    That's when I told inmate Martinez to turn to

*Michael Duvall - Direct*

1    his left and to exit the room, we're going back to his cell.

2         Q    And who else was in your company besides

3    inmate Martinez as you left the property room?

4         A    As we left the property room, it was Officer

5    LaBrague and myself.

6         Q    Describe for us in as much detail as you can

7    recall exactly what happened as you proceeded out of the

8    property room and back towards inmate Martinez's cell.

9         A    Martinez made another complaint about the

10   sneakers and, you know, I told him fill out the claim form,

11   you know, it's not a big deal.  I was directly behind

12   Martinez, Officer LaBrague was to my left and behind a little

13   bit.  We exited the cell -- or the property room, and as we

14   got near his cell --

15        Q    Let me stop you there.  Up to that point,

16   until you returned to the cell, had you had any direct

17   physical contact with inmate Martinez?

18        A    No.

19        Q    Did you observe Officer Sipley have any direct

20   physical contact with inmate Martinez?

21        A    No.

22        Q    Did you observe Officer LaBrague have any

23   direct physical contact with inmate Martinez?

24        A    No.

25        Q    So, now you're at the cell door for inmate

654

*Michael Duvall - Direct*

1   Martinez, is that right?

2          A    Yep, right around there, yes.  Yep.

3          Q    Tell us what you recall exactly what happening

4   at that point.

5          A    That's when Martinez dropped the bag and

6   turned around quickly swinging his right hand in a fist type,

7   in a closed fist towards me.

8          Q    Now, back up and if you can give us as much

9   detail what movement was made, how it was made and by whom

10  when you say dropped the bag.

11         A    Inmate Martinez, he dropped the bag from his

12  left hand and then spun around, took his hand out of his

13  pocket, spun around with a closed fist at me.

14         Q    Was he saying anything to you when that

15  occurred?

16         A    No.  I don't recall it if he was.

17         Q    Had you given him any instruction or direct

18  orders as you proceeded down the hallway prior to that

19  occurring?

20         A    Other than in the property room that we're

21  going back to his cell and to fill out the claim form, no.

22         Q    At that point did you know why those events

23  were occurring?

24         A    The events of?

25         Q    What you just described with the inmate.

*Michael Duvall - Direct*

1           A     No.

2           Q     How did you react?

3           A     I lunged forward and grabbed him in like a

4    bear hug around his upper body.

5           Q     What happened next?

6           A     From lunging forward he fell into the cell

7    door and into the cell on to the floor.

8           Q     Up to that point had Officer LaBrague had any

9    physical contact with inmate Martinez?

10          A     No.

11          Q     Once you came into contact with the floor, was

12   inmate Martinez still in your grasp?

13          A     Yes, I believe so, yes.

14          Q     What happened then?

15          A     Well, like I said, I had him around his upper

16   body and he was just trying to wiggle and get free from me.

17          Q     Describe in as much detail as you can what

18   inmate Martinez was doing once you had reached around and

19   were grasping him?

20          A     Well, he was just kicking his legs, moving his

21   legs like he was trying to get away from someone who had

22   ahold of him, you know.

23          Q     And where was this taking place in relation to

24   the cell door and the cell itself, where were you?

25          A     In the cell door on the floor.

*Michael Duvall - Direct*

1        Q        Were you completely inside the cell?

2        A        Yes.

3        Q        Was Officer LaBrague inside the cell at that

4    point?

5        A        I don't recall if he was.  I mean, he came in

6    behind me, he came right in behind me and assisted, yes.

7        Q        What happened next?

8        A        With Officer LaBrague or me?

9        Q        With you.

10        A        I continued giving inmate Martinez direct

11    orders to stop resisting.

12        Q        How did he respond?

13        A        After three or four times he stopped.

14        Q        What length of time transpired between you

15    making physical contact with inmate Martinez to the point

16    where he stopped resisting your orders and complied?

17        A        Not long.  I want to say maybe a minute.

18        Q        At any point during that minute did you

19    observe Officer LaBrague come into physical contact with

20    inmate Martinez?

21        A        He was, yeah, he was.  You know, like I said,

22    when we fell into the cell and I was on the floor, LaBrague

23    come in right behind me and he was laying on his legs.

24        Q        Did you see that?  Did you see that?  Could

25    you actually see Officer LaBrague doing that?

*Michael Duvall - Direct*

1          A    I can't say as I can remember seeing him but I
2   mean -- I can't remember, as I say, I see him directly doing
3   it, but I mean I could --
4          Q    How did you know he was there, Officer
5   LaBrague?
6          A    How do I know he was there?
7          Q    Yes.
8          A    Because I remember from the incident he was
9   laying near me so he was touching me.
10         Q    And both of you were on top of inmate
11  Martinez, is that right?
12         A    Yes.  He was on his legs, I was on his upper
13  body.
14         Q    Once inmate Martinez stopped resisting, what
15  happened next?
16         A    I stood up on, let's see, it would be his,
17  inmate Martinez's right side.  Officer LaBrague was on his
18  left side.  We basically, you know, grabbed his right wrist,
19  I grabbed his right wrist area and his right upper arm area
20  and Officer LaBrague grabbed his left wrist area and left
21  upper arm area, and we basically guided up off the floor and
22  set him on the bed.
23         Q    Why did you do that?
24         A    It's protocol.  The inmates are told when they
25  come to the SHU the safe position is to sit with their hands

*Michael Duvall - Direct*

1    up like this.

2         Q    Did inmate Martinez comply at that point?

3         A    Yes.

4         Q    Did he state anything further to you before

5    you exited the cell?

6         A    No.

7         Q    Did you give him any further instructions

8    before you exited the cell?

9         A    No.

10         Q    How long did you remain in the cell after

11   inmate Martinez was seated on his bed?

12         A    As long as it takes to step away from his bed

13   and get out the door, a few seconds.

14         Q    Is that what you did?

15         A    Yeah.

16         Q    And did you have any further physical contact

17   with inmate Martinez that day?

18         A    No.

19         MR. MULVEY:  May I approach the witness, Your

20   Honor?

21         THE COURT:  Yes.

22         Q    Officer, I'm -- Sergeant, I should say, I'm

23   handing what's been marked for identification as Defendants'

24   Exhibit D31, and what's been received as Plaintiff's

25   Exhibit 13.  Now let me ask you, immediately after exiting

*Michael Duvall - Direct*

1    from inmate Martinez's cell, what did you do next?

2            A      Probably went to the office to call my area

3    supervisor to notify him.

4            Q      About what?

5            A      That there had been a use of force.

6            Q      Why did you do that?

7            A      Because we got to get everybody medical

8    treatment, Martinez included, make sure no one's, you know,

9    hurt.

10           Q      Did you, in fact, receive medical treatment?

11           A      I went to the infirmary, I mean, I didn't

12   receive no treatment.

13           Q      Did you sustain any injuries?

14           A      No.

15           Q      Could you please look at Exhibit D31?

16           A      Yes.

17           Q      Do you have that in front of you?

18           A      Yes.

19           Q      Could you describe for us what that is?

20           A      It's a memorandum, or the to/from, to

21   Superintendent Hollins from me.

22           Q      Does a bear a date?

23           A      It does.

24           Q      What's the subject?

25           A      Inmate Martinez.

660

*Michael Duvall - Direct*

1          Q    Does it bear your signature?

2          A    Yes, it does.

3          Q    Is that a memorandum that you would make and

4    keep in the ordinary course of your employment in the Oneida

5    Correctional Facility?

6          A    Yes.

7          MR. MULVEY:  Your Honor, I offer Defendants' 31 in

8    evidence.

9          MR. MILLER:  No objection.

10          THE COURT:  Received.

11          (Defendants' Exhibit 31 was received in evidence.)

12          Q    That's a document you prepared concerning this

13    incident, 31, correct?

14          A    Yes.

15          Q    Now, turning your attention to Plaintiff's

16    Exhibit 13 you have in front of you.  That's already been

17    identified so you can just tell us again what it is.

18          A    It's a misbehavior report.

19          Q    Who authored it?

20          A    I did.

21          Q    And is that concerning the incident we're just

22    discussing here now in the SHU, March 5th, '03?

23          A    Yes, it is.

24          Q    Why did you prepare that report, plaintiff's

25    13?

*Michael Duvall - Direct*

1        A    Because Martinez swung at me.

2        Q    Is that the information that's contained in

3   Plaintiff's 13?

4        A    Yes, it is.

5        Q    Did you observe anyone else have any physical

6   contact with inmate Martinez over the course of this incident

7   other than you and Officer LaBrague?

8        A    No.

9        Q    Was Officer Sipley present at any time during

10  the course of your escorting the inmate to his cell or for

11  the incident you have just described inside his cell?

12       A    No.

13       Q    When, if ever, did Officer Sipley arrive in

14  the vicinity of inmate Martinez's cell during the course of

15  the events you just told us about?

16       A    Like I said, when we exited the cell, he was

17  outside the door.

18       Q    Did you overhear him make any statements to

19  inmate Martinez?

20       A    No.

21       Q    Did you make any further statements to

22  Martinez?

23       A    No.

24       Q    Do you recall hearing Officer LaBrague make

25  any further statements to Martinez?

*Michael Duvall - Direct*

1        A    No.

2        Q    After you contacted a supervisor concerning

3  this incident, did you leave the SHU?

4        A    Yes.  I would have went to the infirmary.

5        Q    Did you return to the SHU that day?

6        A    I don't recall.  I don't recall if I returned

7  or not.  I really --

8        Q    Did you have any further contact or

9  interaction with inmate Martinez at Oneida Correctional

10 Facility at any point in time on March 5th, 2003, other than

11 what you've just told us about?

12       A    No.

13       MR. MULVEY:  Nothing further, Your Honor.

14       THE COURT:  Thank you.  Cross-examination,

15 Mr. Miller.

16       MR. MILLER:  Yes, thank you.

17 *CROSS-EXAMINATION BY MR. MILLER:*

18       Q    Officer Duvall, is everything you have just

19 said to this jury the truth?

20       A    Yes.

21       Q    When you said that this incident in the cell

22 was going on for about a minute, could you describe again for

23 the jury all of the physical actions of Angel Martinez during

24 that minute?

25       A    What do you mean by physical actions?

*Michael Duvall - Cross*

1      Q    What was he doing?  What was he doing with his
2  body during that minute?
3      A    Well, I guess I don't understand your
4  question, what was he doing with his body.
5      Q    Well, was he still or was he moving around
6  during that minute?
7      A    Like I said, he was --
8      Q    Moving around?
9      A    Right.
10      Q    Now what I'm asking you to describe is his
11  movements during that minute.
12      A    Okay.  I'll try my best, I mean, you know.
13      Q    Well, did you try your best on direct?
14      A    Yeah.
15      Q    Well, try your best again.
16      A    As I said on direct, when we fell into the
17  cell, he was wiggling trying to get away from me because I
18  had ahold of his upper body and then, you know, that
19  continued for, you know, like he quit after three or four
20  direct orders to stop and then we guided him to his bed.
21      Q    Now, when you say you fell into the cell, did
22  he literally fall to the floor?
23      A    Yeah.
24      Q    Did he fall on his back, on his side, on his
25  front or something else?

*Michael Duvall - Cross*

1          A    It would be on, I think on his back.

2          Q    So, he fell back into the cell and you were on

3    top of him as he fell on his back?

4          A    I mean, not like you make it sound.

5          Q    Well, I'm not trying to make it sound like

6    anything.

7          A    Well, you just said that I -- you said that I

8    fell, you're showing how I fell.  I didn't say I fell

9    directly on top of him.  I said I fell on his body, we fell

10   in the cell.

11         Q    How much did you weigh at the time?

12         A    Probably 280.

13         Q    Okay.  And after you fell on him, he continued

14   to flail his arms and legs for about a minute?

15         A    I did not say that.  I did not say flail his

16   arms and legs.

17         Q    I'm sorry, I thought you did.  What did he do

18   for that minute?

19         A    I said he was wriggling his legs and stuff

20   trying to get away from me.

21         Q    So you were on top of him?

22         A    I was laying on his upper body, yes.

23         Q    Would you agree with Officer Sipley that Angel

24   back on March 5th was in the same apparent physical condition

25   as he is here today?

665

*Michael Duvall - Cross*

```
 1          A    Could be.

 2          Q    Well, do you know?

 3          A    No.

 4          Q    Describe how he appeared to you on March 5th.

 5          A    I don't know.  I don't remember what he

 6   exactly looked like, how he was or anything of that nature.

 7          Q    Do you recall, for example, his body weight?

 8          A    No.  I mean --

 9          Q    Could you give us a range?  Did he weigh less

10   than you?

11          A    Of course.

12          Q    Did he weigh less than 200?

13          A    Probably.  I don't know.  I mean, I don't know

14   for sure.  I don't know where you want me to, you know, go

15   with this.  I don't know what his weight was.  I couldn't

16   tell you exactly.

17          Q    In other words, you didn't weigh him?

18          A    Right.

19          Q    I'm not asking you that.

20          A    Okay.

21          Q    I'm asking you to give an approximation.  You

22   look at me, you can give a guess about how much I weigh,

23   right?

24          A    Yeah, but it might be way off.

25          Q    You might be.  But even though you might be
```

*Michael Duvall - Cross*

1   way off, I want you to approximate as best you can what

2   Martinez weighed back then.

3        A    I would say 160, 170 maybe.

4        Q    And were you aware of whether or not at that

5   time he had been complaining about severe pain throughout the

6   body?

7        A    No.

8        Q    When you left him in the cell and shut the

9   door, was he handcuffed?

10       A    No.

11       Q    Did you find the body movements that you've

12   described of Martinez to be unusual?

13       A    I don't know what you mean.

14       Q    Well, you said he was swinging.

15       A    I did not say he was swinging.

16       Q    Did he swing at you at some point?

17       A    Outside the cell.

18       Q    And then he landed on the floor?

19       A    Exactly.

20       Q    Two guys had to hold him down, right?

21       A    Yes.

22       Q    And then it's your testimony that you just

23   left him on the bed and shut the door and went on your way?

24       A    He stopped.

25       Q    Okay.  Did you know Officer Thompson on March

*Michael Duvall - Cross*

1    5th, 2003?

2         A    I might have seen him, I don't know.  I don't

3    know if I knew him or not.  I might have known who he was but

4    I don't know if I known him.

5         Q    How long had you been working in Oneida as of

6    March 5th, 003?

7         A    Approximately two years.

8         Q    Okay.  Now, I showed Officer Sipley the log

9    from March 5th at SHU.  Had you ever read that log before the

10   incident with Angel Martinez?

11        A    Have I?  I might have.

12        Q    As a matter of fact, I'm not asking you

13   specifically what you read, but did you read the log at all

14   before March 5th of 2003?

15        A    I might have.

16        Q    Do you recall if you were aware that Angel had

17   been taken to the infirmary on March 5th?

18        A    No, no.

19        Q    By the way, when you prepared for this case,

20   did you review any documents?

21        A    I did.

22        Q    And you reviewed your misbehavior report, I

23   assume?

24        A    Correct.

25        Q    Did you review the logs from February 25th,

*Michael Duvall - Cross*

1   2003 from M dorm?

2       A   No.

3       Q   Have you ever seen them?

4       A   Nope.

5       Q   Do you know if they exist?

6       A   I'm assuming they do because, you know -- I

7   don't know.  I don't know.  I've never read them, I don't

8   know.

9       MR. MILLER:  Thank you.

10      THE COURT:  Redirect?

11      MR. MULVEY:  None.  Thank you, Your Honor.

12      THE COURT:  You may step down.  Next witness.

13      MR. MULVEY:  Roland LaBrague.

14      *ROLAND LABRAGUE*, called as a witness and being duly

15   sworn, testifies as follows:

16      MR. MULVEY:  Your Honor, I don't anticipate

17   completing this in ten minutes.  Do you want to forge ahead?

18      THE COURT:  Let's begin, we'll have to break at 11

19   and we'll get as much done as we can.  Everybody still good?

20   Okay.  Proceed.

21   *DIRECT EXAMINATION BY MR. MULVEY:*

22       Q   Officer, where are you currently employed?

23       A   Oneida Correctional Facility.

24       Q   What is your position there?

25       A   Corrections officer.

*Roland LaBrague - Direct*

1        Q    How long have you been employed by the

2  Department of Corrections?

3        A    Fourteen years.

4        Q    How long have you been employed at Oneida

5  Correctional Facility?

6        A    Twelve years.

7        Q    What is your current -- let me ask you this.

8  Do you have a fixed responsibility or assignment at Oneida

9  presently?

10       A    Yes, I do.

11       Q    What is that?

12       A    I'm the SHU first officer on the night shift.

13       Q    What are the hours of the night shift at the

14  SHU at Oneida?

15       A    11:30 p.m. to 7:30 a.m.

16       Q    How long have you held that position?

17       A    About four years.

18       Q    Prior to that did you have a fixed job

19  assignment at Oneida?

20       A    Yes, I did.

21       Q    What was that?

22       A    I had one of those relief bids where you work

23  three separate posts as those three regular officers have

24  their days off.

25       Q    How long were you working as a relief officer?

670

*Roland LaBrague - Direct*

1          A     Probably six years.

2          Q     Would that include the period in March of

3     2003?

4          A     Yes.

5          Q     And since we've heard a lot, I suppose you can

6     be very succinct, tell us in general what your duties and

7     responsibilities were as a relief officer before and after in

8     and around the time of March of 2003.

9          A     One of the jobs I had is I was a rec officer

10    on S dorm and I assisted supervising the inside rec and the

11    TV room.  My other relief job was I was the front lobby

12    officer.  When you came to the front door of the prison, I

13    would be the first person you would see and I would put you

14    in contact with whoever you were there to see.  And the third

15    part of my relief was I was the SHU rover/escort officer.

16         Q     How long had you worked as a SHU rover officer

17    at Oneida prior to March 2003?

18         A     Five years.

19         Q     Had you had occasion to take assignments in

20    the SHU before that same time period?

21         A     Yes.

22         Q     How often would you say that you had worked in

23    the SHU in March of 2003 -- prior, excuse me, prior to March

24    of 2003?

25              A     The days?

671

*Roland LaBrague - Direct*

1        Q    Just give us, why don't you start, had you

2   been there frequently as an officer?

3        A    As least two days a week for five years.

4        Q    Tell us of the duties and responsibilities you

5   discharged as an officer working there in the SHU at Oneida

6   prior to March of '03.

7        A    My primary duty was to escort any SHU inmate

8   out of the SHU, for instance, to go to medical or to see the

9   parole board, it was my job to escort them there and back.

10        Q    Now, tell us in a little bit more detail,

11   please, the exact function and the protocols you would follow

12   as an escort officer in the SHU at Oneida, exactly what you

13   would do.

14        A    Besides the escorting?

15        Q    Tell us what escorting entails is what I'm

16   asking.

17        A    Escorting would entail, we would get a call

18   that would say inmate X needs to be brought to the infirmary

19   for medication.  I would go down to the cell, I would inform

20   the inmate that he was going to the infirmary.  I would have

21   to go to his storage box, which is in the property room, and

22   retrieve his boots.  I return to the cell, give the inmate

23   his boots in the feed-up slot, it's an opening in the doorway

24   where we put the meals, I would put his boots in there, he

25   would put his boots on, and then I would have him back up to

*Roland LaBrague - Direct*

1    the door, he would stick his hands in the door backwards and
2    I would handcuff him and I would step into the cell, open the
3    door, bring him out, and I would escort him off of the SHU to
4    the infirmary, and whatever medical treatment he needed he
5    would receive and I would bring him back and reverse the
6    procedure.

7            Q    And when you say reverse the procedures, just
8    describe those in reverse from the point that you would
9    return to the SHU with the inmate that you were escorting.

10           A    I would return to the SHU, I would escort him
11   to his cell, he would step into his cell, and I would close
12   the door, he would back up to the door, stick his hands
13   backwards to the door, I would take the handcuffs off, he
14   would then go to his bed, sit down, take off his boots and
15   hand me the boots through the feed-up door.

16           Q    Now, if I have it right, I believe you told us
17   on March 5th, 2003, or in that period, you were working at
18   least on some days as a rover officer in the SHU, is that
19   right?

20           A    It's part of the same job.

21           Q    Of which same job?

22           A    Of the escort, escort/rover is the job
23   description.

24           Q    And is that the post you were manning or the
25   assignment that you had on March 5th, 2003?

673

*Roland LaBrague - Direct*

1        A    Yes.

2        Q    So, in addition to the escort you just told us

3   about, would you please give us some detailed description of

4   your duties and responsibilities as a rover?

5        A    The building has three floors.  I was

6   responsible to assist all three floors with their evening

7   meal, with property inventory and issue.  I'd back up the

8   counts if another officer was busy and wasn't able to sign

9   the counts, sign the count slips, I would help them with

10  that.  I was also responsible to help them supervise the

11  protective custody and recreation which ran in the evening.

12       Q    Prior to March 5th, 2003, do you have any

13  recollection of interacting with or having any personal

14  communication with the plaintiff, former inmate Martinez, who

15  is here today?

16       A    Not at all.

17       Q    Do you recall seeing him at the facility at

18  any time prior to that?

19       A    Not at all.

20       Q    Do you recall having seen him in the SHU at

21  any time leading up to March 5th, 2003?

22       A    No, I didn't.

23       Q    Do you remember having an interaction with him

24  on March 5th, 2003?

25       A    Yes, I do.

674

*Roland LaBrague - Direct*

1        Q      As you sit here today, can you recall
2    reporting for duty that day as the SHU rover/escort officer?
3        A      No, I can't.
4        Q      What shift was that?
5        A      That was 3:30 p.m. to 11:30 p.m.
6        Q      Do you remember whether or not you escorted
7    any inmates out of the unit before your interaction with
8    inmate Martinez on March 5th?
9        A      I don't recall that.
10       Q      Do you recall anything that you did before the
11   incident with inmate Martinez that day?
12       A      My first recollection is that I was helping
13   the other two officers lay out property in the property room.
14       Q      Did you know whose property it was?
15       A      No.
16       Q      Was that part of your normal activity or
17   function as the rover/escort officer in the SHU?
18       A      Yes.  There is two disciplinary floors and
19   whichever one happened to have a lot of property that day, I
20   would go help them.
21       Q      Do you have anything to add to the previous
22   testimony of officers Sipley and Duvall concerning the
23   protocol or procedure for inmates viewing their property?  Is
24   there anything else you can tell us about that we haven't
25   heard?

*Roland LaBrague - Direct*

1    A    No, they covered it perfectly.

2    Q    Now, tell us specifically what you recall

3  occurring with being in the property room that day.  Who was

4  there, what were you doing?

5    A    I was assisting laying out the property with

6  Officer Sipley and Officer Duvall and we finished laying it

7  out.

8    Q    And tell us exactly what that entails.

9    A    It's a very large room, it's probably from

10  here past to where the lawyers sit, and there is many, many

11  tables, kind of in a semicircle, and we just lay the property

12  out, like we would put boots here, put the state issue

13  clothing here, personal clothing here, shoes here, bedding

14  here, food here.  It's spread out in a very large -- we have

15  to go through the property and we have to check for

16  contraband because sometimes we find drugs, we find razor

17  blades, so we go through and look through all the property.

18  It's not like we just dump it out and throw it out there, it

19  takes a while.

20    Q    Was anyone else present when you were doing

21  that other than Officer Sipley?

22    A    Officer Duvall.

23    Q    And do you recall completing that process of

24  laying out the property?

25    A    Yes.

676

*Roland LaBrague - Direct*

1     Q    What happened next?

2     A    I recall Officer Sipley and Officer Duvall

3  bringing inmate Martinez into the rec room -- into the

4  property room, I'm sorry.

5     Q    At any point prior to inmate Martinez coming

6  into the property room, had you had any interaction or

7  contact with him?

8     A    No.

9     Q    Do you recall having spoken to him at all that

10 day prior to entering the property room?

11    A    No.

12    Q    Did you go to his cell with Officer Duvall and

13 Officer Sipley that morning?

14    A    No.

15    Q    Tell us what you observed when they returned

16 to the property room with the plaintiff.

17    A    He was in his state green clothing and he had

18 his hands in his pockets and they told him to sit at the

19 table in the front and he did.

20    Q    What happened next?

21    A    He was -- Officer Sipley told him to observe

22 his property and tell us if there is anything missing.

23    Q    Did you play any role in the actual inventory

24 or the completion of the I-64 form for inmate Martinez's

25 property?

677

*Roland LaBrague - Direct*

1          A    As far as I -- I can't tell you what I did but
2   I can tell you what I normally did.
3          Q    Just tell us what you did on this occasion, if
4   you can recall.
5          A    All I remember is kind of standing off to the
6   side so that the inmate could have full view of his property
7   while they were talking to him, I just stood off to the side.
8          Q    Do you have any recollection of filling out
9   any forms or anything like that?
10         A    No, I don't.
11         Q    Do you have any recollection of anything that
12  inmate Martinez said during the course of that portion of the
13  day in the room of the inventory?
14         A    He said I'm missing a pair of Adidas sneakers,
15  I believe he said, or Adidas I think he said.
16         Q    Did he address that to any specific one of
17  you?
18         A    I believe it was Officer Sipley.
19         Q    Do you recall what, if any, response Officer
20  Sipley gave?
21         A    He told him to fill out a claim form, they can
22  get those on the morning go-around.
23         Q    Did you address inmate Martinez at that point?
24         A    No.
25         Q    Do you recall if Officer Duvall addressed

*Roland LaBrague - Direct*

1  inmate Martinez?

2          A    I didn't see him address him.

3          Q    Tell us what happened next.

4          A    They finished looking over the inventory form

5  and I believe inmate Martinez signed it.  And he had a cell

6  issued bag, a clear plastic bag, that had his clothes and

7  what he was allowed to take back to his cell, and Officer

8  Duvall told him to stand up, keep his right hand in his

9  pocket and put the bag up and put it over his left shoulder

10 and hold it in his left hand.

11         Q    And what happened next?

12         A    Officer Duvall motioned down the hallway and

13 said we're returning to your cell.

14         Q    And did Officer Duvall and inmate Martinez

15 leave the area?

16         A    Yes.

17         Q    Anyone else go with them?

18         A    I did.

19         Q    Well, why did you go if he had been escorted

20 there by Officer Sipley?

21         A    Because Officer Sipley had started putting

22 property in a bag.

23         Q    Why were there two officers escorting inmate

24 Martinez?

25         A    Because in the SHU there is always two

*Roland LaBrague - Direct*

1    officers with an inmate when he is out of his cell.

2          Q    You had described escorts, removing inmates

3    from their cell by cuffing them.  Do you recall that?

4          A    Yes.

5          Q    Was inmate Martinez cuffed?

6          A    No.  They were only cuffed if they were taken

7    out of the SHU.

8          Q    What were the instructions that inmates were

9    to follow with respect to placement of their hands if they

10   were being escorted within the SHU?

11         A    Within the SHU they would keep their hands in

12   their front pockets and not to remove them until instructed

13   to do so.

14         Q    Did you give inmate Martinez that instruction

15   as you were leaving or before you left the property area?

16         A    No, I did not.

17         Q    Do you recall, did you hear anybody else give

18   him that instruction?

19         A    No, I did not.

20         Q    Did you observe whether or not he was

21   complying with that protocol?

22         A    Yes, he was.

23         Q    Now, tell us in as much detail as you can

24   recall what transpired or what you observed as you moved out

25   of the property room area and back towards inmate Martinez's

*Roland LaBrague - Direct*

1  cell.

2       A    Inmate Martinez was walking down the hall with

3  the bag over his left shoulder far to the right, his right

4  shoulder almost brushing the wall.  Officer Duvall was right

5  behind him but off set slightly to the left and I was behind

6  Officer Duvall more to the left.

7       Q    Tell us exactly what occurred up to the point

8  when you got to the front area or in front of inmate

9  Martinez's cell door.

10      A    We were walking down the hall and almost the

11 instant that inmate Martinez was even with his cell door, he

12 said something to Officer Duvall.  Officer Duvall said

13 something back, I didn't really hear it, I honestly wasn't

14 listening to them.

15      Q    What was the tone?

16      A    It was very quiet, it wasn't loud at all.  It

17 was like blah, blah, blah, blah, blah, blah.  And suddenly

18 the bag fell and Martinez swung around and tried to punch him

19 in the head.

20      Q    Punch who?

21      A    Punch Officer Duvall.

22      Q    What did you observe happen next?

23      A    Officer Duvall grabbed him in a bear hug and

24 they just fell into the cell.

25      Q    Give us the positioning of their bodies and

681

*Roland LaBrague - Direct*

1   how they fell and where they fell into the cell.

2          A    Martinez had turned, he had spun and he turned

3   and he was facing Duvall, Duvall was facing him, grabbed him,

4   nearly straight on, and they fell into the cell.

5          Q    How much of Officer Duvall's body surface area

6   did you observe covering inmate Martinez?

7          A    Probably diagonally of his torso across here.

8          Q    Where was inmate Martinez's body positioned on

9   the floor in relation to the other fixtures in the room?

10         A    As you were looking straight into the cell, he

11  was almost straight with his feet in the direction of the

12  door.

13         Q    What did you do at that point?

14         A    I entered the cell as rapidly as I could

15  because Martinez was kind of squirming around on the floor

16  and he was kicking his legs at Officer Duvall, so I went in

17  and I kneeled down and I tried to control his legs with my

18  hands but he was able to move my hands, so I laid across his

19  legs and pinned him to the ground.

20         Q    What happened next?

21         A    Officer Duvall was repeating to him, stop

22  resisting, stop resisting, and he was still squirming and he

23  was attempting to move his legs, but I had them underneath my

24  torso, he gave him multiple orders, at least three that I can

25  recall, and then suddenly it stopped, he just stopped.

682

*Roland LaBrague - Direct*

1        Q    Did you issue any orders?

2        A    No.

3        Q    Did inmate Martinez say anything to you during

4   the course of that period of time that the three of you were

5   on the floor?

6        A    No.

7        Q    When you say stopped, describe exactly how

8   inmate Martinez was behaving at the point where as you say he

9   stopped?

10        A    He went from moving around and attempting to

11   kick his legs and bouncing me around and everything and then

12   all his motion just stopped.

13        Q    What happened next?

14        A    Since he had stopped, I slowly got off his

15   legs and they didn't move any more so I assumed he was done.

16   I grabbed him by the left arm.  Officer Duvall rose up to his

17   knees and into a standing position and grabbed him by his

18   right arm, kind of turned him around.  We helped him stand up

19   and backed him up and he sat on the bed.

20        Q    Why did you do that?

21        A    That's just protocol.

22        Q    What is the protocol?

23        A    Protocol is if they're no longer a threat to

24   you, then they can be left in that position on the bed, which

25   is their hands on their lap in a palms-up position.

683
*Roland LaBrague - Direct*

1   Q   Did inmate Martinez comply with protocol?

2   A   Yes, he did.

3   Q   At that point what did you do?

4   A   We exited the cell, closed the door.

5   Q   At any time up to that point did you observe

6   Officer Sipley in the vicinity?

7   A   No, I didn't.

8   Q   Did there come a time when you observed

9   Officer Sipley in the vicinity?

10  A   We were walking toward the office and he kind

11  of came up behind me and startled me and that's the first

12  time I noticed he was there.

13  Q   Did he inquire as to what occurred?

14  A   Yes.

15  Q   Did you tell him?

16  A   Yes.

17  Q   What did you do immediately after you left

18  inmate Martinez's cell?

19  A   We went to the officer and I don't know which

20  one of us called -- the supervisor was called and we were all

21  told to go to medical.

22  Q   Did you have any further contact with inmate

23  Martinez on March 5th, 2003?

24  A   No.

25  Q   At any time from the point you came into the

684

*Roland LaBrague - Direct*

1    property room until you left his cell, did you punch, kick,

2    slap or hit inmate Martinez?

3            A    No.

4            Q    Did you observe any other corrections

5    personnel do the same?

6            A    No.

7            MR. MULVEY:  May I approach, Your Honor?

8            THE COURT:  Yes.

9            Q    Officer, I'm handing you what's been marked as

10   Defendants' Exhibit 30 and ask you to take a look at that and

11   identify it for us, please.

12           A    That's the memo that I wrote to the

13   Superintendent Hollins concerning this incident.

14           Q    Why was that addressed to the superintendent

15   instead of your immediate supervisor?

16           A    That was the instructions I received from my

17   immediate supervisor.

18           Q    Does it bear a date?

19           A    Yes, it does.

20           Q    And what's the date?

21           A    3/5/03.

22           Q    What is it regarding?

23           A    Inmate Martinez, and it has his department ID

24   number afterwards.

25           Q    Does it bear your signature?

685

*Roland LaBrague - Direct*

1          A     Yes, it does.

2          Q     Is it concerning the incident you just told us

3  about?

4          A     Yes, it does.

5          Q     Is that report, or in this case a memorandum,

6  that you would prepare, keep and maintain in the ordinary

7  course of your employment at Oneida Correctional Facility?

8          A     Yes.

9          MR. MULVEY:  Your Honor, I offer the Exhibit 30,

10  D30, into evidence.

11          THE COURT:  Any objections?

12          MR. MILLER:  Is this a copy?

13          MR. MULVEY:  Yes.

14          MR. MILLER:  No objection.

15          THE COURT:  D30 is received.

16          (Defendants' Exhibit 30 was received in evidence.)

17          MR. MULVEY:  Does the witness have Plaintiff's 13?

18  May I approach, Your Honor?

19          THE COURT:  Yes.

20          Q     Officer, I'm handing you what's been received

21  in evidence as Plaintiff's Exhibit 13 and direct your

22  attention to the area of -- the signature area at the end or

23  the body of the report.

24          A     Yes.

25          Q     First tell us again who the author of that

*Roland LaBrague - Direct*

1   report is.

2          A    M. Duvall.

3          Q    And what kind of report is it?

4          A    Inmate misbehavior report.

5          Q    Is it concerning this incident we just talked

6   about?

7          A    Yes.

8          Q    Does it also bear your signature?

9          A    Yes.

10         Q    Where is that?

11         A    It says, endorsement other officers, employee

12  witnesses.

13         Q    That is your signature?

14         A    Yes, it is.

15         Q    Is that standard procedure or protocol?

16         A    Yes, it is.

17         Q    And did you read the content or body of that

18  report before signing it?

19         A    Yes.

20         Q    And to your knowledge is everything in

21  Plaintiff's 13 true and accurate?

22         A    Yes.

23              MR. MULVEY:  I have nothing further of this

24  witness, Your Honor.

25              THE COURT:  All right.  At this point I will take a

*Roland LaBrague - Direct*

1    mid-morning break.  I have another proceeding.

2            MR. MILLER:  Your Honor, I just have like two

3    questions.  I'm happy to do it later.

4            THE COURT:  Let's strike while the iron's hot.  Go

5    for it.

6    *CROSS-EXAMINATION BY MR. MILLER:*

7            Q    Without being repetitive from the other

8    witnesses, you did say something about Angel Martinez

9    bouncing me around in the cell.  What did you mean by

10   bouncing me around?

11           A    When I was laying across his legs, he was

12   continuing to kick his legs and he was moving me a little

13   bit.

14           Q    And you were going up and down?

15           A    Just slightly.

16           MR. MILLER:  Thank you.  No further questions.

17           THE COURT:  Any redirect?

18           MR. MULVEY:  No.  Thank you, Your Honor.

19           THE COURT:  You may step down.  Do you have any

20   further proof to offer or do you rest?

21           MR. MULVEY:  At this point, Your Honor, the defense

22   concludes its presentation in this matter.

23           THE COURT:  Will the plaintiff be offering any

24   rebuttal?

25           MR. MILLER:  I would like to consult my client for

688

1    one minute, no more, before answering that question.

2         THE COURT:  All right.  Why don't we hold that

3    question because we'll have some motions, so this

4    unfortunately may be a half hour or 40 minute break, we have

5    to deal with some legal matters.  But then we'll come back, I

6    will give you some preliminary jury instructions, we'll break

7    for lunch, and then we'll have summations and then you'll get

8    the case.

9         So we'll take our mid-morning recess.  Thank you.

10   Please be sure to remember not to discuss the case among

11   yourselves, keep an open mind until all the proof is in and

12   you've heard my instructions.

13        (Recess at 11:10.)

14        (Reconvene at 11:40.)

15        MR. MULVEY:  Your Honor, I'm going to note my

16   hearsay objection to these medical records.  I understand the

17   Court's previous rulings, I just want to preserve that for

18   the record.

19        THE COURT:  And particularly since I received

20   certain medical records that you offered with similar hearsay

21   statements.

22        MR. MULVEY:  Understood.

23        THE COURT:  I will receive this compilation of

24   records which has been marked as what exhibit?

25        MR. MILLER:  Plaintiff's 34, which are the Bronx

1    Lebanon Hospital Center records.

2              THE COURT:  Plaintiff's 34 is received.

3              (Plaintiff's Exhibit 34 was received in evidence.)

4              THE COURT:  I think I already made it clear to the

5    jury that the statements that are contained in them offered

6    from the plaintiff are not for the truth but only to put in

7    context the care and treatment.  I don't think there is any

8    further need to charge them on that again.

9              At this time I'll hear motions from you,

10   Mr. Mulvey.

11             MR. MULVEY:  Thank you, Your Honor.

12             THE COURT:  Perhaps I should ask, would you like to

13   renew them before the rebuttal?

14             MR. MULVEY:  Let's make sure that all the proof is

15   closed, please, Your Honor.

16             MR. MILLER:  The proof is closed.

17             MR. MULVEY:  Your Honor, I'm going to begin, Your

18   Honor, by -- I can't recall specifically, by either making or

19   renewing a Rule 50 motion for dismissal of the claim of

20   retaliation by officers Sisco, Meyers, Novak and Temple with

21   respect to the incident in M dorm on February 25th, because I

22   think that it's our position that the only -- now that we've

23   heard from the defendants, the only assertion is information

24   that was imparted to defendant Thompson from the plaintiff,

25   and I don't believe that there has been any quantum of proof

1  adduced that the theory that that information in a relatively

2  short 30 second to two minute period of time was in any way

3  communicated to those remaining defendants so that they could

4  have acted in a retaliatory fashion.

5       I know there is similar remaining excessive force

6  or retaliating theme claim, but in terms of retaliating, they

7  have to have some basis.  The basis was reportedly a threat

8  to see a sergeant.  And an opportunity was made to elicit

9  from any of them whether or not that had been communicated to

10  them in any fashion, and there is no proof, and I don't

11  believe that other than the plaintiff's assertion that he

12  made that statement to Officer Thompson that there is

13  anything rising to the level of preponderance that these

14  officers had an opportunity to ascertain that and then their

15  conduct could be construed as retaliatory.

16       THE COURT:  What if those four officers, three and

17  Sergeant Temple, were aware of the activity at the time that

18  the excessive force was used?

19       MR. MILLER:  I'll address this question.  With

20  regard to Novak, Meyers, Temple -- I'm going to put Temple

21  aside for a second -- Sisco, Meyers and Novak, with regard to

22  the retaliation, I think I tend to agree with Mr. Mulvey that

23  as far as retaliation is concerned, I don't think that

24  they -- there is any prima facie proof that they were

25  reacting to Mr. Martinez's request for a sergeant or a threat

1    to call a sergeant, so if that's what your argument was, I

2    think I agree.

3            MR. MULVEY:  If you only hear half of me, I'm still

4    overwhelmingly persuasive, obviously.

5            THE COURT:  Duly noted.

6            MR. MULVEY:  Last self-serving statement of the

7    trial.

8            THE COURT:  So, you do not actively oppose

9    dismissal of the portion of plaintiff's retaliation claim

10    that is related to the excessive force on February 25, 2003

11    with respect to defendants Sisco, Meyers and Novak?

12            MR. MILLER:  That is correct.

13            THE COURT:  That motion is granted.  It just messed

14    up my entire verdict sheet.

15            MR. MULVEY:  I thought of it this morning but I

16    thought we needed to close proof.  And I also make that with

17    respect to Sergeant Temple.

18            THE COURT:  Well, he carved out Sergeant Temple, so

19    I'm waiting to hear his argument on Temple.

20            MR. MILLER:  With regard to Temple, I think there

21    is a longer tail with Sergeant Temple, and also she spoke to

22    Thompson after the incident and those records are also in

23    evidence.  At first she said she didn't speak to him, but

24    then right in her report she admitted that Thompson told her

25    that inmate Martinez had requested a sergeant.  She is the

1    one who then accompanied Mr. Martinez to the infirmary.  And

2    then based on whatever proof you believe or the jury

3    believes, she actually escorted him into the SHU draft room.

4    And so, no, I'm not going to consent in any fashion to

5    Sergeant Temple with regard to the retaliation.

6            THE COURT:  I'm going to reserve decision with

7    regard to Sergeant Temple on this portion of the motion.

8            MR. MULVEY:  Now, Your Honor, along the same lines,

9    turning to the retaliation component, and I could take them

10   one at a time, the argument is the same, so I will link them

11   all.

12           The retaliatory use of force and misbehavior report

13   by Duvall and LaBrague -- and let me look at the sheet, Your

14   Honor.  And I believe that -- and Sipley, so I need to add

15   him.  Duvall, LaBrague and Sipley with respect to

16   retaliation, the same argument, Your Honor, whether the use

17   of force or the misbehavior report by the two of them or the

18   use of force or the failure to intervene by Sipley, there was

19   no proof that that was -- well, I take it back.

20           Initially you had ruled that the plaintiff's

21   statement, I saw Tom, made by one of these witnesses was

22   sufficient, and I'm renewing my motion.  Now having all of

23   these witnesses having an opportunity to be heard and to be

24   questioned about any connection with Officer Thompson, I

25   don't believe that there was any information elicited that

1   would substantiate that they acted on behalf or in reaction

2   to the statement by plaintiff made to Officer Thompson eight

3   days previously that he wanted to see a sergeant.

4           THE COURT:  All right, that motion is denied.

5           MR. MULVEY:  And the same with respect to the

6   misbehavior report as well, Your Honor.

7           THE COURT:  Yes.

8           MR. MULVEY:  I believe those are the remaining

9   applications that I have.

10          THE COURT:  Excellent.  The plaintiff have anything

11  at this point?

12          MR. SIVIN:  A couple things I wanted to bring to

13  the Court's attention, those cases to which I alluded before

14  on the issue of physical injury as it relates to the Prison

15  Litigation Reform Act.  There is two cases.  *Waters versus*

16  *Andrews*, and this discusses the issue and it cites some other

17  cases as well.  *Waters versus Andrews*, 2000 US District Lexis

18  16004, Western District, New York, 2000.

19          And what it discusses is that physical injury

20  within the meaning of the Act does not have the type of

21  physical injury that laymen refer to.  In this particular

22  case there was an inmate who was in the SHU and had suicidal

23  thoughts, which the Court characterized as exposing her to a

24  substantial serious harm, which they felt was sufficient for

25  physical injury, and noxious odors from feces, and they said

1    this could be a prima facie case for physical injury under

2    the Act.

3           In our case we have in addition to that

4    Mr. Martinez was in the SHU with a broken rib for that first

5    week receiving absolutely no medical treatment for that.

6    That's additional exposure to a substantial risk of serious

7    harm, in addition to the other we mentioned, about being

8    beaten in the SHU.

9           The next case addresses the issue of whether

10   physical injury is even required at all in that case.  The

11   case is *Giano versus Kelly*.  That's also Western District

12   New York, 2000, and it's 2000 District Lexis 9138.  In that

13   case the Court cites from other circuits, apparently nothing

14   in the Second Circuit directly on point, and it says, courts

15   have reached contrary conclusions on whether 1997e(e) was

16   intended to apply to claims where physical injury is an

17   unlikely consequence of the claimed violation, i.e. First

18   Amendment claim.  And they cite a Ninth Circuit Court of

19   Appeals case.

20          And similarly in this case, I don't think anybody

21   envisions that a violation of one's right not to be

22   maliciously prosecuted normally results in physical injury,

23   so it's akin to that First Amendment claim.  So it's a

24   two-tier argument.  We don't have to prove physical injury,

25   and if we do, we have proven it.  At the very least it should

1  be a question for the jury as to whether he suffered

2  requisite physical injury.

3        MR. MULVEY:  May I, Your Honor?

4        THE COURT:  Sure.

5        MR. MULVEY:  Let me just take the malicious

6  prosecution component first.  What is the factual correlation

7  between his being in the SHU and the malicious prosecution?

8  He is in the SHU for, what are we talking about, over the

9  course of the nine months or more, he is in the SHU at that

10  point, the prosecution hadn't even been initiated.  The

11  prosecution was initiated, the testimony came out, some ten

12  days to two weeks after the incident.  So that was after he

13  was out of the SHU, so the SHU time that was being used had

14  nothing to do with --

15        THE COURT:  I'm very satisfied that on the

16  malicious prosecution claim there was no physical injury, and

17  I'm satisfied subject to what the Second Circuit tells me in

18  this case that he is not entitled to recover more than

19  nominal damages on malicious prosecution.  I think it is a

20  closer case, and I want to take a very quick look at these

21  two decisions, with regard to malicious -- I'm sorry,

22  retaliation, false misbehavior reports.

23        MR. MULVEY:  And just so I'm clear, that would be

24  only as to Thompson, Sipley and Duvall -- excuse me,

25  Thompson, Duvall and LaBrague, that would be the only three

696

1    defendants to which that would apply?

2            THE COURT:  No.

3            MR. MULVEY:  They're the only three that authored

4    misbehavior reports.

5            THE COURT:  Yes.

6            MR. MULVEY:  They're the only three of all the

7    defendants, so it would be just those defendants?

8            THE COURT:  Yes.

9            MR. MULVEY:  Thank you.

10           THE COURT:  I'm going to take about ten minutes

11   here.

12           (Recess at 11:55.)

13           (Reconvene at 12:10.)

14           THE COURT:  I've reviewed the two cases that you've

15   cited.  I'm not convinced that I was wrong.  I've reviewed

16   *Giano versus Kelly*.  The clear holding of Judge Curtin in

17   that case is that he determined not to apply Section 1997e(e)

18   retroactively and, therefore, permitted the award of damages

19   beyond nominal on a cause of action where there was a

20   physical injury.  I don't determine Judge Fazio's decision in

21   *Waters versus Andrews* differently.  He was addressing a

22   summary judgment motion, but to the extent it might be

23   interpreted to conclude that the PLRA does not bar recovery

24   of more than nominal damages for a false misbehavior report

25   claim of retaliation where no physical injury resulted, I

697

1    respectfully disagree with that result.

2         And so at this point I intend to have the jury

3    brought in, I will charge them substantively, we'll break for

4    lunch, we will have summations and then I'll give them the

5    final charge.  After they have gone to the jury room, we'll

6    entertain any argument regarding the substantive charges and

7    whether there are exceptions or requests to charge that have

8    not previously been already placed on the record.

9         MR. MULVEY:  I have one question that I think

10   remains open.  My notes, I submit, I very well could be

11   wrong, and that would be with respect to the jury verdict

12   questionnaire, item 7, there was some discussion about

13   Officer Novak who did not complete the supporting deposition

14   with the request for prosecution.  My recollection was that

15   what I had was that you had reserved or left that open last

16   evening, and I don't know that we covered that again this

17   morning.

18        THE COURT:  Are you arguing under Rule 50 for

19   judgment as a matter of law in his favor on the malicious

20   prosecution claim?

21        MR. MULVEY:  If the Court would wish to entertain

22   it in that fashion, yes, I am.  There has not been -- through

23   all the proof adduced, there has not been sufficient evidence

24   that Officer Novak sought the prosecution in the same fashion

25   that the Court sustained or would not entertain for the other

1    three defendants in that Officer Novak did not complete a

2    deposition that requested prosecution, and testified that he

3    did not affirmatively seek such.  And I do not believe that

4    at the very least cooperation with the authorities would rise

5    to the level of causing a prosecution.

6         THE COURT:  Did he submit a statement, a written

7    statement?

8         OFFICER NOVAK:  I only did my memorandum from the

9    use of force, I never talked to anybody after that.

10        THE COURT:  Is there any evidence that Officer

11   Novak cooperated, participated in the prosecution, and if

12   so --

13        MR. MILLER:  Yeah, I believe the deposition that is

14   in evidence.  And I assume it's the deposition that he is

15   referring to now, is the same form, it's called a supporting

16   deposition, that was filled out by the other three

17   defendants.  Let me just finish.

18        I believe the testimony of Captain Lane yesterday

19   strengthened my malicious prosecution case against Novak

20   because the process appears to be that the officers submit

21   their supporting depositions and then it's forwarded to the

22   state police.  And the fact that his supporting deposition

23   was verbatim -- when I say verbatim, I don't mean literally

24   verbatim, but substantively the same, I would say it's just

25   as likely that his supporting deposition initiated the

1    criminal investigation equal to the other three.

2            THE COURT:  Yes.  I think Exhibit P28 suffices to

3    provide a basis on which a reasonable factfinder could find

4    against him on malicious prosecution, so I will deny that

5    motion.  Did you want to add?

6            MR. MULVEY:  I respect the Court's ruling, I just

7    would like to clarify.  The memos prepared by the four

8    officers at the facility on the day of the event do bear a

9    heading that includes a citation to the criminal procedure

10   law.  The evidence adduced at trial with respect to

11   supporting depositions were separate documents prepared by

12   the state police and signed by three of the defendants, those

13   who sustained injury at the state police barracks that

14   included statements that they wished to seek prosecution.  So

15   that's the distinction with respect to that.  And there is no

16   evidence that that memo was in any way, shape or form

17   utilized in the deposition.  I'll leave that as my record for

18   the motion.  Thank you, Your Honor.

19           THE COURT:  Great.  Thank you.  Will you kindly

20   bring in the jury?

21           (Jury present, 12:15.)

22           THE COURT:  I am marking as Court Exhibit 2 a set

23   of jury instructions.  As I said before, I am proceeding in a

24   way that is a little unorthodox, and it may not be used to

25   what you see on TV, but I thought it important that you

*Jury Charge*

1    understand the legal principles that you'll be applying so

2    that you will have some context when the attorneys give you

3    their closing arguments.

4          I will collect these before the summation but then

5    I will return them to you and you can take them into the jury

6    room for your use in connection with your deliberations.

7    Although, if there is any discrepancy from what I say from

8    the bench and what is in here, because there has been slight

9    adjustments, my instructions from the bench control.

10         Members of the jury, now that you have heard the

11   evidence it becomes my duty to instruct you as to the law

12   applicable to this case.

13         It is your duty as jurors to follow the law as I

14   state it to you and to apply the law from the facts as you

15   find them from the evidence in this case.  You are not to

16   single out any one instruction alone as stating the law, but

17   instead must consider the instructions as a whole.  You are

18   also not to be concerned with the wisdom of any rule of law

19   that I may state to you.

20         Counsel quite properly have referred or will be

21   referring in their closings to some governing rules of law.

22   If, however, any difference appears to you between the law

23   stated by counsel and that as stated by the Court in these

24   instructions, you are of course to be governed by my

25   instructions.

*Jury Charge*

1          Nothing I say in these instructions is to be taken

2     as an indication that I have any opinion about the facts of

3     the case or what that opinion is.  It is not my function to

4     determine the facts, but rather yours.

5          You must perform your duty as jurors without bias

6     or prejudice to any party.  The law does not permit you to be

7     governed by sympathy, prejudice or public opinion.  All

8     parties expect that you will carefully and impartially

9     consider all of the evidence, follow the law as it is now

10    being given to you, and reach a verdict, regardless of the

11    consequences.

12         Your verdict must be based solely upon the evidence

13    developed at trial, or the lack of evidence, considered in

14    light of my instructions concerning the applicable law.  In

15    reaching your decision it would be improper for you to

16    consider any personal feelings you may have about any party's

17    status, race, religion, national origin, sex or age.  All

18    persons are equal before the law, of equal worth and station

19    in life, and each party is entitled to the same fair and

20    conscientious consideration by you as any other person.

21         Similarly, it would be improper for you to allow

22    any feelings you might have about the nature of this case to

23    interfere with your decision-making process.  To reiterate,

24    your verdict must be based exclusively upon the evidence or

25    the lack of evidence in the case.

*Jury Charge*

1          Although there are multiple defendants in this

2    action, it does not follow from that fact alone that if one

3    is liable, all are liable.  Each defendant is entitled to the

4    same fair consideration of his or her own defense, and it is

5    not to be prejudiced by the fact, if it should become a fact,

6    that you find against another.  Unless otherwise stated, the

7    jury should consider each instruction to apply separately and

8    individually to each defendant in the case.

9          I'll say a few words about the role of attorneys.

10   The function of lawyers is to call to your attention those

11   facts that are most helpful to their side of the case.  What

12   the lawyers say, however, is not binding on you, and in the

13   finding analysis it is your recollection and interpretation

14   of the evidence that controls your decision.

15          Let me further elaborate.  Our courts operate under

16   an adversary system in which we hope that the truth will

17   emerge through the competing presentations of adverse

18   parties.  It is the role of the attorneys to press as hard as

19   they can for their respective positions.  In fulfilling that

20   role, they have not only the right, but the obligation, to,

21   make objections to the introduction of evidence they feel is

22   improper.

23          The application of the rules of evidence is not

24   always clear and lawyers often disagree.  It has been my job

25   as the Judge to resolve these disputes.  It is important for

*Jury Charge*

1   you to realize, however, that my rulings on evidentiary

2   matters have nothing to do with the ultimate merits of the

3   case and are not be considered as points scored for one side

4   or the other.

5          You should also know that one cannot help being

6   involved with the personalities and styles of the attorneys.

7   It is important for you as jurors to recognize that this is

8   not a contest among the attorneys.  You are not to decide the

9   case based on the attorneys' presentations, but rather solely

10  on the basis of the evidence presented.

11         Statements and arguments of counsel are not

12  evidence in the case.  If a lawyer asks a question to a

13  witness which contains an assertion of fact, you may not

14  consider the assertion as evidence of that fact.  The

15  lawyers' statements and characterizations of the evidence are

16  not evidence.  Insofar as you may find their opening and/or

17  closing arguments helpful, take advantage of them.  It is

18  your memory and your evaluation of the evidence in the case,

19  however, that counts.

20         Unless you are instructed otherwise, the evidence

21  in the case always consists of the sworn testimony of the

22  witnesses, regardless of who may have called them, all

23  exhibits received in evidence, regardless of who may have

24  produced them, and any facts which have been stipulated to by

25  the parties, meaning that the parties agree that those facts

*Jury Charge*

1   are true.  Any evidence as to which an objection was

2   sustained by the Court and any evidence ordered stricken by

3   the Court must be entirely disregarded.

4           Concerning the burden of proof in this case.  With

5   exceptions which I will address in a moment relating to a

6   defense to plaintiff's retaliation claim and the issue of

7   qualified immunity, the burden is on the plaintiff in a civil

8   action such as this to prove every essential element of his

9   or her claim by a preponderance of the evidence.  If the

10  proof should fail to establish any essential element of a

11  plaintiff's claim by a preponderance of the evidence in the

12  case, you should find for the defendant as to that claim.

13  Conversely, if the proof does establish each of the essential

14  elements of plaintiff's claim by a preponderance of the

15  evidence, then you should find for the plaintiff as to that

16  claim unless an affirmative defense has been established by a

17  defendant by a preponderance of the evidence.

18          To establish by a preponderance of the evidence

19  means to prove that something is more likely so than not.  In

20  other words, a preponderance of the evidence in the case

21  means such evidence, when considered and compared to that

22  opposed to it, has more convincing force and produces in your

23  mind a belief that what is sought to be proven is more likely

24  true than not true.  The rule does not, of course, require

25  proof to an absolute certainty, since proof to an absolute

*Jury Charge*

1  certainty is seldom possible in any case.

2       In determining whether any fact in issue has been

3  proven by a preponderance of the evidence, unless otherwise

4  instructed, you may consider the testimony of all witnesses,

5  regardless of who may have called them, all exhibits received

6  in evidence, regardless of who may have produced them, and

7  all facts to which the parties have stipulated.

8       When I say in these instructions that a party has

9  the burden of proof on any proposition, or when I use the

10  expression if you find or if you decide, I mean you must be

11  persuaded, considering all the evidence in the case, that the

12  proposition is more probably true than not true.

13       As we discussed at the outset, there are, generally

14  speaking, two types of evidence from which a jury may

15  properly find the truth as to the facts of the case.  One is

16  direct evidence, such as testimony of an eyewitness.  The

17  other is indirect or circumstantial evidence, the proof of a

18  chain of circumstances pointing to the existence or

19  nonexistence of certain facts.

20       As a general rule, the law makes no distinction

21  between direct or circumstantial evidence, but simply

22  requires that you find the facts in accordance with the

23  preponderance of all the evidence in the case, both direct

24  and circumstantial.

25       The parties have also in this case stipulated

*Jury Charge*

1    before you to one fact.  A stipulated fact is simply one that

2    all parties agree is true.  You must therefore accept each of

3    these stipulated facts, as well as any others stipulated to

4    during the trial, as true.

5            You are to consider only the evidence in the case.

6    In your consideration of the evidence, however, you are not

7    limited to the bold statements of the witnesses.  In other

8    words, you are not limited to what you see and hear as the

9    witnesses testify.  From the facts which you find have been

10   proven, you are permitted to draw such reasonable inferences

11   as seen justified in light of your experience.  Inferences

12   are deductions or conclusions which reason and common sense

13   lead you, the jury, to draw from facts which have been

14   established by the evidence in the case.

15           Unless and until outweighed by contrary evidence in

16   the case, you may find that an official duty has been

17   regularly performed, that private transactions have been fair

18   and regular, that the ordinary course of business or

19   employment has been followed, that things have happened

20   according to the ordinary course of nature and the ordinary

21   habits of life, and that the law has been obeyed.

22           You are not bound to decide any issue of fact based

23   on the number of witnesses if those witnesses do not produce

24   in your mind a belief in the likelihood of truth.  The test

25   is not which side brings the greater number of witnesses or

*Jury Charge*

1   presents the greater quantity of evidence, but instead which

2   witnesses and which evidence appeal to your mind as being

3   most accurate and otherwise trustworthy.

4            The testimony of a single witness which produces in

5   your mind a belief that the likelihood -- in the likelihood

6   of truth is sufficient to prove any fact and will justify a

7   verdict in accordance with such testimony, even though a

8   number of witnesses may have testified to the contrary, if,

9   after consideration of all of the evidence in the case, you

10  hold a greater belief in the accuracy and reliability of that

11  one witness.

12           You, as jurors, are the sole judges of the

13  credibility of the witnesses in the case as well as the

14  weight their testimony deserves.  You may be guided by the

15  appearance and conduct of the witness, or by the manner in

16  which the witness testifies, or by the character of the

17  testimony given or by evidence contrary to the testimony

18  given.  You should carefully scrutinize all the testimony

19  given, the circumstances under which each witness has

20  testified, and every matter in evidence which tends to show

21  whether a witness is worthy of belief.  Consider each

22  witness's intelligence, motive, state of mind and demeanor or

23  manner while on the stand.  Consider the witness's ability to

24  observe the matters as to which he or she has testified, and

25  whether he or she impresses you as having a recollection of

*Jury Charge*

1   these matters.  Consider also any relation each witness may

2   bear to either side of the case; the manner in which each

3   witness might be affected by the verdict, and the extent to

4   which, if at all, each witness is either supported or

5   contradicted by other evidence in the case.  Inconsistencies

6   or discrepancies in the testimony of a witness or between the

7   testimony of different witnesses may or may not cause you to

8   discredit such testimony.  Two or more persons witnessing an

9   incident or a transaction may see or hear it differently.  An

10  innocent misrecollection, like failure of recollection, is

11  not an uncommon experience.  In weighing the effect of the

12  discrepancy, always consider whether it pertains to a matter

13  of importance or instead an unimportant detail, and whether

14  the discrepancy results from innocent error or intentional

15  falsehood.  After making your own judgment, you will give the

16  testimony of each witness such weight, if any, as you may

17  think it deserves.  You may, in short, accept or reject the

18  testimony of any witness in whole or in part.  Also, the

19  weight of the evidence is not necessarily determined by the

20  number of witnesses testifying to the existence or

21  nonexistence of any fact.  You may find that the testimony of

22  a small number of witnesses as to any fact is more credible

23  than the testimony of a larger number of witnesses to the

24  contrary.

25          A witness may be discredited or impeached by

*Jury Charge*

1   contradictory evidence, or by evidence that at some other

2   time the witness has said or done something or failed to say

3   or do something which is inconsistent with the witness's

4   trial testimony, or by evidence that the character of the

5   witness for truthfulness is bad, or by evidence that the

6   witness has been convicted of a felony; that is, an offense

7   punishable by imprisonment for a term of years.  If you

8   believe that any witness has been impeached and thus

9   discredited, it is your exclusive province to give the

10  testimony of that witness such credibility, if any, as you

11  think it deserves.  If a witness has shown knowingly to have

12  testified falsely concerning any material matter, you have a

13  right to distrust such witness's testimony in other

14  particulars and you may reject all of the testimony of that

15  witness or give it such credibility as you may think it

16  deserves.  An act or omission is knowingly done if done

17  voluntarily and intentionally, and not because of a mistake

18  or accident or other innocent reason.

19          Finally, remember that the law does not require any

20  party to call as witnesses all persons who may have been

21  present at any time or place involved in the case, or who may

22  appear to have some knowledge of the matters in issue in this

23  trial.  Nor does the law require any party to produce papers

24  and all things mentioned in the case.

25          Now, let's talk about the substantive law to be

*Jury Charge*

1    applied.  At the outset of the case you were told in general

2    terms about the claims being asserted by the plaintiff in

3    this case.  The issues which you must consider involve

4    plaintiff Angel Martinez's constitutional and common law

5    claims of cruel and unusual punishment based upon the alleged

6    use and failure to protect him from excessive force.

7    Secondly, unlawful retaliation based upon the alleged

8    issuance of false misbehavior reports and the alleged use of

9    excessive force and the failure to protect him from the use

10   of force.  And third, malicious prosecution based upon the

11   initiation of criminal charges against him.

12        You may recall that I also mentioned a fourth claim

13   at the outset, violation of plaintiff's procedural due

14   process rights, naming defendant Selsky and defendant Captain

15   Lane as defendants in connection with that claim.  That claim

16   is no longer in the case and you will not be asked to

17   consider any claims with regard to those two defendants.

18        As you have heard and as will be outlined more

19   fully, including in the jury verdict sheet which will be

20   provided for use in your deliberations, not all of the

21   defendants are named in connection with each of plaintiff's

22   claims.  In addition to considering the merits of plaintiff's

23   various claims, you will also be asked to address the

24   defendants' claim of entitlement to good faith qualified

25   immunity.

711

*Jury Charge*

1          Plaintiff's claims are brought under Title 42 of

2    the United States Code, Section 1983.  That provision states,

3    in pertinent part, that:  Every person who, under color of

4    any statute, ordinance, regulation, custom, or usage of any

5    state subjects, or causes to be subjected, any citizen of the

6    United States to the deprivation of any rights, privileges or

7    immunities secured by the Constitution and laws, shall be

8    liable to the party injured.

9          For purposes of these instructions I will refer to

10   this as Section 1983.

11         Section 1983 does not itself create any substantive

12   rights, rather, it serves as a means or vehicle by which

13   individuals can seek redress in a court of law for alleged

14   violations of their substantive rights under, among other

15   things, the United States Constitution.

16         While section 1983 addresses actions taken under

17   color of state law, it is important to note that the State of

18   New York itself is not a defendant in this case.  The

19   defendants are all DOCS employees, including past or present

20   members of the corrections staff at the Oneida Correctional

21   Facility.

22         As I said, Section 1983 provides that a person may

23   seek relief in this court, including in the nature of

24   damages, against any person or persons who, under color of

25   any state law or custom, subjects such person to a

*Jury Charge*

1   deprivation of any rights, privileges or immunities secured

2   or protected by the Constitution or laws of the United

3   States.

4       In order to prove his Section 1983 claim against a

5   particular individual defendant, the burden is on plaintiff

6   Angel Martinez to establish by a preponderance of the

7   evidence each of the following elements:

8       One, that the actions of the defendant were taken

9   under color of state law;

10      Two, that the defendant performed acts which

11  operated to deprive the plaintiff of one or more of his

12  Federal Constitutional rights, as defined and explained in

13  these instructions;

14      And three, that the acts or omissions of the

15  defendant were the proximate cause of an injury sustained by

16  the plaintiff.

17      As to the first element, I instruct you as a

18  matter of law that the defendants in this case were acting

19  under color of state law in performing their duties as

20  employees of the New York State Department of Correctional

21  Services at all times relevant to this case, and that the

22  plaintiff inmate Angel Martinez has proven this section of

23  his 1983 claim.

24      The second element contains various components

25  based on the three different types of causes of action being

*Jury Charge*

1    asserted.  With regard to excessive force and failure to

2    protect, plaintiff alleges that certain of the defendants

3    used excessive and unnecessary force against him and/or

4    failed to intervene to protect him from the use of excessive

5    force by other corrections officers during February and March

6    of 2003.  The use of excessive force and the failure to

7    protect an inmate from use of excessive force by others may

8    under certain circumstances constitute cruel and unusual

9    punishment.

10            The Eighth Amendment to the United States

11   Constitution protects a prison inmate from cruel and unusual

12   punishment.  That constitutional right is violated by the

13   unnecessary and wanton infliction of pain.  It should be

14   noted, however, that as corrections officers, the defendants

15   are given the lawful authority to use such physical force as

16   may be reasonably necessary to enforce compliance with proper

17   instructions and to protect prisoners and themselves from

18   physical harm from an inmate.

19            The lynchpin inquiry in deciding claims of

20   excessive force against prison officials is whether force was

21   applied in a good faith effort to maintain or restore

22   discipline, or rather instead maliciously and sadistically

23   for the very purpose of causing harm.  Your evaluation of

24   this element therefore involves consideration of the amount

25   of force used; that is, whether the force was reasonable in

*Jury Charge*

1   light of the circumstances of the case.  In deciding this you

2   should examine such facts as you deem appropriate, including

3   the extent of plaintiff's injuries, the need for the

4   application of force, the relationship between that need and

5   the amount of force used, the threat reasonably perceived by

6   the defendant you are considering, and any efforts made by

7   the defendant to temper the severity of a forceful response.

8   That is, to use only that amount of force necessary to meet

9   that threat.  In making that analysis you should also bear in

10  mind that in the context of a prison setting, it is necessary

11  to realize that not every push or shove violates a prisoner's

12  constitutional rights, even if it is later established that

13  in hindsight it may not seem to have been unnecessary and --

14  now is correct; it may now have seemed to be unnecessary in

15  hindsight.  A truly de minimis use of force will rarely

16  suffice to establish a cognizable Constitutional claim.

17          If an evaluation of these and any other

18  factors deemed to be relevant lead you to conclude that

19  plaintiff has proven by a preponderance of the evidence that

20  the defendant you are considering acted maliciously and

21  sadistically, then the plaintiff has established this element

22  of his Section 1983 excessive force claim.  If, however, you

23  find that the defendant you are considering acted in a good

24  faith effort to maintain and restore discipline, applying

25  such force as was reasonably necessary under the

*Jury Charge*

1    circumstances, then the plaintiff has failed to meet this

2    element.

3                Turning to the failure to protect prong of

4    this claim.  In addition to the claims addressed to the use

5    of force, plaintiff also asserts that certain of the

6    defendants, while perhaps not active participants in the use

7    of force against him, unlawfully failed to protect him from

8    constitutional violation under the Eighth Amendment.  Under

9    the Eighth Amendment a corrections officer may not, with

10   deliberate indifference, fail to intervene to protect against

11   infringement of a prisoner's constitutional rights by other

12   corrections officers, committed in his or her presence.  To

13   establish his failure to protect claim, Mr. Martinez must

14   prove by a preponderance of the evidence that one or more

15   corrections officers other than the defendant you are

16   considering used excessive force against him and that the

17   defendant you are considering; one, had actual knowledge of

18   the use by another corrections officer of excessive force;

19   two, had a realistic opportunity to intervene and prevent the

20   harm from occurring; and three, disregarded that risk by

21   intentionally refusing or failing to take reasonable measures

22   to stop the use of excessive force.  Mere inattention or

23   inadvertence does not constitute deliberate indifference.

24                The second of plaintiff's claims is one for

25   retaliation.  One of plaintiff Angel Martinez's

*Jury Charge*

1    constitutional claims is that he was effectively deprived of

2    his First Amendment right to free speech because the

3    defendants retaliated against him for attempting to exert

4    that right.  Specifically, plaintiff Angel Martinez alleges

5    that the defendants retaliated against him for complaining or

6    threatening to complain of prison conditions, including staff

7    misconduct, by taking various adverse actions against him,

8    including by issuing him false misbehavior reports and using

9    excessive force against him.

10           In plaintiff Angel Martinez's Section 1983

11   retaliation claim the substantive right involved is the

12   alleged violation of his rights under the First Amendment to

13   the United States Constitution, which provides in relevant

14   part, that, Congress shall make no law abridging the freedom

15   of speech.

16           Although a convicted prisoner loses

17   constitutional rights upon being convicted of an offense, he

18   or she keeps or retains other constitutional rights.  One of

19   those is the right under First Amendment for the prisoner to

20   complain to appropriate prison officials regarding prison

21   staff misconduct.  A prison inmate, like any United States

22   citizen, has the right to free speech provided that that does

23   not unduly interfere with the maintenance discipline and

24   order in a prison facility.

25           In order to prove his First Amendment

*Jury Charge*

1    retaliation claim against a particular defendant, plaintiff

2    must prove each of the following elements by a preponderance

3    of the evidence as to the defendant under consideration:

4    One, that his conduct, that being the plaintiff's conduct,

5    was protected by the First Amendment; two, that the alleged

6    retaliatory action taken against him was adverse to his

7    interests; and three, that plaintiff's protected conduct

8    caused the alleged retaliatory action.

9              The first element of plaintiff's retaliation

10   claim was that his conduct was protected by the First

11   Amendment of the United States Constitution.  Plaintiff

12   asserts that the defendants retaliated against him for

13   complaining or threatening to complain regarding alleged

14   misconduct on the part of Corrections Officer Scott Thompson.

15   The making of such a complaint regarding prison conditions,

16   including staff misconduct, is conduct which is protected by

17   the First Amendment.  Accordingly, if you find that plaintiff

18   has proven by a preponderance of the evidence that he

19   complained or threatened to complain regarding staff

20   misconduct on February 25, 2003, you must conclude that this

21   element of plaintiff's claim has been established.  If,

22   however, you conclude that plaintiff did not complain or

23   threaten to complain of prison conditions, including staff

24   misconduct, on February 25, 2003, then you must find for the

25   defendants on plaintiff's retaliation claim and need not

*Jury Charge*

1    consider the remaining elements of that cause of action.

2              The second element of plaintiff's claim is

3    that retaliatory actions taken by the defendants were adverse

4    to plaintiff's interests.  In the context of a First

5    Amendment retaliation claim, only retaliatory action that

6    would deter a person of ordinary firmness from exercising his

7    or her constitutional rights represents an adverse action.

8    In other words, if the average inmate in plaintiff's position

9    would reasonably be deterred from exercising his or her right

10   to complain regarding the actions of corrections officials at

11   the facility by the action of a defendant, then the alleged

12   retaliatory action is sufficiently adverse to satisfy this

13   element.

14             The third element of plaintiff's claim is that

15   the protected conduct, that is complaining or threatening to

16   complain regarding prison conditions, including staff

17   misconduct, caused the defendants to take the retaliatory

18   action alleged.  To prevail against a particular defendant,

19   the plaintiff must prove that his complaint or threat to

20   complain was a substantial or motivating factor in that

21   defendant's decision to take action against him.  To be a

22   substantial or motivating factor, the act must have been done

23   intentionally.  An act is performed intentionally if it is

24   voluntary and deliberate and not the product of mistake,

25   accident or negligence.

*Jury Charge*

1          Plaintiff's retaliation claim has two

2    components.  The first relates to the issuance of allegedly

3    false misbehavior reports on February 26, 2003 and again on

4    March 5, 2003.  In deciding whether the issuance of those

5    misbehavior reports was causally connected to the plaintiff's

6    protected activity, you may consider any of the factors you

7    deem relevant, including, though not limited to, the temporal

8    proximity between the protected activity and the alleged

9    retaliatory conduct, the plaintiff's prior disciplinary

10   record, whether the plaintiff was vindicated at a hearing

11   concerning the matter, and any statements by the defendant

12   concerning the motivation for issuing the misbehavior report.

13   It should be noted that a defendant may have performed the

14   acts in question for more than one reason.  If so, then you

15   must determine whether one of those reasons was plaintiff's

16   complaints, and then you must determine whether plaintiff's

17   complaint or threat to complain prompted or substantially

18   caused the defendant's decision to take that action against

19   the plaintiff.  If you find that the plaintiff's complaint or

20   threat to complain was the only reason for each defendant's

21   alleged retaliatory action, then you must find that the

22   plaintiff's protected conduct was a substantial or motivating

23   factor in that defendant's decision.

24          If the plaintiff carries this burden of

25   establishing that his protected conduct motivated adverse

*Jury Charge*

1    action by a defendant, then you next must consider whether

2    the particular defendant under consideration has shown by a

3    preponderance of the evidence that he or she would have taken

4    the same action against the plaintiff even absent the

5    protected conduct.  This is one of the exceptions I referred

6    to earlier, in that the burden of proof on this particular

7    issue, which implicates an affirmative defense, is on the

8    defendant.

9            The second element of plaintiff's retaliation

10   claim concerns the alleged use of excessive force against

11   him.  In this respect to prevail on his claim of retaliation,

12   it is not sufficient for the plaintiff to establish, if he

13   can, that one or more of the defendants exerted excessive

14   force against him.  Rather, the plaintiff must show by a

15   preponderance of the evidence that the defendant's conduct

16   was in retaliation for his exercise of free speech rights.

17   Accordingly, if you find that any of the defendants did use

18   force against the plaintiff, then you must also determine why

19   that occurred.  The use of force against the plaintiff may

20   have been exerted for more than one reason.  If so, then you

21   must determine whether one of those reasons was that the

22   plaintiff complained or threatened to complain about prison

23   conditions, including staff misconduct.  If that was one of

24   the reasons, then the plaintiff must establish by a

25   preponderance of the evidence that it played a substantial

*Jury Charge*

1  role in the defendant's decision to take action against him.

2  If you find by a preponderance of the evidence that it did,

3  that would mean that the plaintiff's complaints were a

4  substantial or motivating factor in the defendant's conduct.

5          If you find that plaintiff's complaint or

6  threat to complain regarding prison conditions, including

7  staff misconduct, was a substantial or motivating factor in

8  the use by the defendant under consideration of excessive

9  force against him, you must again next decide whether the

10 particular defendant under consideration has shown by a

11 preponderance of the evidence that he or she would have taken

12 the same action against the plaintiff even in the absence of

13 the protected conduct.  Once again, this is an exception in

14 that the burden of proof on this particular issue is on the

15 defendant.

16          If you find that the use by the defendant

17 under consideration of force against the plaintiff was

18 motivated by plaintiff's complaint or threat to complain

19 regarding prison conditions, including staff misconduct, and

20 that the defendant has failed to sustain his or her burden of

21 proving the same action would have been taken even absent

22 those actions, then you should return a verdict in favor of

23 the plaintiff on the portion of his retaliation claim related

24 to excessive force.  If, however, the plaintiff fails to show

25 that his complaints played a substantial or motivating role

1  in the defendants's alleged use of excessive force against

2  him, or that the defendant under consideration has proven by

3  a preponderance of the evidence that the same action would

4  have been taken regardless of plaintiff's complaint or threat

5  to complain, then you must return a verdict in favor of the

6  defendant on this portion of plaintiff's retaliation claim.

7           The second element of this Section 1983 claim

8  relates to malicious prosecution.  One element of plaintiff's

9  Section 1983 claim asserts malicious prosecution against

10  certain of the defendants, including Thompson, Sisco, Meyers

11  and Novak.  Those defendants do not deny that they cooperated

12  to some degree in the criminal prosecution against the

13  plaintiff, although the evidence I think will show or you

14  could determine that among those four defendants they

15  cooperated to differing degrees, and that cooperation,

16  including by providing written statements to the New York

17  State Police and in certain instances testifying before the

18  Grand Jury, but they contend, however, that they acted in

19  good faith and based on reasonable grounds.

20           Plaintiff's malicious prosecution claim is

21  rooted in the Fourth Amendment, which protects against

22  unreasonable seizures, as well as the common law of New York.

23  In order to recover on his malicious prosecution claim, the

24  plaintiff must establish that:  One, a criminal prosecution

25  was initiated against him; two, the prosecution against him

*Jury Charge*

1    was terminated in his favor; three, at the time the

2    prosecution was initiated, the defendants did not have

3    probable cause to believe the plaintiff was guilty of the

4    crimes of which they accused him; and four, their actions

5    were motivated by actual malice.

6            Whether probable cause exists depends on

7    whether a reasonably prudent person would have believed that

8    the plaintiff was guilty of the crime charged on the basis of

9    the facts known to the defendant at the time that the

10   prosecution was initiated, or what he or she reasonably

11   believed to be true.  The fact that the defendant personally

12   believed that the plaintiff was guilty is not enough if a

13   reasonably prudent person would not have believed that to be

14   so.  On the other hand, the fact that the Grand Jury refused

15   to indict the plaintiff does not establish that a defendant

16   lacked probable cause at the time the prosecution was

17   initiated.  The critical inquiry when addressing the issue of

18   probable cause is not whether the plaintiff was in fact

19   guilty or innocent, or whether the defendant was in fact

20   mistaken or correct, but rather whether, on the facts known

21   or reasonably believed by the defendant, a reasonably prudent

22   person would have believed the plaintiff was guilty.

23           Plaintiff alleges that the four defendants

24   under consideration in his claim cooperated in a prosecution

25   against him for assault.  The defendants contend that at the

*Jury Charge*

1    time they gave statements and in certain instances testified

2    before the Grand Jury, the facts as they appeared to them

3    were sufficient to sustain any degree of the crime charged.

4    If you find that the facts reasonably appeared to the

5    defendants as they now claim and that based upon those facts

6    a reasonably prudent person would have believed the plaintiff

7    had committed the crime of assault, your finding will be that

8    the defendant had probable cause for believing the plaintiff

9    was guilty and you need to proceed no further on this claim.

10   If, however, you find that the facts did not appear to the

11   defendant under consideration as he or she claims or that he

12   or she did not have a reasonable belief as to the fact, or

13   that it was not reasonable for him or her to have believed

14   that plaintiff committed a crime, your finding will be that

15   the defendant did not have probable cause to believe that the

16   plaintiff was guilty, and you will next proceed to consider

17   whether the defendant acted maliciously in initiating or

18   cooperating in the prosecution.

19            A prosecution is initiated maliciously and an

20   act is committed maliciously if it is done for a purpose

21   other than bringing an offender to justice or out of personal

22   ill will, and it may also be initiated maliciously if it is

23   brought in reckless disregard of the rights of the person

24   accused.  The phrase reckless disregard of the rights of the

25   person accused means initiation of the prosecution without

*Jury Charge*

1  any reasonable ground for belief that the plaintiff was

2  guilty.  If you find that the defendant under consideration

3  did not have probable cause for believing that the plaintiff

4  was guilty at the time he or she cooperated in the

5  prosecution, you may, although you are not required to, infer

6  from that fact alone that the defendant acted maliciously.

7  If you find hat defendant under consideration gave an

8  incomplete or false statement of facts to the New York State

9  Police or testified falsely before the Grand Jury, your

10 finding will be that the defendant actual maliciously.  If,

11 however, you find that the defendant did not act maliciously,

12 you will find for the defendants even though you find that

13 the defendant did not have probable cause to believe that the

14 plaintiff was guilty.  If you find that the plaintiff has

15 proven both that the defendant did not have probable cause

16 and that the defendant under consideration acted maliciously,

17 the plaintiff is entitled to recover and you will proceed to

18 consider the question of damages.  Since I charge you as a

19 matter of law based on the proof submitted that the first two

20 elements of the malicious prosecution claim, namely that a

21 criminal prosecution was initiated and that it was terminated

22 in his favor, have been satisfied.

23        The third element of a 1983 claim is

24 addressing proximate cause.  The third element of plaintiff

25 Angel Martinez's Section 1983 claim is the requirement that

*Jury Charge*

1    he prove that the acts of the defendant under consideration

2    were a proximate cause of the injuries that he suffered.

3    Proximate cause means that there must be a sufficient causal

4    connection between the acts or omissions of the defendant and

5    any injury or damage sustained by the plaintiff.  An act or

6    omission is a proximate cause if it was a substantial factor

7    in bringing about or actually causing injury.  That is, if

8    the injury or damage was a reasonably foreseeable consequence

9    of a defendant's act or omission.  In order to recover for an

10   injury, the plaintiff must show by a preponderance of the

11   credible evidence that the injury would not have occurred but

12   for the conduct of the defendant.

13           In deciding the issue of proximate cause, you

14   should be aware that there may be more than one proximate

15   cause of an injury.  Many factors, or the conduct of two or

16   more people, may operate at the same time, either

17   independently or together, to cause an injury.  A defendant

18   is not liable if the plaintiff's injury was caused by a new

19   or independent source of an injury which intervenes between

20   the defendant's act or omission and the plaintiff's injury

21   and which produces a result which was not reasonably

22   foreseeable by the defendant.

23           Under Section 1983 a defendant is responsible

24   only for his or her own individual actions.  Accordingly, the

25   defendants in this case are not responsible for the acts of

*Jury Charge*

1  any other employee of the New York State Department of

2  Corrections, or the DOCS.  The law requires that a defendant

3  be personally involved in conduct that deprived another

4  person of his or her constitutional rights before that

5  defendant may be held liable for such deprivation.

6  Accordingly, you may not find a defendant liable for the

7  actions taken by another person.  Nor may you, in

8  consideration of damages, if you reach that question, award

9  damages against a defendant based on actions taken by another

10  individual, whether or not that individual is a party in this

11  case.

12          If you find that plaintiff has proven a

13  violation of one or more of his constitutional rights, then

14  you must next consider the defendants' claim that their

15  conduct was objectively reasonable in light of the legal

16  rules clearly established at the time of the incident in

17  issue, and that the defendants are therefore entitled to

18  qualified immunity and are not liable for the violation of

19  his constitutional rights.  This is an affirmative defense

20  asserted by the defendants.  Consequently, to prevail in

21  establishing a basis to find qualified immunity, the

22  defendants must prove each of the elements that of that

23  defense by a fair preponderance of the evidence.

24          In this case I previously advised you

25  regarding the constitutional rights guaranteed to the

*Jury Charge*

1    plaintiff, including under the First, Fourth, Eighth and

2    Fourteenth Amendments to the United States Constitution.  I

3    now charge you that those constitutional rights were clearly

4    established at the time of the events giving rise to

5    plaintiff's claims.

6                    A defendant is entitled to qualified immunity

7    only if he or she did not know what he or she did was in

8    violation of federal law and if a reasonable, competent

9    public official could not have been expected at the time to

10   know that the conduct, if committed, would constitute a

11   violation of federal law.  In deciding what such a competent

12   official would have known about the lawfulness of the

13   defendant's conduct, you may consider the nature of the

14   defendant's official duties, the character of his or her

15   official position, the information which was known to him or

16   her or not known to him or her, and the events which

17   confronted him or her.  You must ask yourself what a

18   reasonable official in the defendant's position would have

19   believed about the legal propriety of the defendant's

20   conduct.  You should not consider the defendant's subjective

21   intent, even if you believe it was to harm the plaintiff.

22   You must also use your common sense.

23                    If after considering the scope of discretion

24   and responsibility generally given to corrections officers in

25   the performance of their duties, and after considering all

*Jury Charge*

1   the surrounding circumstances of the case as they would have

2   reasonably appeared at the time of the incident, you find

3   based upon a preponderance of the evidence that plaintiff has

4   proven either; one, that the defendant under consideration

5   was plainly incompetent or; two, that the defendant under

6   consideration knowingly violated the law regarding the

7   plaintiff's constitutional rights, you must find for the

8   plaintiff.  If, however, you find that the defendant under

9   consideration has proven by a preponderance of the evidence

10  that he or she had a reasonable belief that his actions did

11  not violate the clearly established constitutional rights of

12  the plaintiff, then you cannot find him or her liable even if

13  the plaintiff's rights were in fact violated as a result of

14  that defendant's objectively reasonable action.

15          Let me reiterate, that this is an affirmative

16  defense, therefore, the burden of proof on this offense lies

17  with the defendant by a preponderance of the evidence.

18          Turning to damages.  If you find any defendant

19  liable on any of plaintiff Angel Martinez's claims, you must

20  next go on to consider the question of damages.  If you find

21  that the plaintiff is entitled to recover damages on his

22  Section 1983 claim, you may award compensatory damages,

23  nominal damages and/or punitive damages.  Keep in mind,

24  however, that any damage award by you must represent

25  compensation for damages proximately caused by the acts for

*Jury Charge*

1    which you find the particular defendant liable.

2              In determining the amount of damages, if any,

3    that you decide to award, you should be guided by

4    dispassionate common sense.  You must use sound discretion in

5    fixing an award of damages, drawing reasonable inferences

6    from the facts in evidence.  You may not award damages based

7    on sympathy, speculation or guesswork.  On the other hand,

8    the law does not require that the plaintiff prove the amount

9    of his or her losses with mathematical precision, but only

10   with as much definiteness or accuracy as circumstances

11   permit.

12             The fact that I have instructed you regarding

13   the proper measure of damages should not be considered at

14   intimating any view of mine as to which party is entitled to

15   your verdict in this case.  Instruction as to the measure of

16   damages are given to for your guidance, in the event that you

17   should find in favor of the plaintiff by a preponderance of

18   the evidence in this case in accordance with the other

19   instructions.

20             The purpose of the law of damages is to award,

21   as far as possible, just and fair compensation for the loss,

22   if any, which resulted from the defendant's violation of

23   plaintiff's rights.  As I stated earlier, an injury or

24   damages are proximately caused by an act or failure to act

25   whenever it appears from the evidence in the case that the

*Jury Charge*

1    act or omission was a substantial contributing factor in

2    causing the injury or damage.  The plaintiff need not prove,

3    however, that the conduct of a defendant was the sole cause

4    of his or her injuries.

5              These types of damages are known as

6    compensatory damages.  Such damages seek to make the

7    plaintiff whole; that is, to compensate him or her for the

8    damage suffered.  Compensatory damages are not awarded to

9    punish a defendant.  Compensatory damages are awarded in

10   order to attempt to put the injured party back in the same

11   position as he or she would have been had the wrongful

12   conduct not occurred.  Compensatory damages are, however, not

13   merely limited to expenses that the plaintiff may have

14   incurred.  A plaintiff is also entitled to recover

15   compensatory damages for the physical injury, pain and

16   suffering, mental anguish, shock and discomfort that he or

17   she has suffered because of the defendant's conduct.  Any

18   damage award, including for compensatory damages, however,

19   must be just and reasonable.  The award must neither be

20   inadequate nor excessive.

21             The plaintiff is not automatically entitled to

22   recover compensatory damages solely by virtue of the fact, if

23   you should find it to be a fact, that his or her rights were

24   violated.  The plaintiff must also demonstrate that the

25   deprivation of his or her rights caused some actual injury.

*Jury Charge*

1    A plaintiff in a civil rights action such as this is not

2    permitted to recover compensatory damages based on the

3    abstract value or importance of a constitutional right;

4    rather, such an award may only compensate a plaintiff for

5    actual injury that he or she sustained.

6              I further instruct that you may, consistent

7    with these instructions, award the plaintiff compensatory

8    damages, including for mental anguish and emotional distress,

9    proximately caused by the defendants in connection with his

10   excessive force/failure to protect cause of action, and the

11   portion of his retaliation claim which alleges the use of

12   excessive force and/or failure to protect in retaliation for

13   protected activity.  You may not, however, award compensatory

14   damages with regard to plaintiff's claim of malicious

15   prosecution, as well as the portion of plaintiff's

16   retaliation claim which depends upon the alleged issuance of

17   false misbehavior reports, since the law prohibits such a

18   recovery absent a showing that the plaintiff has suffered

19   physical injury as a result of defendant's actions giving

20   rise to that claim.  If you find liability with respect to

21   either of those claims, and additionally find that a award of

22   damages is appropriate, the damage award is limited to

23   nominal damages, as well as possibly punitive damages, in

24   accordance with the instructions which follow regarding those

25   types of damage awards.

*Jury Charge*

1       If you find, after considering all the

2   evidence presented, that a defendant violated the plaintiff's

3   constitutional rights but that the plaintiff suffered no

4   actual, measurable injury as a proximate result of that

5   violation, you may award the plaintiff what is known as

6   nominal damages in the amount of one dollar.  Nominal damages

7   are awarded as recognition that the plaintiff's rights have

8   been violated.  You should award nominal damages if you

9   conclude that the only injury that the plaintiff suffered was

10  the deprivation of his or her constitutional rights, without

11  any resulting physical, emotional or financial damage.

12       A word about punitive damages.  If you award

13  actual or nominal damages to the plaintiff in connection with

14  his Section 1983 claim, the law permits you to make, but does

15  not require an award for punitive damages.  Such damages are

16  awarded in the discretion of you, the jury, to punish a

17  defendant for extreme or outrageous conduct, or to deter or

18  prevent a defendant and others like him or her from

19  committing similar acts in the future.  You may award

20  plaintiff punitive damages if you find that the acts or

21  omissions of the defendant under consideration were done

22  maliciously, wantonly, or oppressively, in violation of

23  plaintiff's constitutional rights.  An act or failure to act

24  is maliciously done if it is prompted by ill will or spite

25  toward the injured person.  An act or failure to act is

*Jury Charge*

1   wanton if done in reckless or callous disregard of, or

2   indifference to the rights of the injured person.  An act or

3   failure to act is oppressively done if done in a manner that

4   injures, damages or violates the rights of another person

5   with unnecessary harshness or severity, as by misuse or abuse

6   of authority or power, or by taking advantage of some

7   weakness, or disability, or misfortune of other person.  In

8   order to justify an award of punitive damages, Mr. Martinez

9   has the burden of proving by a preponderance of the evidence

10  that the defendant under consideration acted maliciously,

11  wantonly, or oppressively with respect to the plaintiff's

12  rights.

13           I instruct you that even if the plaintiff

14  succeeds in proving that the defendant under consideration

15  acted maliciously, wantonly or oppressively, an award of

16  punitive damages is entirely in your discretion, that is,

17  even if the legal requirements for punitive damages has been

18  satisfied, you may decide not to award punitive damages.  In

19  arriving at this particular decision, you should consider the

20  underlying purpose of punitive damages.  To reiterate,

21  punitive damages are awarded to punish a defendant for

22  outrageous conduct and to deter that defendant and others

23  similarly situated from engaging in such conduct in the

24  future.  If you decide to award punitive damages, your

25  decision must not reflect bias, prejudice or sympathy toward

*Jury Charge*

1    any party.

2                At this stage of the proceedings, you are to

3    consider only whether or not the plaintiff is entitled to an

4    award of punitive damages.  You will not be at this time

5    determining an amount of punitive damages, if you find that

6    the plaintiff should recover such damages.  Instead, in the

7    event that you do determine that the plaintiff is so

8    entitled, a separate hearing will be held at which you will

9    or may hear evidence relevant to the proper amount of such

10   damages.  At the conclusion of that hearing, I will charge

11   you will further on the law in relation to how to determine

12   the appropriate amount of punitive damage award.

13               After the parties have given their summations,

14   I will give you some closing instructions regarding how to go

15   about your duty as jurors to deliberate and also will go over

16   with you a verdict sheet which I have prepared for your use

17   and ease, hopefully to simplify some of these rather

18   complicated instructions.

19               We will break for lunch.  We will be back at

20   2:05.  In the meantime, please remember to keep an open mind,

21   even though I have instructed you, you have not heard the

22   final instructions nor have you heard the arguments of

23   counsel.  Please do not discuss the case with anyone,

24   including among yourselves.  Do not begin any deliberative

25   process.  Have a good lunch and see you back here at 2:05.

1          Counsel, we'll reconvene at 2:00 and hear any

2    arguments regarding the instructions at that time.

3          (Recess at 1:00.)

4          (Reconvene at 2:05.)

5          THE COURT:  In addition to the matters that have

6    already been placed on the record, are there any exceptions

7    to the jury instructions which I have given?  From the

8    plaintiff?

9          MR. SIVIN:  Nothing additional from the plaintiff.

10         THE COURT:  Mr. Mulvey?

11         MR. MULVEY:  No.  Thank you, Your Honor.

12         THE COURT:  Any requests to charge?

13         MR. SIVIN:  No additional ones.

14         MR. MULVEY:  None from the defense, Your Honor.

15         THE COURT:  Excellent.  Bring in the jury.

16         MR. MILLER:  Just one matter.  And I discussed this

17   with Mr. Mulvey a few minutes ago.  Plaintiff's 31, which is

18   this large stack of papers from DOCS, the medical records, I

19   actually paper-clipped a number of pages for the jury's

20   reference, and I discussed the matter with Mr. Mulvey as to

21   whether or not this stack with the clips should go in with

22   them.  My request would be yes, just because there is so many

23   pages with irrelevant material.  I don't know what

24   Mr. Mulvey's position is, but I just want the Court to be

25   aware of this issue.

1          THE COURT:  Is there any other way that you can

2  identify those particular pages?  Are they Bates stamped?

3          MR. MILLER:  Unfortunately they're not Bates

4  stamped, nor are the records in any type of semblance of

5  chronological order either.  I really suffered through this

6  last night because of this fact.  The jury can obviously do

7  what I did, go through each page, but I was hoping to avoid

8  that.  I have no objection to Mr. Mulvey, before this going

9  in, putting a clip or whatever on the pages that he wants

10  them to refer to either.

11          MR. MULVEY:  And for clarification, I understood

12  the Exhibit 31 that was marked was that white binder that we

13  had -- is that the exhibit?

14          THE CLERK:  This one.

15          MR. MULVEY:  That's up there, Your Honor.

16          MR. MILLER:  This is the original.  What I have

17  here is what came from the institution.

18          THE COURT:  What should go into the jury is the

19  original.  Now, if you want to clip the pages on the original

20  that you have clipped there, wonderful, but I do not think

21  it's a good idea to substitute without having Mr. Mulvey an

22  opportunity to review this.  I have no reason to disbelieve

23  you, but let's keep the original exhibits together and those

24  are the ones that will go into the jury room.

25          MR. MILLER:  This is the original.

1          THE COURT:  That's not what you marked and I
2     received, is it?
3          MR. MILLER:  Yes.
4          THE CLERK:  We marked the binder and you gave me
5     the binder.
6          MR. MULVEY:  I've been relying on the binder, Your
7     Honor, I concur.  So an opportunity then, Your Honor, for
8     both of us to go through and flag the pages that we choose.
9     I don't have an objection to counsel doing that, I don't want
10    to cause more work for you, but I would be more comfortable
11    with the binder that's been marked and received.  If counsel
12    wants to go through and kind of mark up what he has got with
13    that, give me an opportunity to do the same for any pages
14    that I would like to, I have no objection.
15         THE COURT:  Maybe Mr. Sivin can do that while
16    Mr. Miller is giving the closing argument and then you can do
17    it on break or whatever.
18         MR. MULVEY:  Thank you.
19         THE COURT:  Any other matters?
20         MR. MILLER:  No.
21         THE COURT:  Do we have an agreement between the two
22    of you and the courtroom deputy as to the exhibits that are
23    received in evidence?
24         MR. MULVEY:  They're all accounted for, Your Honor,
25    I understand.

1          MR. MILLER:  Yes.

2          THE COURT:  Excellent.  Bring the jury in, please.

3          (Jury present, 2:10.)

4          THE COURT:  Please be seated.  We're in the home

5    stretch.  Can I have a sidebar.

6          (Sidebar discussion held off the record.)

7          THE COURT:  Mr. Mulvey, are you prepared to make

8    your closing statement?

9          MR. MULVEY:  Thank you.  Good afternoon, ladies and

10   gentlemen.  And this will be the last that you will hear from

11   me in this case.  And as I began, I would like to close by

12   thanking you again for your attention and for your

13   participation in the process.

14          In my opening statement I hope you recall that I

15   told you that this would be a case about prison discipline.

16   And hopefully you are in agreement that that was, in fact,

17   what this case is overall ultimately about.  And I believe I

18   told you then, I would like you to reflect a little bit now,

19   in the context of the challenges that these eight remaining

20   defendants face on a day-to-day basis in maintaining the

21   care, custody and control of inmates at Oneida Correctional

22   Facility back in 2003.

23          One of the things that I was struck by as each of

24   the corrections officers testified to you is that these are

25   experienced and mature corrections department personnel.  I

*Closing Statement - Mr. Mulvey*

1    hope they impressed you as much as they did me with their

2    knowledge of policy and procedure, their understanding as to

3    why things are done, and their professionalism in discharging

4    their duties in that context.

5          I'm going to encourage you to use your life

6    experience and your common sense and not be drawn into some

7    fictionized or dramatized stereotype of the sadistic prison

8    guard or the inmate who is not unworthy.  I want you to

9    please evaluate these individuals on their own merits and

10   consider the types of challenges that they would face in a

11   situation such as confronted here.

12         To me, and I suspect to most, if not all of you,

13   the central and basic question that won't be answered here

14   but that you will have to struggle with is very simple.  Why.

15   Why did this happen?  Why did the plaintiff act the way the

16   defendants contend he did?  Or why did the defendants act the

17   way the plaintiff contends that they did?  That's not an easy

18   question to answer.

19         And as the Judge instructed you, you're going to

20   draw on all of your experience and the facts of this case in

21   answering that question.  Of course, on behalf of the

22   defendants, I submit that they discharged their duty in a

23   professional manner.

24         Now, there is no doubt, there is no doubt that

25   force was used on the landing of the M dorm on the afternoon

*Closing Statement - Mr. Mulvey*

1    of February 25th, 2003, on inmate, the plaintiff in this

2    case, Angel Martinez.  How and why that force was used is

3    clearly the question before you.  I submit to you that the

4    documents that have been introduced into evidence and the

5    testimony of the officers reflects a consistency of their

6    approach in administering the prison discipline or the

7    control of the inmate in this particular instance.

8            Now, that can suggest one of two things.  It can

9    suggest that their consistency is the reflection of the

10   truthful nature of what happened, or perhaps it could suggest

11   to you that all of these five individuals, Officer Thompson,

12   Officer Sisco, Officer Meyers, Officer Novak and Officer

13   Temple collectively behaved in a rather shocking, if not

14   outrageous, fashion, begging the question, why would they do

15   that.

16           The theory that appears to be before us on behalf

17   of the plaintiff is that he had a disagreement with Officer

18   Thompson and stated his desire to speak to a sergeant.  It

19   would be terrible if, in fact, corrections personnel response

20   to a request to speak with a ranking officer was met by

21   vicious, wanton, malicious, assaultive behavior; that would

22   not be appropriate, that would not be proper.  And I submit

23   to you that those five defendants, four of whom were accused

24   of actually using excessive force and one who is accused of

25   merely standing by, would not, based upon their testimony and

*Closing Statement - Mr. Mulvey*

1    the evidence before you, engage in such conduct.

2         Especially since they all told you, and it hasn't

3    been refuted, that none of them knew of or saw this inmate,

4    the plaintiff, Mr. Martinez, before that very moment.  There

5    was no history here.  There was no stories of previous

6    involvement.  There is nothing other than the immediacy of

7    that moment in terms of what occurred.

8         I think the most illustrative scenario or series of

9    allegations and what should allow you to make a reasoned

10    decision about what happened here involves Sergeant Donna

11    Temple.  No dispute, plaintiff told you, Sergeant Temple

12    never made physical contact with him.  But he alleges that

13    she was present and did nothing on that landing in the M dorm

14    while he was viciously and maliciously beaten for no apparent

15    purpose.

16         Then she escorted him to the infirmary where other

17    unnamed individuals resumed that reprehensible behavior and

18    she stood by and she did nothing.  And then she moved him to

19    another part of the prison where she allegedly violated the

20    protocol, as it's been described to us, went into the special

21    housing unit, even though we heard from several officers that

22    a sergeant turns over custody of an inmate to the ranking

23    officer in the SHU.  Then she went into the special housing

24    unit, and for a third time in a matter of what couldn't have

25    been more than perhaps an hour or an hour and a half,

*Closing Statement - Mr. Mulvey*

1    Sergeant Donna Temple, who you sat and listened to tell about

2    her career in corrections and her experience, stood by and

3    for the third time that afternoon did nothing while another

4    group of unnamed officers, who are not defendants in this

5    case, viciously beat and assaulted the plaintiff.

6          In order to sustain the charge of deliberate

7    indifference, you would have to accept that entire series of

8    allegations.  Now, apparently, the third incident, according

9    to the allegations of the plaintiff, the third incident --

10   let me before I get to that, let me just point out a few

11   things.

12         After that was done, after the incident in the M

13   dorm, when it was finished, what happened, according to my

14   clients, according to the defendants?  Mr. Martinez was

15   transported to the infirmary, where medical assessment was

16   made.  And you're going to see that, and you have

17   photographs.  There was no dispute that inmate Martinez has

18   obvious cuts and bruises on his body, which the defendants,

19   Thompson, Sisco, Meyers, Novak and Temple, who were present,

20   contend were the result of his struggling and refusing to

21   comply with their orders to allow himself to be cuffed.

22         I'm going to give you a good example of the

23   dichotomy, the difference, the dispute here.  I think it's

24   telling.  Hopefully you will recall the testimony about the

25   handcuffs.  Again, just putting on handcuffs and tightening

*Closing Statement - Mr. Mulvey*

1   to the point of pain and injury to an inmate is, as I believe

2   they told you, inappropriate and shouldn't be done.  And the

3   officers described for you, Officer Meyers described for you

4   the appropriate way to apply the handcuffs.

5          Clearly the photographs in the use of force report

6   show redness and injury to the plaintiff's wrist.  And the

7   explanation of the use of force was that he would not comply

8   with placing the cuffs on.  The double locking device to

9   prevent them from tightening was not engaged and in his

10  resistance to their instruction, he tightened the cuffs on

11  his wrist.

12         And I think it's important again in this context

13  for you all to appreciate and think about, given the nature

14  and seriousness of these allegations and the suggestion that

15  these defendants, these first five defendants, were acting in

16  concert in an inappropriate way and collectively made false

17  reports and engaged in a string of falsehoods to somehow

18  cover up that behavior, but then the first thing they would

19  do would be to take inmate Martinez to the infirmary and have

20  him photographed and make a use of force report and have a

21  report of injury done and offer him medical attention.  And

22  there is no dispute that that is what was done.

23         It doesn't appear from the second incident in the

24  SHU, the following week, March 5th, according to the reports

25  that you will have before you, and I believe based upon the

*Closing Statement - Mr. Mulvey*

1    medical records that are being provided to you as exhibits as

2    well, that Mr. Martinez suffered any noticeable injury as a

3    result of his altercation with Sergeant Duvall, Officer

4    LaBrague and Officer Sipley.  Therefore, that leaves us with

5    what happened.

6              In addition to the cuts and scrapes that are

7    evident on the use of force and inmate injury report, there

8    is, as I understand it, there are two claims of injury.  One

9    is fractured rib.  Certainly the evidence is the

10   radiologist's testimony.  If I advocate for it on behalf of

11   my clients.  The only question with respect inmate Martinez's

12   ribs was the tenth rib and a recommendation by the

13   radiologist that the facility doctor follow up with that.  I

14   do not believe if you were to review that testimony that

15   Dr. Goldberg made any conclusive statement about a fracture,

16   but he did have a question, no doubt, about that tenth rib.

17   And worst case for the defendants, is it conceivable that in

18   Officer Thompson, who is a larger man, bringing inmate

19   Martinez to the floor, that a rib could have been injured?

20   That's a possibility.

21             I submit to you that that was not excessive under

22   the circumstances, but that is the remainder of the ribs

23   healed and we know from the testimony and from the records

24   that the remaining rib fractures were from a previous health

25   situation with Mr. Martinez approximately five years before.

*Closing Statement - Mr. Mulvey*

1   Those healed fractures were not five days old, they were more
2   like five years old.
3          Which, of course, then leads us with what other
4   injuries were there besides what you can see for yourself in
5   the photographs.  This is the open question.  The plaintiff,
6   I have no doubt, insists that his back problems, through his
7   attorney, his back problems are associated with his encounter
8   with the officers in the M dorm.
9          Now, I brought to your attention during his
10  examination that as of February of 2004, approximately a year
11  afterward, a CAT Scan revealed that the vertebra were well
12  aligned, the disc spaces were well preserved, and that other
13  than a node at S1, his CAT Scan was otherwise unremarkable to
14  his back.  That I hope will raise a question with you as to
15  whether or not there is a causal connection between, this is
16  a year afterwards, the subsequent diagnosis and
17  recommendation for surgery in 2005 on his back.
18         To first add question to that issue, I believe that
19  plaintiff, Mr. Martinez, did acknowledge that he had seen,
20  sought medical attention during his first incarceration in
21  the 1980s for back, complaints of back pain at several
22  correctional facilities.  And again, those are medical
23  records that will be available for you to draw your own
24  conclusion.  But as a general proposition on behalf of the
25  defendants, I would like to focus your attention on the fact

*Closing Statement - Mr. Mulvey*

1   that there were complaints of back pain made before the

2   incident.

3          There was the incident.  Medical tests done a year

4   after the incident seemed to indicate no problems with the

5   back, and then a diagnosis was made in 2005 and surgery was

6   offered to the plaintiff, the state recommended for him to

7   have surgery, and he declined, for his own reasons.

8          Now, turning to the events of March 5th in the SHU.

9   As I understand it, the contention is that in some rather

10  tenuous fashion Officers Duvall, LaBrague and Sipley, because

11  of their knowledge of or some connection to Officer

12  Thompson -- which we contend has not been fully explained or

13  discussed what the nature of that connection is, other than

14  the general assertion, I believe by Mr. Martinez, that the

15  dominoes kept falling, perhaps a way of suggesting just as a

16  general proposition corrections officers are all aware of

17  everything that goes on in a facility with 1,200 inmates and

18  360 officers, with sergeants and captains and lieutenants

19  working three different shifts over the course of eight days.

20         In any event, that tenuous connection was a basis

21  for them to without provocation, for no reason assault and

22  attack the plaintiff.  You heard their description of the

23  events.  These are brief encounters, they don't last that

24  long.  Certainly there should be a serious question in your

25  mind beginning with Officer Sipley.  Very consistent story of

748

*Closing Statement - Mr. Mulvey*

1    events.  Officer Sipley went to his cell, escorted him to the

2    property room, viewed his property, remained in the property

3    room when he packed it.

4          The allegation is that I believe it's Officer

5    Sipley made some utterance to the effect of I saw Tom, or

6    Tom, something about Tom, which suggests that an inference

7    should be drawn that meant Officer Thompson and the

8    implication to inmate Martinez was what was about to ensue or

9    what was ensuing was the result of some connection with

10   Officer Thompson.  As I said, very tenuous, at best.

11         And I believe again the description of events by

12   Officer Duvall and Officer LaBrague are very consistent with

13   how officers will maintain care, custody and control in a

14   situation where an inmate is not being compliant.  Think

15   about this.  You heard many of the witnesses talk about the

16   force necessary to control the situation, without being

17   excessive.  Clearly being an aggressor and being more of a

18   brawler might be more effective in subduing the inmate, but

19   that would be wrong, that would be improper.  A corrections

20   officer just can't come at an inmate and attempt to knock him

21   unconscious to control him, he has to make reasonable

22   attempts to restrain himself and use the proper amount of

23   force.

24         I believe I told you at the outset, I repeated it

25   now, there is no dispute that force was used here.  What you

749

*Closing Statement - Mr. Mulvey*

1    have to determine based upon the Court's instruction is

2    whether that was excessive, malicious, sadistic.  Did Donna

3    Temple stand by and watch this man being viciously beaten

4    time after time after time and do nothing?  Would people that

5    have spent that long, 12, 15, 18, 20 years as employees of

6    the Department of Corrections be that depraved without any

7    human dignity to stand by and allow that to happen or to do

8    it themselves?

9         I believe as the Judge has instructed you, you had

10   an opportunity to evaluate and assess the demeanor, the

11   comportment of these defendants, and I submit to you that

12   taken as a whole, the plaintiff has not by a preponderance of

13   the evidence before you established that that was the case.

14        I can't tell you and I don't know the answer to the

15   why Mr. Martinez behaved the way he did according to the

16   defendants.  I don't know what it's like to be incarcerated.

17   I don't know what it's like to be fearful of authority.  I

18   don't know what that is like.  I cannot explain that for you.

19   I don't believe that my clients fully know or understand why

20   an individual in custody may do what they do, but they are

21   trained to respond in a professional and reasonable way to

22   maintain order within the facility and to maintain care,

23   custody and control of the inmates.  And I believe that based

24   upon all the records that are before you and the testimony

25   that you have had, that you will justifiably come to that

*Closing Statement - Mr. Mulvey*

1  conclusion as well.

2         A few words about the prosecution.  As the Judge

3  has told you, clearly criminal charges were brought as a

4  result of this and clearly they were dismissed or not

5  sustained by the Grand Jury.  The Judge's instruction focused

6  you on the motivations of the officers in doing so.  I'm not

7  going to repeat all the elements and things like that, but

8  whether or not excessive force was used, it would go to the

9  same set of criteria.  Were these people acting maliciously

10  without cause out of some vendetta or sense of punishing

11  inmate Martinez?  It comes back again to the why.  Why would

12  these officers want to punish this inmate?  Because on the

13  afternoon of February 25th, 2003, he told officer Scott

14  Thompson that he wanted to see a sergeant?  That seems so

15  completely disproportionate and out of whack.

16         I told you at the outset that just as these

17  officers have a responsibility to act reasonable, that all of

18  them subscribe to as through their testimony the notion that

19  when Mr. Martinez comes in state custody, he does not forfeit

20  his rights, he does not be mistreated or maltreated.  He is

21  not to be beaten for no reason or to be deprived of his basic

22  rights to file a complaint or ask to see a sergeant.  That

23  did not occur in this case.

24         And the injuries, if any, that he sustained were

25  not permanent or disabling.  We talked about the back

*Closing Statement - Mr. Mulvey*

1 | problem.  We know about the one rib and you see the rest of
2 | the injuries that are there.  Those injuries are consistent
3 | with a reasonable use of force under the circumstances.  And
4 | on that basis not only do I urge you not to find in favor of
5 | the plaintiff on any of the questions before you, but even if
6 | you do, that he is not entitled to compensation because these
7 | officers were acting as responsibly as they believed they
8 | should have under the circumstances.  Thank you.

9 |         THE COURT:  Thank you, Mr. Mulvey.  Mr. Miller.

10 |         MR. MILLER:  It's not that simple.  I want to start
11 | out by trying to refresh your recollection about the hearing,
12 | the Tier III hearing that took place on February 28th and
13 | March 13th before Captain Lane.  And the reason I wanted to
14 | start out with that is to remind all of you that this trial
15 | before you, as the factfinders, is not a rubber stamp for
16 | what they say.  I have no objection to any of their reports
17 | coming into evidence on the assumption that none of you would
18 | just rubber stamp those reports.  This trial process in this
19 | room with a Judge and an even playing field is a much more
20 | complicated process than a rubber stamp.

21 |         And I agree with Mr. Mulvey that no one in this
22 | room in their heart of hearts wants to believe that what
23 | Angel Martinez described what happened to him really goes on.
24 | None of us want to believe that.  We hope it doesn't happen.
25 | But hope alone does not help these defendants.

*Closing Statement - Mr. Miller*

1        What we're asking you to do as the finders of fact

2    is to put together all of the evidence presented to you

3    during this trial, no matter who put the evidence in and no

4    matter who made the statements, put it together with an open

5    mind and ask yourselves, as much as we as citizens of this

6    civilized country hope that this doesn't happen to fellow

7    citizens, if it did happen, we as a jury need to do something

8    about it.  And I hope that when you go into the jury room,

9    you go in with that open mind, even though this hurts to

10    think that this could happen.

11        One of the things that I said to you during my

12    opening statement and I stand by that now is with all of the

13    paperwork that came in before you, and there is dozens of

14    documents that you'll have the opportunity to review, photos,

15    medical records, statements, et cetera, et cetera, what this

16    case comes down to is credibility.  This is -- you know,

17    think about it.  We started Monday, it's Thursday.  Feels

18    like, I don't know about you, feels like we've been here for

19    a long time because so much has come before us.  But this

20    comes down to credibility.  What makes the most sense?  Whose

21    account of what happened during those various incidents is

22    backed up by other documentation that you'll have before you?

23        I said to you that Angel is coming before you with

24    his history.  He is an open book.  You know everything about

25    him, the good and the bad.  That's the way he wanted it to

*Closing Statement - Mr. Miller*

1    be.  There is no glossing over, there is no phoniness, there
2    is no checking his notes to see what to say next, there is no
3    looking at the lawyer to find out what do I say now.  This
4    man took the stand and was on the stand for over a day and he
5    told you not what sounded best, but he told you about his
6    life in open court, in front of his family, in front of these
7    people who he clearly hates.  He opened up to you.
8              He is obviously not proud of some of the things he
9    said, but we're not here to determine whether or not he was a
10   heroin user.  He was.  We're not here to decide whether or
11   not he should have been in Oneida.  He was.  But you also
12   heard that Angel Martinez in all the years that he spent in
13   jail never had a problem with a corrections officer, never
14   had a problem with another inmate.  He was a meek, weak drug
15   addict who only wanted to do his time and get on with his
16   life and hopefully do better the next time around.
17             They want you to believe that Angel somehow out of
18   nowhere, out of context, because there is no history of this
19   at all, became Superman on April 25th, and for that matter
20   March 5th.  All of a sudden this man became Superman, who
21   could punch a corrections officer, who's almost twice his
22   weight, five times in the face and then break away.  And you
23   heard the testimony.  That's what they want you to believe.
24             And members of the jury, Mr. Mulvey gave you his
25   personal impression of the defendants.  I don't know if he

*Closing Statement - Mr. Miller*

1    was also referring to Scott Thompson.  But you're the ones

2    who need to decide what these guys are all about and whether

3    or not when they're in that prison setting, they act as

4    politely as some of them might have acted up on the stand

5    here today and yesterday.  They want you to believe that he

6    became Superman to the point where there is a 280 pound

7    corrections officer on top of him and he is able to lift

8    another police officer, corrections officer with his legs, so

9    that he bounced up and down.

10          Again, those types of statements cannot be rubber

11   stamped.  Those are the types of things where you say to

12   yourself, does this make sense, because if it doesn't make

13   sense, then you can argue it didn't happen, and if it didn't

14   happen, they're not telling you the truth.

15          I just want to touch on some of the aspects of the

16   incident of April 25th.  The issue with the ringing of the

17   bell.  It might have sounded like an innocuous point during

18   the point of the trial, and we have completely opposing

19   positions on what happened.  Angel said, I don't want to

20   repeat it, you remember, he rang it a few times and there was

21   no answer.  Thompson finally came to the door, cursed him out

22   because he was in the bathroom, et cetera.  You heard it all.

23   I don't need to repeat it.

24          Thompson said I was sitting right there, it rang

25   once, I went to the door, he was there.  That's important for

755

*Closing Statement - Mr. Miller*

1    two reasons.  Number one, it sets off a series of events and

2    it's important for you to figure out what direction we're

3    going from the get-go.  But I think that Defendants' 7 in

4    evidence will assist you in determining who's telling the

5    truth on that particular issue.  This is the inmate injury

6    report that Angel told you when he went to the infirmary it

7    said within the hour, but based on the testimony I think it

8    was ten minutes because he was only in the infirmary for

9    seven minutes, according to Sergeant Temple.  This is

10   something written down in that small period of time after the

11   incident and before he went to the infirmary.  He said

12   Sergeant Temple was rushing me and there was only X amount of

13   lines on the page and I was writing as furiously as I could

14   15 minutes after the incident.

15          Do you think that within that period of time, with

16   everything that happened, Angel Martinez would have made up

17   the fact that he rang the bell three times and the

18   corrections officer was in the bathroom?  Is that something

19   he would make up?  With everything that happened in the

20   previous hour or so, is that something that he would make up?

21          I'll just read some of it, it's fast.  I come in

22   from a med trip.  Remember he was under a lot of pressure,

23   the grammar is not good and it's not complete, but he did his

24   best.  I ring the doorbell two times, nobody answered the

25   door.  At the third time the officer in charge opened the

*Closing Statement - Mr. Miller*

1    door and he started pushing me without reason.  He said to

2    me, don't you see I was using the bathroom.  I didn't say

3    anything.  I started opening the door.  He pushed me again.

4    I opened the door and he said to me, quote, "you are out of

5    here today."  Then it goes on to say, erase your name from

6    the board, give me you ID.  He took me out of the dorm and

7    started hitting me.  At the same he had pulled the radio,

8    quote, "thing."  And that's it.  Is this something that he

9    would make up in that period of time?

10          Three days later he went to this kangaroo court and

11   he was asked to give a statement about what happened.  You

12   heard the tape.  Does he sound like he is lying in that tape?

13   He is not represented by a lawyer.  You can only imagine,

14   ladies and gentlemen, the surrounding in that room.  And in

15   that tape he says the same thing, obviously with more detail

16   because I don't think he was being rushed as much as he was

17   when he was writing this.

18          I think that as you start your inquiry on what

19   happened that day at the door, I think your common sense will

20   take you to what Angel said about having rang the bell all

21   those times.  You saw Officer Thompson.  Do you think Officer

22   Thompson, you saw him on the stand, is going to take kindly

23   to an inmate interrupting whatever he is doing in that

24   bathroom?  Does he sound like the type of person, does he

25   strike you as the kind of person who would take kindly to be

*Closing Statement - Mr. Miller*

1    interrupted by an inmate?  And that's why he pushed him.

2            This started out pretty innocuously, I will agree

3    with that.  The guy was angry and he pushed Angel and he

4    threatened that he is going to the SHU.  How dare you

5    interrupt me when I'm in the bathroom, inmate.  Angel stood

6    up for his rights to a certain degree.  He said, if I'm going

7    to the SHU for this, I want to speak to a sergeant because

8    you pushed me.  It's right here.  Did he make it up?

9            Now, another issue that might have sounded somewhat

10   innocuous to you was the door, to the door.  That door,

11   according to Thompson, was open, unlocked, because this

12   stranger is coming into the dorm and, you know, I messed up,

13   I broke protocol, I didn't lock the door after he came in, I

14   don't know who this stranger is.  Angel gives you another

15   reason why that door was unlocked.  Do you remember what he

16   said?  Because Thompson wanted to take me outside.  I thought

17   he was going to apologize to try to keep me from going to the

18   sergeant.  That's why it was unlocked.  Nothing to do with

19   this stranger coming into the dorm.  And Officer Thompson,

20   who must be new on the job just like totally forgot to lock

21   the door with 54 inmates in the room, I mean this must be a

22   major emergency to the point where I better grab the stranger

23   and not let him go into the dorm, no less all the way to the

24   back, all the way up here where his cubicle was.

25           Do you see now why Officer Thompson is trying to

1  convince you that he was not on duty in the morning when

2  Angel went on his medical trip?  He wants you to believe that

3  when Angel came back from his medical trip, Angel was a total

4  stranger.  But the fact of the matter is, Thompson knew Angel

5  was going on his medical trip, and when Angel came back into

6  the dorm, he knew he was a member of that dorm.

7          And what is most interesting, and you might have

8  just picked up on this this morning during my questioning of

9  Officer Sipley, there is a log book for all the dorms, all

10  the housing units, and the M dorm had a log book that

11  morning.  And presumably, we haven't seen the log book, they

12  have not produced this log book, that log book would answer

13  the question as to whether or not Officer Thompson was on

14  duty in the morning when Angel Martinez went out for his

15  medical trip, because once he comes on duty, he stamps that

16  template, he is now on duty.  Anything that happens after he

17  comes on duty gets recorded line by line chronologically in

18  the log book.

19          So, if Thompson were telling the truth, this log

20  book would have Angel leaving the dorm at some point and then

21  later on it would have Thompson coming on duty.  If that were

22  the case, guess what, we'd see that log book.  If the log

23  book had, as we are arguing, Thompson coming on duty in the

24  morning and then underneath there inmate Martinez going to

25  his medical trip, they would not produce that.  Because if

*Closing Statement - Mr. Miller*

1    they produced that log book, do you know what you all would

2    say?  Thompson's lying.  He knew he was out on that medical

3    trip, there was no emergency when he came back.  That door

4    was not left unlocked because this unknown stranger is coming

5    into his dorm.

6           Members of the jury, Mr. Mulvey downplayed the

7    photographs during his closing statement.  I think the

8    photographs, especially if you look at all of them, the ones

9    of Angel.  Angel, the one who landed five punches on

10   Thompson's face that day and then just kept punching away at

11   these guys.  And then you look at the pictures of the person

12   who got clocked in the face five times.  This is the guy who

13   got clocked on the face five times with a closed fist.  Wow.

14   Check that out.  Check out that injury, members of the jury.

15          And the one that I specifically asked Thompson

16   about, and I think his answer should make us all angry, I

17   asked him, what is going on with this picture, officer

18   Thompson.  And his answer was, I don't remember; I don't even

19   know what these pictures are.

20          Members of the jury, what he is doing in this

21   picture is he is faking pain, he is posing for the camera.

22   This is what he is doing and this is why he is trying to

23   separate himself from these pictures.  This is why he is

24   telling you, I don't even know about these pictures, I don't

25   know what these pictures are.  Yeah, they took pictures, I

*Closing Statement - Mr. Miller*

1    don't know if these are those pictures.  They can give every

2    explanation they want about the injuries suffered by Angel as

3    depicted in these photographs.  He has an explanation for the

4    wrist injury.  They have an amazing explanation for the

5    injury to the left side of his face.

6          Angel told you how that happened.  He said Sisco

7    came in and clocked him and knocked him out.  I think that

8    makes a little more sense, but again, that's up to you.  But

9    the picture -- by the way, five pops to the face, members of

10   the jury, 16D.  But the picture that I don't think counsel

11   did address was the welt to the back here underneath the

12   tenth rib.  Even a slam of the face to the floor can't

13   account for a fractured rib.

14         And what I'm going to ask you to do in the jury

15   room when you talk about what happened on April 25th, I'm

16   going to ask you to look at both sets of these photographs in

17   your endeavor to figure out who's telling the truth, what

18   happened on that day.

19         Counsel mentioned something about the X-rays of the

20   ribs.  That X-ray was taken because of complaints of rib

21   pain.  Dr. Goldberg said I need clinical correlation, which

22   makes sense, if there are four healed fractures and then

23   there is another acute fracture, any radiologist in his right

24   mind would want to know the cause of that.  Is that a

25   coincidence?  What's going on?

*Closing Statement - Mr. Miller*

1    So what's clinical correlation?  Clinical

2   correlation is, is there pain, is there new pain.  Picture

3   when a doctor palpates it.  Is it painful?  If the answer to

4   those questions are yes, then Dr. Goldberg said to you then

5   this is what it looks like, it's an acute new injury.  Well,

6   bear in mind, but I don't think he said this, Mr. Mulvey said

7   this, why did he have X-rays on his ribs taken in the first

8   place?  It's because he was complaining about pain in that

9   area.

10    And after the X-ray report came back, it says

11   clinical correlation.  You have the records, these are all

12   the records from every time he was ever in jail.  And,

13   obviously, it's a lot to go through, and Mr. Mulvey and I

14   might try to make it easier for you by clipping but we might

15   not.  But you will see that Angel was complaining about rib

16   pain after that February 25th incident.  Every opportunity

17   that he had starting with March 3rd, March 6th, March 7th.

18   Once he went to Mohawk, he was actually getting the medical

19   attention that he needed, and that was starting on

20   March 6th.

21    And you will see that there is clinical correlation

22   not only with the complaints and the doctor's report that

23   there is pain on palpation, but the picture alone shows that

24   there was trauma to that area.  I believe it was Officer

25   Sisco, I asked how did he suffer that injury to his ribs.  He

762

*Closing Statement - Mr. Miller*

1    doesn't know.

2           One thing we do know from their own reports.  They

3    all suffered injuries to their right hands.  Now, Angel said

4    he was kicked and he was punched.  We don't know if it was a

5    boot or a fist.  Don't you just want to ask yourselves how

6    some of these injuries arise and they were swollen?  If you

7    ask Angel himself what happened to him while he was on the

8    floor, he was being punched, his face was down, he didn't

9    actually see who was doing it.  He knows Sisco knocked him

10   out.  He knows what Thompson did to him inside the dorm.  We

11   know that Novak and Meyers were the two other officers

12   involved in the contact, let's call it, because their own

13   reports, their own admission, they say they're the other two

14   guys there.

15           Which one caused the fractured rib?  I don't know.

16   No one is going to raise their hand and say I'm the one who

17   did the ribs, I did the face.  That's not happening.  And you

18   don't need that to happen because these guys were working

19   together, and as much as they want you to say each one of

20   them is an individual and, frankly, that's the law, Judge

21   Peebles in his charge said to you, you need to evaluate each

22   one individually.  I agree.  But if they're working as a

23   team, then you should take that into consideration when you

24   talk about each one of them individually.  And you will know

25   that those four guys, Thompson, Novak, Meyers and Sisco, laid

763

*Closing Statement - Mr. Miller*

1   a beating on my client for no reason, for no reason.

2          Now, I just want to address the issue of

3   retaliation on that incident for a second.  I will

4   acknowledge something.  I'm going to throw them a bone.

5   Thompson was retaliating because Angel was going to go to the

6   sergeant, no question about it.  So with Thompson we have the

7   excessive force, we have the battery, we have the

8   retaliation.  The other three guys who came up to the M dorm,

9   they had an alarm, they heard an alarm.  They get up there,

10  they see Thompson, they see Martinez.  Those guys were

11  reacting to what they saw.  They were brutal.  They were

12  excessive.  But they weren't acting in retaliation to Angel's

13  desire to speak to a sergeant, because I don't think that

14  they had that information at that time.

15         So you will see a separation on the verdict sheet,

16  first excessive force, and clearly they're all guilty of

17  that, but when it comes to retaliation, I'm going to ask you

18  as far as those four officers are concerned, it was Thompson

19  who was retaliating, the other three were just helping out

20  their fellow officer.  He retaliated by the beating and he

21  retaliated almost equally bad by writing out that misbehavior

22  report which landed him in the SHU.

23         Let me just take a deep breath for a second.

24  Members of the jury, I want to go back to the issue of

25  credibility again, and I do apologize for belaboring the

1   point.  I just think that's what you're going to be talking

2   about in the jury room.  Officer Thompson, I don't --

3   frankly, I don't know what to make of him, and you all -- you

4   all have an opinion which is probably more worthy than mine.

5   You all saw what I saw.  You all see what I see right now; he

6   is not here.  You all know that Thompson was aware before

7   this trial began that if there was one real villain in this

8   case, one guy that Angel really, really, you know, has a

9   terrible problem with for the way he was treated, it was

10  Thompson.

11          Each one of these guys played a role, some worse

12  than others, and I'll address each one of them in a second.

13  But I suspect as like members of the community, people with

14  common sense, each one of you deal with human beings on a

15  daily basis, you know, at your jobs, at home, you need to

16  figure this guy out.  I think there is something missing.  I

17  think there is something wrong with him.  I think he came

18  into this courtroom as someone who doesn't like to be

19  controlled by anybody; even the judge, with all due respect.

20  He struck me as someone who doesn't like to be challenged by

21  anybody.  He struck me as somebody who would do exactly what

22  he did under his own roof where he was in charge, where

23  nobody would get him in trouble for what he did, not even

24  Sergeant Temple.

25          And I hear Mr. Mulvey's point, how can anyone watch

765

*Closing Statement - Mr. Miller*

1   this.  I don't know when she got there, but Officer
2   Thompson's credibility against Angel's credibility is really
3   what you're talking about here, and if you feel that he lied
4   about knowing Angel was out on the medical leave, and if you
5   feel he lied about why the door was unlocked, and if you feel
6   that he lied about all these other steps in the process, then
7   he should be held accountable by you all.
8          This is Federal Court of the United States of
9   America, and people take an oath to tell the truth, and if
10  you all feel that one of your fellow citizens did not tell
11  the truth under oath, you have the right to take action on
12  behalf of the aggrieved party.
13         Now, I'm going to talk briefly about Officer Sisco.
14  Again, your gut feeling is more important than mine.  But it
15  seemed to me that he was just here to say what he was
16  supposed to say, and it seemed that he didn't remember what
17  it was that he was supposed to say.  He had to check the
18  paperwork, he had to check with Mr. Mulvey.  His description
19  of the incident didn't make any sense at all.  I don't even
20  know if he explained how he injured his right hand, and he
21  certainly doesn't know how Angel injured his rib.
22         But, again, if you were to read a transcript either
23  of this trial or of a Shakespearian play, the words alone
24  will not do the play justice and the transcript alone of this
25  case will not do this case justice.  It's your feeling about

*Closing Statement - Mr. Miller*

1    that person in that seat, how they appear to you.  And you

2    know, you were here, same as me, and I want you just to

3    remember that these guys are all together, they're working

4    together.  Some made better witnesses than others.  And

5    again, your thoughts about how they appeared are more worthy

6    than mine, you're the triers of fact.

7              I'm not even going to talk about Meyers, Novak, I

8    would be repeating myself.  They're members of the team.

9    Some were better than others.  I think besides Novak they all

10   had injured hands, they couldn't explain that.

11             But after this incident of April 25th, as a

12   result of this incident of April 25th, Angel Martinez

13   became a shell.  He became a shell of a man, and that's an

14   injury.  You know about the physical injuries, but we're

15   talking about his manhood, his feeling of worth, just his

16   overall emotional state.  He became a shell of a man because

17   he knew he didn't deserve this treatment.

18             Angel describes this incident and what happened to

19   him afterward as torture.  You know, that's his word.  What I

20   will describe to you of this incident and what happened

21   after, it's something that you as jurors can do something

22   about.  That's the best way as Angel's lawyer that I will

23   describe all of this.  You can do something about this.  And

24   you know, I don't think I need to go into how he did in the

25   SHU.  I think you can all understand what that did to him,

*Closing Statement - Mr. Miller*

1   especially knowing that he was being railroaded.

2          I think that it's very hard sometimes to put

3   yourself in someone else's shoes when you have never

4   experienced anything even close, even close to what he went

5   through.  But one of the things you need to do is assess his

6   mental pain and his physical pain, and luckily you have the

7   medical records to help you out with that and, you know,

8   counsel said something about the back.

9          You know, I'm asking a rhetorical question now, so

10  no one raise their hand, but if I were to say everyone raise

11  your hand who in the last thirty years had back pain once or

12  twice in your life.  That's how weak their case is.  They're

13  talking about back complaint that's made on two or three

14  occasions, back in 1986.  Seventeen years later there were

15  no, not ever back complaints, back treatment, nothing.

16  Plenty of medical visits, hearing problems, finger problem.

17  Never, ever, ever any complaint whatsoever about back pain.

18         But what he suffered as a result of this incident

19  was just not mere back pain.  The records will indicate,

20  members of the jury, that he is suffering from what's known

21  as radiculopathy, or the condition of the disc is called a

22  herniated disc.  And it's not just back pain, we're talking

23  about numbness going down the legs.  We're talking about

24  times where he had to walk with a cane.  We're talking about

25  something that has not gone away.  And so to say 17 years ago

768

*Closing Statement - Mr. Miller*

1    Angel Martinez complained about some back pain is a very,

2    very weak argument on these defendants' behalf, and again I'm

3    going to ask you to use your common sense when assessing his

4    back injury.

5            I read to you the stipulation.  This was a prison

6    doctor, he wanted to do surgery on his back because the disc

7    was encroaching upon the nerve roots of his spine.  We're not

8    talking about back pain, we're talking about radicular pain

9    going down the legs.  There is a difference.  And we're

10   talking about when he got out of jail.

11           All of these records are in evidence.  Some of them

12   were entered when you weren't here but we have the records

13   from Montefiore Hospital where he was treated for his back

14   condition.  We have records from MedAlliance.  I read the one

15   report from that Dr. Guy.  We have the entire chart for

16   MedAlliance.  We have the records from Bronx Lebanon Hospital

17   where he was treated both for his back injuries and for

18   post-traumatic stress disorder.  We have records going from

19   the prison in 2003 to date that documents the severity of his

20   back problems and his leg problems.  And all they have in

21   response is, oh, back in 1986 he complained about his back

22   once or twice.  And I don't think they even address the issue

23   of post-traumatic stress disorder.

24           And, once again, I got to say, none of you have

25   ever been in such a situation that he was in where you feel

*Closing Statement - Mr. Miller*

1    totally hopeless, you feel like you're a caged animal and you

2    have no protection at all from the people who are doing this

3    to you.  Can you just imagine what that does to you?  You

4    will see in the Bronx Lebanon records that they needed to get

5    him someplace else because they were looking for a survivor

6    of torture program for him.  And that's what the records also

7    indicate from Bronx Lebanon.

8            You must be wondering, how did he end up in

9    Bellevue under the care of Christine Janick, when he was

10   going to Bronx Lebanon.  He lives in the Bronx, why would he

11   go all the way to Bellevue?  I don't know how familiar you

12   all are with the geographics down in New York City, but the

13   Bronx is north of Manhattan.  He was referred down to

14   Bellevue because they had a program dealing with victims of

15   crimes, crime victims, people who are suffering from trauma,

16   post-traumatic stress disorder.

17           I told Ms. Janick that she doesn't have to go

18   through all the visits because they're in evidence and

19   luckily they're typed, so I'm not going to go through it with

20   you now, but I urge you when you talk about pain and

21   suffering and what's fair and adequate compensation, that you

22   read Ms. Janick's records from Bellevue Hospital where she

23   talks about how this man has been ruined by these guys.

24           He is trying to make a comeback.  He is doing

25   everything he can.  He is going to therapy.  He likes

*Closing Statement - Mr. Miller*

1    Ms. Janick, she is very helpful.  But we're not talking about

2    mere depression.  If we were talking about mere depression,

3    then I would have a weak case because he was depressed before

4    this incident.  We're talking about post-traumatic stress

5    disorder.

6            You will have in the jury room a chapter from the

7    DSM that deals with the criteria and you will have an

8    understanding about the severity of PTSD and what it does to

9    you on a daily basis.  When Angel talks about the incident,

10   it's like yesterday.  And, you know, this might have been

11   subtle, but his presentation about what happened on the 25th

12   was different from March 5th, and I can only suggest to you

13   that one of the reasons for that is Thompson wasn't here when

14   he talked about the 25th.  When he talked about the 5th and

15   he saw those guys over there, it was like yesterday.

16           And this is what he goes through every day of his

17   life.  And that type of pain, that type of emotional pain is

18   a lot worse than physical pain.  It's a lot worse than

19   breaking your leg or breaking your arm or getting punched in

20   the face.  To live with that type of emotional pain is just a

21   life ruiner.

22           And the reason why maybe I'm saying this, even

23   though it's obvious, is because, as Judge Peebles charged you

24   before, you need to come up with an award in damages that's

25   fair and adequate.  Make him whole.  I suggest to you that

*Closing Statement - Mr. Miller*

1    nothing ever, no amount of money will ever make this man

2    whole.  But you need to do your best and you need to

3    understand the severity of his condition now and what he's

4    been through since February 25th, 2003.

5          I'm allowed to make suggestions on what I think is

6    adequate compensation for pain and suffering.  What I'm going

7    to do is just address Thompson.  I'm going to ask that you

8    award Angel Martinez a million dollars for his pain and

9    suffering for his back injuries, his PTSD, his rib injuries,

10   all of the mental torture and pain, the headaches.  With

11   regard to Thompson, a million dollars.

12         Then I want to you take -- I'm asking you, I

13   want -- but I'm arguing on his behalf that you take it down

14   from that point and you think about each one of these other

15   people who are here in court.  And you decide, you decide

16   what these people have done to Angel Martinez, another human

17   being, another human being with the same feelings as anyone

18   else.  Just because he is an inmate doesn't mean he has less

19   feelings and less rights.

20         Judge Peebles is also going to instruct you on

21   punitive damages.  Punitive damages, members of the jury, is

22   where you're invited to take the gloves off.  That's your

23   opportunity to decide who should be punished.

24         On behalf of Angel, he would like you to focus on

25   three individuals with regard to punitive damages.  He would

*Closing Statement - Mr. Miller*

1   like you to focus on Thompson, who needs to hear it loud and

2   clear wherever he is, that you're taking charge.  He needs to

3   be punished.  But also Duvall, LaBrague, because what they

4   did to him was just cowardly, for no reason but to get back

5   at him for what happened back on February 25th.  And in an

6   SHU where there is no witnesses, no one's going to see what's

7   going on, these cells are lined up so that no one can see

8   what's going on.

9        What they did was cowardice and it was the worse

10  form of bullying that I can ever imagine.  And we all in our

11  lives view bullying as one of the worst human everyday traits

12  as imaginable.  And we as citizens do our best in the

13  playgrounds and schools to prevent bullying.  Bullying is

14  really mean.  And for that reason I ask you to check yes on

15  the verdict sheet for Duvall and LaBrague as well for

16  damages, they deserve to be punished for what they did as

17  well.

18       Members of the jury, I say this on behalf of Angel

19  Martinez, this has been a great week for him up here in

20  Syracuse.  This is a day, a week that back in 2003, 2004 he

21  thought would never happen the way he was being treated.  He

22  never thought that he would be in a situation where there

23  would be an obviously fair judge and lawyers representing all

24  the parties and, most importantly, each witness being

25  required to take that stand, not just submit a piece of paper

1    that gets one of those, but to take that stand and answer

2    real questions.  And this is something that he has been

3    waiting for all these years, and all I'm asking you on his

4    behalf is that you not give a rubber stamp this time.  Thank

5    you very much.

6          THE COURT:  Thank you, Mr. Miller.  Are you doing

7    all right?  I've got about five minutes.

8          I've handed out a jury verdict form, which I will

9    have marked as Court Exhibit 3.  And let me close with some

10   instructions to you regarding your deliberations.

11         Members of the jury, the verdict must represent,

12   the verdict that you arrive at and announce in open court

13   must represent the considered judgment of each juror.  In

14   order to return a verdict, it is necessary that each juror

15   agree.  Your verdict must be unanimous.

16         It is your duty as jurors to consult with one

17   another, if you can do so without violence to individual

18   judgment.  You must each decide the case for yourself, but

19   only after an impartial consideration of the evidence in the

20   case with your fellow jurors.  In the course of your

21   deliberations, do not hesitate to re-examine your own views

22   and change your opinion, if convinced it is erroneous, but do

23   not surrender your best conviction as to the weight or effect

24   of evidence solely because of the opinion of your fellow

25   jurors or for the mere purpose of returning a unanimous

1  verdict.

2          Upon retiring to the jury room, you will select one

3  of your number to act as a foreperson.  The foreperson will

4  preside over your deliberations and will be your spokesperson

5  here in court.  The verdict form has been prepared for your

6  convenience.  You will take this form together with my jury

7  instructions to the jury room.  Let me go over the verdict

8  form with you.

9          The first question asks:  Do you find by a

10  preponderance of the evidence that any of the following

11  defendants, acting under color of state law, violated the

12  constitutional rights of plaintiff Angel Martinez by applying

13  excessive force or by failing to protect him from the use of

14  excessive force, based upon the incident which occurred on

15  February 25th, 2003?  There are then listed five defendants,

16  Scott Thompson, Larry Sisco, Scott Meyers, Thomas Novak and

17  Donna Temple.  And your answer will be either yes or no, you

18  must consider each of those defendants separately.

19          If you answer no to all the defendants in question

20  number 1, then you will skip question number 2 and proceed to

21  question 3.  If, however, the answer to question number 1 as

22  to any of the defendants is yes, then you should proceed to

23  question number 2 with respect to any defendant who you

24  answered yes in question number 1.

25          And you will then be asked, and this is the

1    qualified immunity defense question:  For any defendant for

2    whom you answered yes in question number 1, do you find that

3    the defendant has proven by a preponderance of the evidence

4    that a reasonable prison employee in that defendant's

5    position would have believed his or her conduct was lawful in

6    that it did not violate any of plaintiff's clearly

7    established rights?  Again, yes, if you believe that the

8    defendant has proven entitlement to qualified immunity by

9    preponderance of the evidence; no if that defendant has not.

10   And again the same defendants are listed as in question

11   number 1.

12        Question number 3 is the excessive force and

13   failure to intervene claim regarding the March 5, 2003

14   incident.  The question is similar to question number 1, it

15   focuses on the three defendants named in that count, Raymond

16   Sipley, Michael Duvall and Roland LaBrague.  And the answer

17   is a yes if you find that the plaintiff has proven by a

18   preponderance of the evidence the claim against each such

19   defendant, and no if not.

20        If you answer no as to all three defendants, you

21   will skip to question 5.  With regard to any defendants who

22   you answer yes for question number 3, you will then proceed

23   to question number 4, which once again addresses the

24   affirmative defense of qualified immunity.  You will answer

25   yes if you find that the defendant you are considering has

1  proven entitlement to qualified immunity by a preponderance

2  of the evidence.

3       Five relates to the retaliation claim.  Do you find

4  by a preponderance of the evidence that any of the following

5  defendants, acting under color of law, violated the

6  constitutional rights of plaintiff Angel Martinez by

7  retaliating against him for his complaining or threatening to

8  complain regarding prison conditions, including staff

9  misconduct, either by issuing false misbehavior reports to

10  him or by using or permitting the use of excessive force

11  against him.  There are five defendants named, Scott

12  Thompson, Michael Duvall, Roland LaBrague, Donna Temple and

13  Raymond Sipley.  Yes indicates that the plaintiff has proven

14  a retaliation claim by a preponderance of the evidence

15  against that defendant; no means that he has not.

16       Six is the qualified immunity question regarding

17  the retaliation claim for any defendant with a yes answer in

18  question number 5, you must then answer question number 6.

19  Yes means you find that that defendant is entitled to

20  qualified immunity; no indicates that the defendant is not.

21  Once again, that is an affirmative defense, it must be proven

22  by the defendant by a preponderance of the evidence.

23       Seven:  Do you find by a preponderance of the

24  evidence that any of the following defendants, acting under

25  color of state law, subjected the defendant to malicious

1    prosecution?  The four defendants named in connection with

2    that cause of action are listed, and the answer is yes if you

3    find that the plaintiff has established that claim with

4    regard to the defendant under consideration; no if he has

5    not.

6            Eight is the qualified immunity defense question

7    with regard to any defendant with a yes answer in question

8    number 7.

9            Question number 9 is addressed to damages.  I tried

10   to break it down as simply as I could.  So for anyone that

11   you find liability and you find are not entitled to qualified

12   immunity, is essentially what this first part says, you must

13   then consider damages, and the question is:  What amount for

14   that defendant of actual or nominal damages, if any, do you

15   find were proximately caused by with that defendant's

16   deprivation of plaintiff's constitutional right?  I broke it

17   down, excessive force/failure to protect, and I listed I

18   think eight defendants on that claim.

19           Retaliation.  Now, retaliation, you may have picked

20   this up during the jury, charge is unique.  Retaliation, as

21   you recall, has two components.  On the -- if you find for

22   the plaintiff on a retaliation claim based on use of

23   excessive force or failure to protect, you can award

24   compensatory damages, including for mental anguish and

25   emotional distress, in an amount that you deem appropriate

1    based on my instructions.  If you find for any defendant that

2    that defendant is only liable for retaliation because he

3    issued a false misbehavior report, your answer to this

4    question must be either zero or one dollar.  On the false

5    misbehavior report retaliation claim you cannot award more

6    than one dollar.  And I explained that a little bit to you in

7    the jury charge, that's because the law says that there has

8    to be a physical injury associated with the claim in order to

9    award mental anguish and emotional distress damages.

10            Malicious prosecution is a similar situation, but

11    in that case the most you can award against any defendant is

12    one dollar.  You can award zero or one dollar if you find

13    liability against the four defendants, again because there

14    was no physical injury associated with that cause of action.

15            Ten is a yes/no question as to whether, consistent

16    with my instructions, for the basis of whether any of the

17    defendants should be subject to a punitive damage award.  If

18    so, as I charged you earlier, if you say yes, we will have a

19    further brief hearing where there may or may not be testimony

20    offered.  You will then be given an instruction as to how you

21    would calculate those and you will retire to deliberate over

22    that issue.

23            You will note that certain of the questions as I

24    I've gone over call for a yes or no answer while others call

25    for a numerical response.  The answer to each question,

1   whether it's yes, no or numerical, must be the unanimous

2   answer of the jury.  The foreperson will write the unanimous

3   answer of the jury in the space provide below each question.

4   One of those the foreperson will complete, it will be the

5   official verdict sheet for your jury.

6          It is important to add the caution that nothing

7   said in these instructions and nothing in any verdict form

8   prepared for your convenience is meant to suggest or convey

9   in any way, manner, shape or form any intimation as to what I

10  think your verdict should be.  What the verdict shall be is

11  the sole and exclusive duty and responsibility and province

12  of you; you, the jury.

13         If it becomes necessary during your deliberations

14  to communicates with the Court, you may send a note by the

15  bailiff, signed by the foreperson or by one of your members

16  of the jury.  No member of the jury should ever attempt to

17  communicate to the Court by means other than a signed

18  writing, and the Court will never communicate with any member

19  of the jury on any subject touching the merits of the case

20  other than in writing or orally here in open court.

21         You will note from the oath about to be taken by

22  the bailiffs that they too, as well as all other persons, are

23  forbidden to communicate in any way or manner with any member

24  of the jury on any subject touching the merits of the case.

25  Bear in mind also that you are never to reveal to any person,

1    not even to me, the Court, how the jury stands, numerically

2    or otherwise, on the questions before you until after you

3    have reached a unanimous verdict.

4              At this time I'm going to ask my courtroom deputy

5    if she will swear in the deputy marshals.

6              (The Deputy Marshals were duly sworn.)

7              THE COURT:  Members of the jury, I'm going to ask

8    you to retire to the jury room.  Do not begin your

9    deliberations until you're advised to do so by the bailiff

10   because we have some legal matters to discuss.  We will

11   confer among the three of us and make a decision as to what

12   exhibits should be sent in to you.  If there were any

13   exhibits that were received in evidence and not sent in to

14   you, kindly notify us in writing through the bailiff and we

15   will take that under advisement.

16             Probably around 5:00 if you've not arrived at a

17   verdict, we will consult with you to see what your pleasure

18   is, whether you want to continue deliberations or instead

19   adjourn until tomorrow morning and resume.  So keep that in

20   the back of your mind, we're not going to keep anyone here

21   until midnight against their will.  Good luck in your

22   deliberations.

23             (Jury out to begin deliberations at 3:35.)

24             THE COURT:  Counsel, other than what we've already

25   discussed, and placed on the record, are there any exceptions

781

1    or requests that you would like to make at this time?  The

2    plaintiff?

3             MR. MILLER:  No, Your Honor.

4             THE COURT:  The defendant?

5             MR. MULVEY:  No.  Thank you.

6             THE COURT:  All right.  Why don't you get together

7    with Shelly on the exhibits and you can tell them that they

8    can begin deliberations.

9             (Recess at 3:35.)

10            (Reconvene at 5:10.)

11            THE COURT:  I think what we'll do is bring in the

12   jury, see where they are, if they wish to deliberate further

13   or go home and start again tomorrow.

14            (Jury present.)

15            THE COURT:  Members of the jury, I know that you

16   have a great deal of information and testimony to digest and

17   that you have a difficult job going through the jury verdict

18   form and considering all of the evidence that you've heard

19   over these last four days, and so, as promised, I'm

20   reconvening you to see what your pleasure is, whether you

21   would like to stay and deliberate further this evening or

22   instead resume tomorrow morning.  Have you got kind of a

23   consensus on that?

24            FOREPERSON:  Yes, we do.  And we would like to come

25   back tomorrow morning.

782

1          THE COURT:  What time would you like to start?
2     It's completely up to you.  9:00, or if you would like to
3     start earlier.
4          FOREPERSON:  It's been requested that we come in at
5     8:30, if that works for the Court.
6          JUROR:  As soon as possible; 8:00, please.
7          THE COURT:  That's fine.  You can go right in the
8     jury room, once you're all present, not before, once you're
9     all present you can continue deliberating, we're not going to
10    have any formality in the morning, no morning prayer.  Thank
11    you for your efforts.  I hope you all have a good evening.
12          (Court adjourned at 5:10.)
13                *             *             *
14
15
16
17
18
19
20
21
22
23
24
25

1

2                        C E R T I F I C A T I O N

3

4

5                    I, EILEEN T. MCDONOUGH, RPR, CRR, Official

6      Court Reporter in and for the United States District Court,

7      Northern District of New York, DO HEREBY CERTIFY that I

8      attended the foregoing proceedings, took stenographic notes

9      of the same, and that the foregoing is a true and correct

10     transcript thereof.

11

12

13

14

15

16

17

18                              _____

19                              EILEEN MCDONOUGH, RPR, CRR
                                Official U.S. Court Reporter
20

21

22

23

24

25